# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LYDIA OLSON, et al.,

*Appellants,*

v.

STATE OF CALIFORNIA, et al.,

*Appellees.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:19-cv-10956-DMG-RAO | Hon. Dolly M. Gee

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Theane Evangelis
Blaine H. Evanson
Heather L. Richardson
Dhananjay S. Manthripragada
Alexander N. Harris
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520
tevangelis@gibsondunn.com

*Attorneys for Appellants Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1, the undersigned counsel of record certifies that Uber Technologies, Inc. is the parent corporation of Postmates, LLC f/k/a Postmates Inc. Uber Technologies, Inc. is a publicly held corporation.

Dated: November 17, 2021

/s/ Theane Evangelis
Theane Evangelis
Blaine H. Evanson
Heather L. Richardson
Dhananjay S. Manthripragada
Alexander N. Harris

*Attorneys for Appellants Lydia Olson, Miguel Perez, Postmates Inc., and Uber Technologies, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF THE ISSUES...........................................................3

STATUTORY AND REGULATORY AUTHORITIES .........................4

STATEMENT OF FACTS ....................................................................4

    I.     The California Legislature Enacts Assembly Bill 5............................4

          A.    AB5 Expands the ABC Test for Some Occupations, and Rolls It Back Entirely for Many Others.....................................6

          B.    AB5's Sponsors Target Network Companies............................8

    II.    Plaintiffs Move for a Preliminary Injunction .....................................10

    III.   AB2257 Rolls Back the ABC Test for Millions More California Workers ....................................................................................13

    IV.   The People Resoundingly Reject AB5's and AB2257's Disparate Treatment of Plaintiffs by Passing Proposition 22 .............15

    V.    The District Court Dismisses the Case.................................................17

    VI.   The Preliminary Injunction Merges into the Final Judgment .............20

STANDARD OF REVIEW ...................................................................20

ARGUMENT ........................................................................................21

    I.     AB5, as Amended by AB2257, Violates the Equal Protection Clause ........................................................................................21

          A.    AB5 Does Not Rationally Relate to a Legitimate Government Interest................................................................22

                1.    AB5 Creates Unreasonable and Arbitrary Distinctions Between Similarly Situated Workers.........22

2.  The District Court's Disregard for Plaintiffs' Well-Pleaded Factual Allegations Was Reversible Error .......25

3.  The Distinctions Drawn in AB5 and AB2257 Are Irrational ........................................................................27

4.  AB5 and AB2257 Contradict the Government's Stated Interest ..................................................................32

B.  AB5 Singles out Network Companies for Unconstitutionally Disfavored Treatment ................................34

II.  Forced Reclassification Would Irrationally Deprive Plaintiffs of the Right to Pursue Their Chosen Occupation ....................................39

III.  Enforcement of AB5 Would Unconstitutionally Impair Plaintiffs' Contracts................................................................43

A.  Forced Reclassification Would Severely Impair Plaintiffs' Contractual Relationship............................................44

B.  The District Court Failed to Engage in a Searching Review of the Worker-Classification Scheme's Purpose and Its Necessity and Reasonableness ......................................47

IV.  Plaintiffs Sufficiently Alleged AB5, as Amended by AB2257, Is a Bill of Attainder ..........................................................50

A.  AB5 and AB2257 Impermissibly Target Network Companies................................................................51

B.  AB5 Punishes Network Companies..........................................54

V.  The Same Errors Require Reversal of the Denial of the Preliminary Injunction ..........................................................58

CONCLUSION ................................................................................61

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978).................................................................43, 45, 47

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ...............................................59

*American Society of Journalists & Authors, Inc. v. Bonta*,
15 F.4th 954 (9th Cir. 2021) ..................................................37

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021) ................................................26

*Ass'n of L.A. City Attorneys v. City of Los Angeles*,
2012 WL 12887541 (C.D. Cal. Nov. 20, 2012)......................50

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................20

*United States v. Brown*,
381 U.S. 437 (1965)...............................................................56

*Brown v. New York*,
975 F. Supp. 2d 209 (N.D.N.Y. 2013)...................................49

*Castellanos v. State*,
2021 WL 3730951 (Cal. Super. Aug. 20, 2021)....................16

*Christopher Lake Dev. Co. v. St. Louis County*,
35 F.3d 1269 (8th Cir. 1994) .................................................34

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..........................................................22, 31

*Clayton v. Steinagel*,
885 F. Supp. 2d 1212 (D. Utah 2012)....................................41

*Communist Party of the U.S. v. Subversive Activities Control Bd.*,
367 U.S. 1 (1961)...................................................................54

iv

# TABLE OF AUTHORITIES (*continued*)

*Conn v. Gabbert*,
526 U.S. 286 (1999) ..................................................................... 39

*Consol. Edison Co. of N.Y. v. Pataki*,
292 F.3d 338 (2d Cir. 2002) ..................................................... 55, 57

*Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. State of Washington*,
696 F.2d 692 (9th Cir. 1983) ................................................... 43, 46

*Cornwell v. Hamilton*,
80 F. Supp. 2d 1101 (S.D. Cal. 1999) ...................................... 40, 41

*Craigmiles v. Giles*,
312 F.3d 220 (6th Cir. 2002) ................................................... 42, 43

*Darsey v. Wag Labs, Inc.*,
No. 2:17-cv-07014 (C.D. Cal. Sept. 22, 2017) .............................. 25

*Davis v. Weir*,
497 F.2d 139 (5th Cir. 1974) ......................................................... 32

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
920 F.2d 1496 (9th Cir. 1990) ...................................................... 34

*Desert Citizens Against Pollution v. Bisson*,
231 F.3d 1172 (9th Cir. 2000) ...................................................... 58

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles*,
4 Cal. 5th 903 (2018) ................................................................. 5, 33

*Equip. Mfrs. Inst. v. Janklow*,
300 F.3d 842 (8th Cir. 2002) ........................................................ 48

*In re Eric J.*,
25 Cal. 3d 522 (1979) .................................................................. 22

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
880 F.3d 450 (9th Cir. 2018) ........................................................ 22

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) ................................................................35

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
654 F.3d 989 (9th Cir. 2011) ...................................................21

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) ...........................................51, 55, 57, 58

*Fowler Packing Co., Inc. v. Lanier*,
844 F.3d 809 (9th Cir. 2016) ..............................................38, 55, 56

*Garcia v. Border Transp. Grp., LLC*,
28 Cal. App. 5th 558 (2018) ...................................................41

*Garris v. Hanover Ins. Co.*,
630 F.2d 1001 (4th Cir. 1980) ...........................................43, 48, 49

*HSH, Inc. v. City of El Cajon*,
44 F. Supp. 3d 996 (S.D. Cal. 2014)........................................26

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019)......................................................26

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
909 F.3d 446 (D.C. Cir. 2018) ................................................57

*Kendall-Jackson Winery, Ltd. v. Branson*,
82 F. Supp. 2d 844 (N.D. Ill. 2000) ........................................48

*Kenna v. U.S. Dist. Ct. for C.D.Cal.*,
435 F.3d 1011 (9th Cir. 2006) ................................................35

*Kim v. Reins Int'l Cal., Inc.*,
459 P.3d 1123 (Cal. 2020) ......................................................55

*In re LaFortune*,
652 F.2d 842 (9th Cir. 1981) ...............................................48, 49

Page(s)

*Legislature v. Eu,*
816 P.2d 1309 (Cal. 1991) .................................................................56

*Local 101 of the Am. Fed'n of State, Cnty. & Mun. Emps. v. Brown,*
2015 WL 5316296 (N.D. Cal. Sept. 11, 2015) .......................................45

*Matsuda v. City of Honolulu,*
512 F.3d 1148 (9th Cir. 2008) .............................................................44

*McDonald's Corp. v. Nelson,*
822 F. Supp. 597 (S.D. Iowa 1993) ......................................................48

*Merrifield v. Lockyer,*
547 F.3d 978 (9th Cir. 2008) ................................... 22, 23, 31, 32, 33, 37

*Metro. Life Ins. Co. v. Ward,*
470 U.S. 869 (1985) ............................................................................38

*Nationwide Biweekly Admin., Inc. v. Owen,*
873 F.3d 716 (9th Cir. 2017) ...............................................................58

*New Directions Treatment Servs. v. City of Reading,*
490 F.3d 293 (3d Cir. 2007) .................................................................36

*Newcal Indus., Inc. v. Ikon Office Sol.,*
513 F.3d 1038 (9th Cir. 2008) .............................................................20

*News Am. Publ'g, Inc. v. FCC,*
844 F.2d 800 (D.C. Cir. 1988) .............................................................34

*Nixon v. Adm'r of Gen. Servs.,*
433 U.S. 425 (1977) ......................................................................56, 57

*O'Neal v. City of Seattle,*
66 F.3d 1064 (9th Cir. 1995) ...............................................................32

*OSU Student All. v. Ray,*
699 F.3d 1053 (9th Cir. 2012) .............................................................40

*Parr v. Mun. Ct.*,
3 Cal. 3d 861 (1971) ........................................................................31, 36

*PDK Labs Inc. v. Ashcroft*,
338 F. Supp. 2d 1 (D.D.C. 2004) ...........................................................39

*People v. Grant*,
973 P.2d 72 (Cal. 1999) .........................................................................50

*People v. Super. Ct. of L.A. Cty.*,
57 Cal. App. 5th 619 (2020) ..................................................................41

*People v. Uber Techs., Inc.*,
2020 WL 5440308 (Cal. Super. Ct. Aug. 10, 2020)...............................54

*People v. Uber Techs., Inc.*,
56 Cal. App. 5th 266 (2020) .....................................................16, 37, 54

*Reynolds v. Quiros*,
990 F.3d 286 (2d Cir. 2021).................................................................51

*Rinaldi v. Yeager*,
384 U.S. 305 (1966).......................................................................22, 31

*Ross v. City of Berkeley*,
655 F. Supp. 820 (N.D. Cal. 1987)......................................44, 47, 48, 49

*S. Cal. Gas Co. v. City of Santa Ana*,
336 F.3d 885 (9th Cir. 2003) .................................................................49

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
48 Cal.3d 341 (1989) ...............................................................................5

*Sacramento Cty. Retired Emps. Ass'n v. County of Sacramento*,
2012 WL 1082807 (E.D. Cal. Mar. 31, 2012).......................................27

*San Diego Police Officers' Ass'n v. Aguirre*,
No. 05-CV-1581, 2005 WL 3180000 (S.D. Cal. Nov. 5, 2005)..............44

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*Sateriale v. R.J. Reynolds Tobacco Co.*,
697 F.3d 777 (9th Cir. 2012) ...............................................20

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*,
309 F.3d 662 (9th Cir. 2002) ...........................50, 51, 53, 56

*Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*,
468 U.S. 841 (1984) ..........................................................54, 55

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) ...............................................23

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ............................................20

*Treigle v. Acme Homestead Ass'n*,
297 U.S. 189 (1936) ..............................................................49

*Trister v. Univ. of Miss.*,
420 F.2d 499 (5th Cir. 1969) .........................................23, 31

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ..........................................................22, 34

*U.S. Tr. Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) ..................................................................55

*Univ. of Hawai'i Pro. Assembly v. Cayetano*,
183 F.3d 1096 (9th Cir. 1999) ............................................49

*Valle Del Sol Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013) ...............................................21

*W. States Trucking Ass'n v. Schoorl*,
377 F. Supp. 3d 1056 (E.D. Cal. 2019) ..............................41

*In re Workers' Compensation Refund*,
46 F.3d 813 (8th Cir. 1995) .................................................48

*Wynn v. N.Y.C. Hous. Auth.*,
2015 WL 4578684 (S.D.N.Y. July 29, 2015) .......................................................26

**STATUTES**

AB 5, 2019–20 Reg. Sess. (Cal. 2019) ....................................................4, 5, 7, 32

AB 2257, 2019–20 Reg. Sess. (Cal. 2020) ...........................................................14

Cal. Bus. & Prof. Code § 7451 ....................................................................15, 16

Cal. Bus. & Prof. Code § 7453 ...........................................................................16

Cal. Bus. & Prof. Code § 7463 .............................................................................8

Cal. Lab. Code § 225 ............................................................................................6

Cal. Lab. Code § 226.6 .........................................................................................6

Cal. Lab. Code § 227 ............................................................................................6

Cal. Lab. Code § 553 ............................................................................................6

Cal. Lab. Code § 1199 ..........................................................................................6

Cal. Lab. Code § 2775 ..........................................................................................6

Cal. Lab. Code § 2776 ........................................................................................13

Cal. Lab. Code § 2777 .............................................................13, 14, 28, 30, 35

Cal. Lab. Code § 2778 ........................................................................................13

Cal. Lab. Code § 2779 ..................................................................................13, 14

Cal. Lab. Code § 2780 ........................................................................................13

Cal. Lab. Code § 2781 ..................................................................................28, 30

Cal. Lab. Code § 2782 ........................................................................................13

Page(s)

Cal. Lab. Code § 2783 ...........................................................................13, 28

Cal. Lab. Code § 2785 ........................................................................53

Cal. Lab. Code § 2786 ..........................................................................6

Cal. Unemp. Ins. Code § 976 ...............................................................6

Cal. Unemp. Ins. Code § 977 ...............................................................6

Cal. Unemp. Ins. Code § 1088.5 ..........................................................6

Cal. Unemp. Ins. Code § 1112 ..............................................................6

Cal. Unemp. Ins. Code § 1126.1 ..........................................................6

Cal. Unemp. Ins. Code § 13020 ...........................................................6

Cal. Unemp. Ins. Code § 13021 ...........................................................6

## CONSTITUTIONAL PROVISIONS

Cal. Const. art. I, § 9 .........................................................................43

U.S. Const. art. I, § 10.......................................................................43

## OTHER AUTHORITIES

Alex Padilla, *Statement of Vote*, *General Election November 3, 2020*,
available at https://tinyurl.com/d7a4aku9 ............................................15

Assemb. Comm. on Lab. & Emp., 2019–20 Reg. Sess. (Cal. July 5, 2019) ...........30

Cal. Emp't Dev. Dep't, *Penalty Reference Chart* (2018), available at
https://tinyurl.com/bms7eb6a...............................................................6

Lorena Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them*,
Wash. Post. (Sept. 11, 2019), available at https://tinyurl.com/whrx6j4f.................52

Sen. Comm. on Lab., Public Emp., & Ret., 2019–20 Reg. Sess. (Cal. July 8, 2019),
available at https://tinyurl.com/jzw3f3xw .............................................5

## TABLE OF AUTHORITIES (*continued*)

Page(s)

Xavier Becerra, Press Release (May 5, 2020), available at
https://tinyurl.com/5x29catj .....................................................................10

**INTRODUCTION**

California's worker-classification scheme is irrational and unconstitutional. The law's patchwork of exemptions treats similarly situated individuals and professions disparately, and affirmatively *rolls back* protections for some workers in order to disfavor Plaintiffs and others who use technology platforms like Uber and Postmates for certain types of referrals. The district court dismissed Plaintiffs' challenge to California Assembly Bill 5 ("AB5"), but in doing so failed to apply the proper standard of scrutiny, ignoring the well-pleaded factual allegations in the complaint and impermissibly drawing inferences *against* Plaintiffs.

For instance, on Plaintiffs' equal protection claim, the complaint pleads specific facts plausibly showing that AB5's litany of irrational exemptions creates arbitrary distinctions among similarly situated workers, and those exemptions contradict, and do not rationally relate to, the government's stated interests. The complaint shows that the statute's *real* purpose is to target and eliminate prominent network companies like Uber and Postmates that are used by app-based drivers, which is an unconstitutionally illegitimate purpose.

If there were any doubt about the irrational classifications created by AB5, the California legislature removed it by passing Assembly Bill 2257 ("AB2257"), which dramatically expanded the referral agency exemption to include any service provider using a referral agency in any industry *except Plaintiffs'*. The complaint's detailed

factual allegations show that Plaintiffs are materially identical to the litany of exempted referral agencies. The legislature's gerrymandering serves no other purpose than—as AB5's and AB2257's lead sponsor, Assemblymember Lorena Gonzalez, admitted in a committee hearing—to preclude "*Uber* [from] just say[ing]" it falls within an exemption.

The complaint explains how AB5 is unconstitutional for several additional reasons as well. Plaintiffs alleged that forcing these app-based drivers into an employment relationship under AB5 would completely deprive them of their right to work as independent business owners. Plaintiffs adequately alleged that AB5 would severely impair thousands of on-demand economy contracts without the justification the Contracts Clause demands. And Plaintiffs pleaded that the Legislature's targeting of network companies and the drivers who use their platforms constitutes an impermissible bill of attainder. All of these claims were supported with detailed factual allegations.

The district court's order dismissing Plaintiffs' complaint disregarded Plaintiffs' well-pleaded factual allegations. The facts as pleaded state a viable claim that AB5, especially as amended by AB2257, violates the Equal Protection, Due Process, Contracts, and Bill of Attainder Clauses of the U.S. and California Constitutions. The district court erred in dismissing the complaint, and because the

same legal errors underlie its ruling denying a preliminary injunction, the Court should reverse both decisions.

## STATEMENT OF JURISDICTION

The district court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. The court denied Plaintiffs' motion for a preliminary injunction on February 10, 2020 (1-ER-017–40), and Plaintiffs timely appealed from that decision on March 10, 2020 (4-ER-695–97). The court subsequently granted Defendant's motion to dismiss, with prejudice, on July 16, 2021 (1-ER-002–16), entering judgment the same day (2-ER-042–43). Plaintiffs again filed a timely notice of appeal on July 19, 2021. 4-ER-698–700. This Court consolidated the two appeals (Dkt. 10 at 3), and has jurisdiction under 28 U.S.C. §§ 1291, 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether, construing the complaint in the light most favorable to Plaintiffs, Plaintiffs stated claims that AB5 (as amended by AB2257) violates the Equal Protection, Due Process, Contracts, and Bill of Attainder Clauses?

2. Whether Plaintiffs raised serious questions regarding the constitutionality of AB5 and showed that AB5's enforcement may cause them irreparable injury, such that the district court abused its discretion in denying them a preliminary injunction?

## STATUTORY AND REGULATORY AUTHORITIES

Relevant constitutional, statutory, and regulatory authorities appear in the addendum to this brief.

## STATEMENT OF FACTS

## I. The California Legislature Enacts Assembly Bill 5

A group of California legislators designed AB5 as a means to force independent service providers in the on-demand economy into traditional "employer-employee" relationships.[1]  AB5 purports to "codify the decision of the California Supreme Court" (AB5 § 1(d)) in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018), which adopted a three-factor "ABC test" to determine whether an employer has properly classified a worker as an independent contractor (rather than an employee) for purposes of the California Industrial Welfare Commission's wage orders.  The ABC test presumes a worker is

---

[1] *See* 2-ER-062 (SAC ¶ 56) (one of AB5's sponsors calling for enforcement against network companies); 2-ER-080 (SAC ¶ 85) (AB5's sponsor "open to changes in the bill next year, including an exemption for musicians—but not for app-based ride-hailing and delivery giants" like Plaintiffs); 2-ER-085 (SAC ¶ 94 n.63) ("AB5 takes direct aim at ride-share services Uber Technologies Inc. and Lyft Inc."); *id.* ("While [AB5] does not actually say it, it is clearly aimed at modern companies like Uber and Lyft—and increasingly more businesses in the sharing economy space."); *id.* ("A.B. 5's primary target is gig employers like ridesharing apps Uber and Lyft, whose drivers are classified as contract workers, not employees.").

an employee and requires the hiring entity to rebut this presumption by establishing each of three elements:

A. The individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact;

B. The service is performed outside the usual course of the business of the employer; and

C. The individual is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the service performed.

4 Cal. 5th at 916–17. Before *Dynamex*, courts adjudicating wage-order claims applied the alternative "control-of-the-work" test from *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (1989), which uses a multi-factor balancing analysis—where no one factor is dispositive—to determine whether a worker is an employee or an independent contractor. *Id.* at 354–55.

AB5's sponsors were highly critical of *Borello*. AB5's statement of purpose asserts that "potentially several million workers" have been denied "basic workplace rights" under *Borello*. AB5, 2019–2020 Reg. Sess., § 1(e) (Cal. 2019). A July 2019 Senate committee report claimed that workers subject to *Borello* "remain in the messy muddle of a failed employment test that met the needs of neither employers nor workers." Sen. Comm. on Lab., Public Emp., & Ret., AB5, 2019–20 Reg. Sess., at 8 (Cal. July 8, 2019) ("Sen. Rep."), available at https://tinyurl.com/jzw3f3xw. The view of AB5's lead author and most vocal sponsor, Assemblymember Lorena

Gonzalez, is that *Borello* "was weighted heavily against … trying to prove misclassification." 2-ER-124 (SAC ¶ 220).

### A. AB5 Expands the ABC Test for Some Occupations, and Rolls It Back Entirely for Many Others

AB5 extends the *Dynamex* ABC test from just wage-order claims to the entirety of the California Labor Code *and* the California Unemployment Insurance Code (Cal. Lab. Code § 2775(b)(1)), thereby purportedly making thousands of former independent contractors into employees *for all purposes* of California law overnight. *See*, *e.g.*, Cal. Unemp. Ins. Code §§ 976, 977, 13020, 13021. AB5 extends numerous civil and criminal penalty provisions to businesses who fail to comply with these lengthy requirements. *See*, *e.g.*, Cal. Labor Code §§ 225, 226.6, 227, 553, 1199; Cal. Unemp. Ins. Code §§ 1088.5(e), 1112(a), 1126.1; *see also generally* Cal. Emp't Dev. Dep't, *Penalty Reference Chart* (2018), available at https://tinyurl.com/bms7eb6a. And AB5 authorizes the California Attorney General and various local officials to bring an enforcement action for injunctive relief "to prevent the continued misclassification of employees as independent contractors." Cal. Labor Code § 2786.

But AB5 exempts a whole host of occupations from the ABC test. And for the exempted occupations, AB5 does not simply preserve the status quo; the statute *rolls back* existing law (*Dynamex*), and reinstates the very *Borello* test decried by AB5's sponsors.

An initial set of exemptions grew out of the July 8, 2019 report from the Senate Committee on Labor, Public Employment, and Retirement. This report articulated four factors for determining whether an industry should be exempted: (1) market strength, (2) rate setting, (3) relationship between contractor and client, and (4) "technological neutrality." Sen. Rep. at 8–12. At that time, the exemptions in the bill included professional occupations such as lawyers, physicians, surgeons, dentists, and accountants. *See* AB5, 2019–20 Reg. Sess. (Cal. 2019) (as amended in Senate, July 11, 2019).

But as the bill progressed through the legislature, *dozens* of additional exemptions were added that were in no way related to these factors—or any others. The lobbying became so overt that, at the urging of Assemblymember Gonzalez and her staff, the California Labor Federation circulated a one-page form that business groups could complete to request an exemption from the statute. 2-ER-042 (SAC ¶ 83). As one journalist explained, "How do you qualify for an exemption? Answer: pressure and persistence. Better also hire a lobbyist. And, of course, it helps to be a political supporter." 2-ER-115 (SAC ¶ 189 n.98).

The final version of the statute exempted millions of workers, spanning all sorts of vocations, skill levels, income, education, and sophistication, and bearing no relation to the Senate Committee's standards or any other objective indication of

rationality.[2]  And to make AB5 more palatable, the legislature added yet another, last-minute exemption for the newspaper industry.  Assemblymember Gonzalez admitted that she "had no other choice" but to add this exemption "as a condition of AB5's passage."  2-ER-076 (SAC ¶ 81).

### B.    AB5's Sponsors Target Network Companies

Network companies, like Plaintiffs Uber and Postmates, maintain apps that help independent providers offer on-demand delivery or transportation services.  *See* Cal. Bus. & Prof. Code § 7463(l).  The complaint pleads dozens of public statements by the sponsors of AB5 explicitly and deliberately targeting network companies like Plaintiffs, and acknowledging that the patchwork of exemptions was included in the bill solely to obtain the necessary political support to punish these network companies.

---

[2]  The exempted professions included: direct sellers, commercial fisherman working on American vessels, private investigators, newspaper cartoonists, estheticians, electrologists, manicurists, barbers, cosmetologists, real estate licensees, repossession agencies, business service providers, construction contractors and subcontractors, photographers, tutors, event planners, minor home repairers, movers, home cleaners, errand runners, furniture assemblers, providers of "animal services," marketers, human resources administrators, travel agents, graphic designers, grant writers, fine artists, licensed agents practicing before the IRS, payment processing agents, still photographers, freelance writers, editors, dog walkers, dog groomers, web designers, picture hangers, pool cleaners, yard cleaners, and persons providing services to motor clubs.

Network companies offered multiple proposals to address the legislature's stated concern of ensuring wages, benefits, and protections for independent service providers, but the legislature rejected them out of hand. 2-ER-117–118 (SAC ¶¶ 194–95). After AB5 passed, Assemblymember Gonzalez tweeted that she had "fought so hard for #AB5 with no gig carve-outs." 2-ER-082 (SAC ¶ 89). And she has since made clear that although she is open to considering further exemptions, network companies will never be exempted by any such "fix." 2-ER-091 (SAC ¶ 110).

During the debates and passage of AB5, the statute's sponsors accused network companies of engaging in "wage theft," "skirt[ing] labor laws," and "exploit[ing] working people" (2-ER-078–79 (SAC ¶ 85)) (Assemblymember Gonzalez); stated that Uber's Chief Legal Counsel is "full of sh*t" (Assemblymember Gonzalez) (2-ER-079 (SAC ¶ 85)); claimed that "the gig economy is … a continuation of hundreds of years of corporations trying to screw over workers," calling the gig economy "f—g feudalism all over again" (2-ER-050, 2-ER-080 (SAC ¶¶ 13, 86)) (Assembly Speaker Rendon); and stated that, "just because your employer uses a smartphone app, doesn't mean they should be able to misclassify you as an independent contractor" (2-ER-081 (SAC ¶ 86)) (Assemblymember Wicks). This is just a sampling. *See also* 2-ER-078–82 (SAC ¶¶ 84–88).

Assemblymember Gonzalez publicly "ask[ed] the 4 big City Attorneys offices to file for injunctive relief on 1/1/20" against network companies. 2-ER-062 (SAC ¶ 56). Defendant Attorney General Xavier Becerra—joined by the city attorneys of San Francisco, Los Angeles, and San Diego—heeded the call and "sue[d] Uber and Lyft for misclassifying their drivers as independent contractors," "[p]ursuant to authority codified by Assembly Bill 5." Xavier Becerra, Press Release (May 5, 2020), available at https://tinyurl.com/5x29catj.

## II. Plaintiffs Move for a Preliminary Injunction

Plaintiffs filed a complaint on December 30, 2019, alleging violations of the Equal Protection, Due Process, and Contracts Clauses of the United States and California Constitutions. 4-ER-646–94. Plaintiffs immediately moved for a preliminary injunction. 4-ER-708 (D.Ct. ECF # 14).

Individual Plaintiffs Lydia Olson and Miguel Perez are independent business owners who wish to remain independent. Ms. Olson is a driver who uses the Uber platform to get leads for passenger requests for transportation in the Sacramento and San Francisco areas. 2-ER-053 (SAC ¶ 21). Mr. Perez is an independent courier who uses the Postmates (now Uber Eats) platform to get leads for delivery requests in the Los Angeles area. *Id.* (SAC ¶ 22). Unrebutted declarations from Ms. Olson, Mr. Perez, and representatives from Postmates and Uber detailed the irreparable injuries they are now suffering and would suffer absent an injunction. 3-ER-478–

89.  And economist Justin McCrary submitted an expert declaration explaining the harms to network companies and consumers that would flow from enforcement of AB5.  4-ER-589–632.  The government submitted no competing evidence.

Ms. Olson and Mr. Perez testified in their declarations that they dread AB5's threat to their businesses and livelihoods and are already suffering the consequences of the uncertainty AB5 creates.  3-ER-478–89.  Representatives from Postmates and Uber explained that, if forced to reclassify independent service providers as employees, the companies would need to restructure their entire business models in a way that would undermine their on-demand technology.  3-ER-499–505, 3-ER-533–35.  For instance, forced reclassification would require these technology companies to construct from the ground up a management and human resources infrastructure capable of managing thousands of drivers and delivery persons.  3-ER-534–35, 3-ER-501.  They and Dr. McCrary also explained how an employer-employee regime is incompatible with the companies' on-demand algorithms that rely on flexibility to match supply and demand in real time.  3-ER-530, 3-ER-532, 3-ER-534, 3-ER-501–02, 4-ER-600–01, 4-ER-610–15.

Dr. McCrary also detailed how forced reclassification would deprive the thousands of members of the public of their ability to work in the on-demand economy, eliminate a critical source of independent income, and curtail the flexibility and autonomy they value heavily.  4-ER-605, 4-ER-610–14.  He cataloged

numerous harms forced reclassification would cause the public, including increased costs passed on to consumers and businesses, a lower number of products and services available to the public, and the various injuries network companies would suffer, including to their technology. 4-ER-600–01, 4-ER-605–10. All this evidence was undisputed.

The district court nonetheless denied Plaintiffs' motion for a preliminary injunction, concluding Plaintiffs failed to show "serious questions exist[ed] as to Plaintiffs' likelihood of success on the merits." 1-ER-029–34.

The district court determined Plaintiffs established "some measure of irreparable harm stemming from threatened municipal enforcement actions." 1-ER-036. But the court reasoned that, because Uber and Postmates "insist that the ABC test would not affect their drivers' employment statuses, any irreparable injury [to them] based on a costly business restructuring process and unrecoverable expenditures," and any irreparable injury to Ms. Olson and Mr. Perez based on a loss of "customer goodwill, freedom, financial stability, and work satisfaction," is merely "speculative." 1-ER-035–36.

The court also concluded that "the balance of equities and the public interest weigh against the issuance of injunctive relief." 1-ER-040.

### III. AB2257 Rolls Back the ABC Test for Millions More California Workers

On September 4, 2020, the legislature adopted AB2257, which added dozens

of additional exemptions,[3] rolling back the ABC test for millions more California

---

[3] The additional exemptions, added on top of the exemptions from AB5, include: recording artists; songwriters; lyricists; composers; proofers; managers of recording artists; record producers and directors; musical engineers and mixers; musicians engaged in the creation of sound recordings; vocalists; photographers working on recording photo shoots, album covers, and other press and publicity purposes; independent radio promoters; any other individual engaged to render any creative, production, marketing, or independent music publicist services related primarily to the creation, marketing, promotion, or distribution of sound recordings or musical compositions; musicians or musical groups participating in single-engagement live performance events; individual performance artists; individuals who provide feedback to data aggregators; two contracting individuals acting as sole proprietors or separate business entities providing services at the location of a single engagement event; people who provide underwriting inspections, premium audits, risk management, or loss control work for the insurance and financial service industries; licensed landscape architects; manufactured housing salespeople; people working for foreign exchange programs; amateur umpires, referees, and other competition judges; videographers and photo editors; photographers, photojournalists, videographers, and photo editors when providing content to a digital content aggregator; translators, copy editors, and illustrators; content contributors, advisors, producers, narrators, and cartographers who provide services for journals, books, periodicals, evaluations, or other publications, or for educational, academic, or instructional works in any format or media; "master class" teachers; appraisers; registered, licensed professional foresters; home inspectors; contracts between businesses and public agencies and businesses and quasi-public corporations, tutors who don't develop their own curriculum, web designers, consultants, youth sports coaches, caddies, wedding planners, wedding and event vendors, and interpreters. *See* Cal. Lab. Code §§ 2776(a), 2777(b)(5) & (b)(2)(B), 2778(b)(2), 2779, 2780, 2782(a), 2783.

workers.  *See* AB2257 §§ 1, 2.  And AB2257 removed any pretense that the legislature was targeting network companies.

AB2257 dramatically expanded the referral agency exemption to include *any and all* referral agencies and service providers that meet certain requirements—*except* "delivery, courier, [or] transportation" services.  *Id.* § 2777(b)(2)(B) ("Under this paragraph, referrals for services shall include, *but are not limited to* …." (emphasis added)); §§ 2777(b)(2)(C), 2779(c) (referrals for services "do not include" "delivery, courier, [or] transportation" services, even if those occupations meet the same requirements).  This language was added specifically to exclude companies like Uber and Postmates, after the district court denied a preliminary injunction because "[f]ood delivery for Uber Eats and Postmates would likely fall under" the referral exemption for "[people who run] errands."  2-ER-197 (Prelim. Inj. Hr'g Tr. at 9:5–7); *see also* Cal. Lab. Code § 2777(b)(2)(B) ("referrals for services shall include … errands").

*All* of the millions of workers exempted under AB5 and AB2257 are no longer governed by the stricter *Dynamex* standard and are now subject to the *Borello* standard—the same standard AB5's sponsors claim is insufficient to protect workers.

**IV. The People Resoundingly Reject AB5's and AB2257's Disparate Treatment of Plaintiffs by Passing Proposition 22**

On November 3, 2020, the People of California decisively approved Prop 22, repudiating AB5's and AB2257's disparate treatment of Plaintiffs. The Proposition passed by an overwhelming margin of 58.6% percent to 41.4%. Alex Padilla, *Statement of Vote*, *General Election November 3, 2020* 14, available at https://tinyurl.com/d7a4aku9.

Prop 22 classifies service providers who use rideshare and delivery apps to find leads, like Ms. Olson and Mr. Perez, as independent contractors. Specifically, it provides that "[n]otwithstanding any other provision of law"—including AB5 and AB2257—"an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company" as long as four conditions are met: (1) the network company "does not unilaterally prescribe" when drivers "must be logged into the" app; (2) it "does not require the app-based driver to accept any specific rideshare service … request"; (3) it "does not restrict the app-based driver from performing rideshare services" using other apps; and (4) it "does not restrict the app-based driver from working in any other lawful occupation or business." Cal. Bus. & Prof. Code § 7451.

Prop 22 also gives app-based drivers a wide range of benefits and protections not available under current law. These include minimum compensation levels, insurance to cover on-the-job injuries, automobile accident insurance, health care

subsidies for qualifying drivers, protection against harassment and discrimination, and mandatory contractual rights and appeal processes. *Id.* §§ 7451, 7453–57.

Despite the People's expressed intent that app-based drivers be independent contractors, Defendant and other State officials are continuing to enforce the now-superseded AB5 and AB2257 against Plaintiff Uber.  For instance, Defendant obtained an injunction against Uber that, one week after the voters approved Prop 22, the California Court of Appeal affirmed—even after recounting evidence of various harms to Uber, drivers, and the public, and despite its assumption that "the harm to defendants could fairly be considered grave or irreparable." *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 302–03, 306–07 & n.20 (2020).[4]  The Attorney General and California's Division of Labor Standards Enforcement are continuing to enforce AB5 and AB2257 against Uber, seeking relief based on alleged violations of these statutes.  *See People v. Uber Techs., Inc.*, No. CGC-20-584402 (Cal. Super. Ct.).

Even though AB5 and AB2257 have been superseded, Plaintiffs are forced to maintain this action to protect themselves against Defendant's continued enforcement of these unconstitutional laws.  As the Attorney General agreed in the

---

[4]  In addition, a California trial court has ruled that Prop 22 violates the state constitution. *See Castellanos v. State*, 2021 WL 3730951, at *5 (Cal. Super. Aug. 20, 2021), *on appeal*, No. A163655 (Cal. Ct. App.).

preliminary injunction appeal, the constitutionality of these statutes is a live issue because of the pending enforcement actions. *See* Joint Supplemental Brief (No. 20-55267) at 1–3, 5–7.

## V.     The District Court Dismisses the Case

On March 5, 2020, Plaintiffs filed an amended complaint alleging that AB5 violates the Equal Protection, Due Process, and Contracts Clauses of the United States and California Constitutions.  2-ER-223–89.  On September 18, 2020, the district court dismissed the complaint with leave to amend as to those claims.  2-ER-133–148.  Plaintiffs filed a Second Amended Complaint on November 9, 2020.  2-ER-044–132.  Plaintiffs added copious new factual allegations, as well as claims under the Bill of Attainder Clauses of the United States and California Constitutions.

The complaint alleged that AB5 and AB2257 single out Plaintiffs for disfavored treatment, while simultaneously exempting similarly situated groups.  2-ER-045 (SAC ¶ 2).  The laws' exemptions—which are legion—are irrational, and were included solely to obtain the necessary political support to punish Plaintiffs.  2-ER-049–50 (SAC ¶ 13).  The complaint spells out in detail how this targeting was motivated by the laws' sponsors' obvious and well-documented animus towards Plaintiffs. *Id.*

The complaint also alleged that "[b]eing one's own boss, as Plaintiff Olson, Plaintiff Perez, and many other independent service providers choose to do, is a

fundamentally different occupation than driving as an employee on an inflexible shift." 2-ER-119 (SAC ¶ 204). By forcing Ms. Olson and Mr. Perez to be employees, AB5 and AB2257 would act as a complete prohibition on their right to pursue their chosen work as independent service providers, with all the flexibility and autonomy that entails. 2-ER-119–20 (SAC ¶¶ 204–05). This reclassification would also infringe on the rights of Postmates and Uber, "transform[ing] [them] … from technology platform companies into taxi and delivery companies." 2-ER-119 (SAC ¶ 203).

Finally, the complaint alleged that forced reclassification would "substantially impair existing contracts … between Company Plaintiffs and the app-based drivers who use their apps," undermining key contractual rights (such as rights to flexibility) and "impos[ing] new obligations …, such as a duty of loyalty, unemployment coverage, and other employment benefits." 2-ER-123 (SAC ¶ 218).

Defendant moved to dismiss again, and the district court granted the motion without leave to amend. 1-ER-002–03.

The district court dismissed the Equal Protection claims, reasoning that AB5 is "rationally related to [the state's] interest in protecting workers." 1-ER-004. The court acknowledged Plaintiffs' new allegations that AB5 exempts (for example) TaskRabbit and Wag!, two network companies with "nearly identical business models as the Company Plaintiffs." 1-ER-007. Nevertheless, the court disagreed

with Plaintiffs' factual allegations that they "are so similarly situated to exempted workers that the Legislature's failure to exempt [them] is irrational or arbitrary." 1-ER-004. The court also acknowledged "Assemblymember Gonzalez's undeniable disdain for Uber and her specific desire that AB5 cover Uber in particular," as well as her statements that an exemption she sponsored "was 'shameful' and would cause 'continue[d] … miclassif[ication]'" but was a "condition of AB5's passage." 1-ER-005; 1-ER-009. Still, the court held that Plaintiffs "did not sufficiently allege that AB 5 was motivated purely by irrational animus or favoritism to lobbying groups." 1-ER-004.

Next, the court held that "even if Plaintiffs' [new] allegations … establish that driving as an independent contractor … is its own 'calling' or profession, to which AB5 acts as a complete prohibition," AB5 still does not violate due process because it "conceivably furthers the State's legitimate interest in preventing misclassification." 1-ER-011–12 (emphasis omitted).

The court also dismissed Plaintiffs' claims under the federal and state Contracts Clause. Contradicting the allegations of the complaint, the court found that AB5 "did not create unexpected changes to Plaintiffs' past relationships and resulted only in some impairment to their existing and future contracts." 1-ER-013.

Finally, the court dismissed Plaintiffs' Bill of Attainder Clause claims. 1-ER-016. Despite acknowledging that AB5, as amended, "has numerous exemptions,"

and was sponsored by "legislators [who publicly] pointed fingers at Uber," the court held that AB5 "is still a law of general applicability." 1-ER-015. As a result, the court determined that Plaintiffs failed to prove "that AB5, as amended, singles them out." *Id.*

The court entered final judgment on July 16, 2021. 2-ER-042–43. And Plaintiffs filed a timely notice of appeal on July 19, 2021. 4-ER-698–700.

## VI. The Preliminary Injunction Merges into the Final Judgment

On September 16, 2021, this Court held that the district court's preliminary injunction order merged into the final judgment. Dkt. 10 at 2. The panel stated that, if it reverses the district court's dismissal order, it will then consider whether denial of a preliminary injunction was proper. *Id.* at 3.

## STANDARD OF REVIEW

A complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This Court "review[s] de novo a district court's order granting a Rule 12(b)(6) motion to dismiss," "[c]onstruing the complaint in the light most favorable to the plaintiffs, and drawing all reasonable inferences from the complaint in the plaintiffs' favor." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 784, 787 (9th Cir. 2012) (citation omitted). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's

complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Resolution of factual questions is inappropriate. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008).

This Court reviews the denial of a preliminary injunction for abuse of discretion, but "[w]hen the district court bases its decision on an erroneous legal standard, [the Court] review[s] the underlying issues of law de novo." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816–17 (9th Cir. 2013); *see also Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011) (per curiam) ("The district court … necessarily abuses its discretion when it bases its decision on an erroneous legal standard." (internal quotation marks and citation omitted)).

## ARGUMENT

AB5, as amended by AB2257, violates the federal and state Constitutions. The district court erred by ignoring Plaintiffs' detailed factual allegations and misstating the legal standards. The same legal errors infected the court's denial of Plaintiffs' motion for a preliminary injunction, which should be reversed for the same reasons.

## I.  AB5, as Amended by AB2257, Violates the Equal Protection Clause

The district court dismissed Plaintiffs' equal protection claims based on false extra-record assumptions and negative inferences drawn *against* Plaintiffs.

Plaintiffs pleaded specific facts plausibly showing that AB5's litany of irrational exemptions creates arbitrary distinctions among similarly situated workers; those exemptions contradict, and do not rationally relate to, the government's stated interests; and the statute's *real* purpose to target and eliminate prominent network companies used by app-based drivers is unconstitutionally illegitimate.

### A. AB5 Does Not Rationally Relate to a Legitimate Government Interest

The Equal Protection Clause requires that any legislative classifications between similarly situated groups be "rationally related to a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973). Even under rational basis review, the court must "apply a two-tiered inquiry" to this analysis. *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018); *see also* PLF Br. (No. 20-55267, Dkt. 19) at 4–13 & n.4 (explaining that Supreme Court precedent demands *rigorous* rational basis review). It must first "determine whether the challenged law has a legitimate purpose" and then "address whether the challenged law promotes that purpose." *Id.* Plaintiffs plausibly alleged that AB5 fails to meet this basic standard.

### 1. AB5 Creates Unreasonable and Arbitrary Distinctions Between Similarly Situated Workers

Even where "economic rights are at stake, … the Equal Protection Clause[] requir[es] that similarly situated persons … be treated equally." *Merrifield v.*

*Lockyer*, 547 F.3d 978, 992 (9th Cir. 2008); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("[A]ll persons similarly situated should be treated alike."). The "distinctions … drawn" in legislation must be "applied with an even hand." *Rinaldi v. Yeager*, 384 U.S. 305, 309, 311 (1966); *see also In re Eric J.*, 25 Cal. 3d 522, 531 (1979) ("The concept of the equal protection … recogni[zes] … that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (citation omitted)). Plaintiffs sufficiently pleaded that AB5 violates equal protection because its "distinctions" are not "applied with an even hand": They place a "more onerous" burden on Plaintiffs, yet exempt similarly situated workers indistinguishable from these app-based drivers. *Trister v. Univ. of Miss.*, 420 F.2d 499, 502 (5th Cir. 1969).

In *Merrifield*, this Court held that a California economic-licensing scheme violated equal protection because its exemptions discriminated between two subsets of the pest-control industry. The "[g]eneral[]" assumption that creating exemptions is "a rational and quintessentially legislative decision" does not hold when "the government … undercut[s] its own rational basis for the licensing scheme by excluding" "similarly situated" parties from the exemption's scope. 547 F.3d at 990–92. Such a scheme "fails to meet … rational basis review." *Id.* at 991; *see also St. Joseph Abbey v. Castille*, 712 F.3d 215, 226–27 (5th Cir. 2013) (law granting funeral homes an exclusive right to sell caskets was not rationally related to the

legitimate purpose of protecting consumers where it "add[ed] nothing to protect consumers and put[] them at a greater risk of abuse including exploitative prices").

Plaintiffs alleged numerous facts showing the same is true of AB5 and AB2257. They alleged that AB2257 magnified the irrational line-drawing in AB5, nullifying the ABC test for millions *more* workers by creating new classes of exemptions and broadening the categories of exemptions contained in AB5. 2-ER-085–90 (SAC ¶¶ 95–101, 105). For example, AB2257's "referral agency exemption arbitrarily excluded Uber and Postmates while exempting other errands-based apps like TaskRabbit … and Wag!." 2-ER-089 (SAC ¶ 104). The complaint details how these exempted service providers' work is factually identical in all relevant respects to the work performed by app-based drivers, including that "[t]he service providers who use TaskRabbit and Wag! have the same patterns of use as the 'drivers' and 'couriers' who use Uber and Postmates." 2-ER-074–75, 2-ER-089 (SAC ¶¶ 77, 104). In fact, Wag!'s business model is so similar, it is often referred to as "Uber for dogs." 2-ER-048 (SAC ¶ 10).

The latest complaint also alleged new facts showing that AB5 and AB2257 create legal distinctions among materially identical workers. 2-ER-70–72, 2-ER-74–75, 2-ER-088–89 (SAC ¶¶ 70–73, 77, 103–04). For example:

- AB2257 exempts all "photographers, photojournalists, videographers, or photo editors" who meet certain conditions, except for "photographers,

photojournalists, videographers, or photo editors" who work in the "motion picture" industry, even if they meet the same requirements.

- "Photographers" who shoot "album covers" are exempt, but not "photographers" who work in "film or television."

- "Publicists" are exempt unless they are "independent music publicists." Musical groups performing in live, single-engagement events are exempt if they play rock or jazz, or are a choir, but not if they are a symphony orchestra.

- Brass bands who perform at live, single-engagement events are exempt if they perform in a stadium, but not if they perform at an amusement park.

- Musicians who perform at live, single-engagement events are exempt if they perform in ballets, but not if they perform in musical theatre productions.

2-ER-090 (SAC ¶ 107 (alterations omitted)).

### 2. The District Court's Disregard for Plaintiffs' Well-Pleaded Factual Allegations Was Reversible Error

The district court expressly refused to take these facts as true, and dismissed Plaintiffs' allegations based on extra-record (and demonstrably false) inferences it drew *against* Plaintiffs. 2-ER-139–42. This was reversible error.

For instance, the district court rejected Plaintiffs' allegations that Uber was similarly situated to Wag!, in part, on the ground that the "employment of dog

walkers and errand-runners has not engendered any comparable misclassification lawsuits" to those against app-based drivers. ER0008. But that is not true. *See, e.g.*, First Am. Compl. ¶¶ 4, 38, *Darsey v. Wag Labs, Inc.*, No. 2:17-cv-07014 (C.D. Cal. Sept. 22, 2017), ECF No. 30 (alleging misclassification of California dog walkers using the Wag! app). Nor is it appropriate for the district court to adopt *any* such conceivable difference between similarly-situated parties, when all that is required to plead an equal protection claim is that a plaintiff allege, as Plaintiffs did here, that they are similarly situated "in all *relevant* respects" to other parties. *Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) (emphasis added) (citation omitted) (reversing district court's dismissal of equal protection claim based on non-"meaningful" distinctions between groups because, under *Twombly*, a plaintiff's burden is to allege plausible facts showing that they are "similarly situated to others … 'in all relevant respects'—not all respects").

The court justified "go[ing] beyond the pleadings to hypothesize a legitimate governmental purpose" for these exemptions based on a district court case relying on a Fifth Circuit precedent predating *Iqbal* and *Twombly*. 2-ER-138 (citing *HSH, Inc. v. City of El Cajon*, 44 F. Supp. 3d 996, 1008 (S.D. Cal. 2014)). This was error because the Supreme Court has never excluded constitutional claims from the rule that courts must accept pleaded facts as true on a motion to dismiss. Any dispute as to whether these groups are similarly situated is an issue of *fact*; and at this stage,

the district court needed to accept the allegations as true. *See, e.g., Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019) ("[I]t is precisely in light of the inquiry's fact-intensive nature that we have cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."); *Wynn v. N.Y.C. Hous. Auth.*, 2015 WL 4578684, at *5 (S.D.N.Y. July 29, 2015) ("[W]hether two people are similarly situated is usually a question of fact for the jury." (citation omitted)); *Sacramento Cty. Retired Emps. Ass'n v. County of Sacramento*, 2012 WL 1082807, at *6 (E.D. Cal. Mar. 31, 2012) (denying motion to dismiss when plaintiffs alleged that county "created distinct classifications amongst its retirees (not based on age or length of service) absent any rational basis or legitimate governmental interest").

### 3. The Distinctions Drawn in AB5 and AB2257 Are Irrational

Had the district court accepted the allegations in the operative complaint as true, it would have had no choice but to deny the government's motion to dismiss and issue a preliminary injunction. The complaint sets forth in detail the myriad ways in which the distinctions drawn by California's worker classification scheme are irrational and unconstitutional. App-based drivers satisfy the supposed "hallmarks of independent contractors" identified in the legislative history and are

otherwise similarly situated to many of the exempted occupations. 2-ER-054–58, 2-ER-070–75 (SAC ¶¶ 35–41, 70–77).[5]

*First*, Individual Plaintiffs "control their working conditions free from coercion and intimidation" (Sen. Rep. at 9 (emphasis omitted)) as much as, if not more than, a dog walker, a commercial fisherman on someone else's vessel, or a construction subcontractor—each of whom is exempted from AB5 (*see* Cal. Lab. Code §§ 2777(b)(2)(B), 2781, 2783(g)).

Mr. Perez has built his own business by cultivating relationships with local merchants and by developing innovative strategies to deal with the delivery challenges particular to his community. 2-ER-074–75 (SAC ¶ 77). Ms. Olson uses the Uber app only when needed to supplement her primary income or to respond to

---

[5] The district court noted that "[t]o explain the exemptions, [the legislature] point[ed] to the traditional distinctions between independent contractors and employees," guided by weighing four factors (1-ER-026; 2-ER-138–39): (1) "market strength" (marked by the "ability" to "control their working conditions free from coercion and intimidation" and higher "barriers to entry," Sen. Rep. at 9 (emphasis omitted)); (2) "rate setting" (ability or not to "set their own rates for their labor," *id.*); (3) "[r]elationship between the [c]ontractor and [c]lient" (ability to "communicate directly to resolve any questions or concerns[] and use the structure of the contract to resolve any disputes," *id.* at 10); and (4) "[t]echnological [n]eutrality" (whether "the intermediary is, to use the legal world as a model, deriving disproportionate benefits from the relationship," *id.*). The court relied on these factors in attempting to justify AB5's exemptions, reasoning that the exempt jobs "require business organization, skill, self-direction, self-pricing, shorter or less frequent work terms, a distinct location, specific type of work, and other hallmarks of independent status" outlined above. 1-ER-026.

unpredictable family challenges (2-ER-057, 2-ER-074–75 (SAC ¶¶ 40, 77))—exemplifying the "shorter or less frequent work terms" relied on by the district court (1-ER-026). The ability to multi-app also increases their market influence by fostering competition among network companies and promoting workers' bargaining power. 2-ER-056, 2-ER-070 (SAC ¶¶ 39, 70).

And it cannot be said that *exempted* professions like yard workers, picture hangers, furniture assemblers, and house cleaners entail higher "barriers to entry" than Individual Plaintiffs' driving businesses. The district court certainly was not permitted to conclude as much when the complaint alleges the opposite.

*Second*, app-based drivers like Individual Plaintiffs heavily direct their rates by multi-apping to find the highest paying opportunities and choosing when to work, thus deciding whether to take advantage of peak-hours pricing or pass on less lucrative trips. 2-ER-056, 2-ER-070 (SAC ¶¶ 39, 70). By contrast, there is no doubt that many of the exempted workers do *not* set their own rates. 2-ER-069 (SAC ¶ 69).

Exempted "construction contractors," for instance, do not always "maximize rate setting and market position" for their subcontractors or "improve contractor earnings": Many (if not most or all) select their subcontractors based on *minimum bids*. 2-ER-069 (SAC ¶ 69 & n.26) ("In order to create successful construction bids, remember the industry golden rules: Start with highly accurate cost estimates, and submit the lowest bid of all the competing contractors."). The district court was

required to accept these allegations as true at the pleadings stage, rather than resolve factual disputes against Plaintiffs.

*Third*, independent drivers use the structure of their contracts to resolve "disputes." 2-ER-074–75 (SAC ¶ 77). With respect to this inquiry, the legislative report endorses "intermediary" relationships (connecting independent contractors and clients) that aptly describe network companies. Network companies like Postmates and Uber act as "intermediar[ies that] may accrue a simple fee" for connecting independent drivers and customers and "ensur[ing] that the worker is paid in a timely manner and has the maximum amount of work requested"—all "functions … beyond skirting employer responsibilities." Sen. Rep. at 10.

*Fourth*, Postmates and Uber are not "deriving disproportionate benefits from the relationship" by foregoing an "employer-based model" in a desire to "cut costs." *Id.* Several paragraphs of the complaint demonstrate that an "employer-based model" *is incompatible* with network companies' business and technology—not to mention *unwanted* by independent drivers and couriers. 2-ER-105–111 (SAC ¶¶ 146–48, 153–54, 159–163, 168–174).

The legislative history asserts that "[r]ecent research … finds some of the highest misclassification rates in the economy's growth industries, including home care, janitorial, trucking, construction, hospitality, security, and the app-based 'on demand' sector." Assemb. Comm. on Lab. & Emp., AB5, 2019–20 Reg. Sess., at 2

(Cal. July 5, 2019). But AB5 specifically exempts workers in many of the very "growth industries" mentioned in the report, including workers in the "construction" industry, like construction truckers and subcontractors (Cal. Labor Code § 2781), and workers in the "hospitality" industry, like errand runners and event planners (*id.* § 2777(b)(2)(B)).

And even assuming the exempted occupations better fit the identified "hallmarks" of independent contractor status than drivers and couriers, that might justify a different *outcome* under the test, but is no basis for imposing a different (and more onerous) *test* altogether. There is no rational reason to make Plaintiffs satisfy an entirely different test—the ABC test—while the exempted entities merely have to satisfy the *Borello* test. A faster runner is more likely to win a race; that does not justify letting her run a shorter distance than her competitors. *See Merrifield*, 547 F.3d at 992.

There is, simply put, no rationality to AB5 and AB2257's incoherent scheme of exemptions. The statutes "den[y] plaintiffs the equal protection of the laws by imposing" on them a legal standard that is "different and more onerous than those imposed upon other[s]" who are materially "the same" as Plaintiffs. *Trister*, 420 F.2d at 502.

### 4.   AB5 and AB2257 Contradict the Government's Stated Interest

Equal protection "requir[es] that … distinctions that are drawn" in legislation between similarly situated parties be "relevan[t] to the purpose for which the classification [wa]s made" in the first place.  *Rinaldi*, 384 U.S. at 309.  "A statutory classification which does *not* bear a rational relationship to the purpose which the statute is intended to serve" is unconstitutional.  *Parr v. Mun. Ct.*, 3 Cal. 3d 861, 864 (1971) (emphasis added); *see also City of Cleburne*, 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

In *Merrifield*, for instance, this Court concluded that the government "undercut" its asserted safety interest by exempting *subsets* of the pest control industry:  "[T]his type of singling out, in connection with a rationale so weak that it undercuts the principle of non-contradiction, fails … rational basis review."  547 F.3d at 991–92; *see also O'Neal v. City of Seattle*, 66 F.3d 1064, 1068 (9th Cir. 1995) (government's chosen line-drawing "illogical" and not "rationally related to the City's interest"); *Davis v. Weir*, 497 F.2d 139, 144 (5th Cir. 1974) (any "classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation" (internal quotation marks and citation omitted)).

AB5's stated purpose is "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave." AB5 § 1(e); 1-ER-024. To do so, the legislature sought to replace the *Borello* legal standard—which it derided as "a failed employment test that met the needs of neither employers nor workers" (Sen. Rep. at 8) and provided "insufficient protection for workers" (2-ER-062, 2-ER-068 (SAC ¶¶ 57, 67))—with the *Dynamex* ABC test.

But AB5 directly undercuts this purported purpose in that its exemptions affirmatively reinstate the *Borello* test for millions of workers that would otherwise be governed by the ABC test. *Dynamex* applied to all wage-order claims before AB5. 4 Cal. 5th at 964. Yet the complaint lays out in detail how, for the millions of workers AB5 and AB2257 exempt, the statutes make it *easier* for these workers to be classified as independent contractors. For their wage-order claims, these workers were subject to the *Dynamex* ABC test on December 31, 2019, but on January 1, 2020 (or thereafter under AB2257), reverted to the more flexible *Borello* test—with retroactive effect.

As Plaintiffs alleged, if AB5's purpose was to make it *harder* for workers to be classified as independent contractors, then it was irrational to *remove* a legal

standard the legislature apparently preferred (*Dynamex*) and *reinstate* the legal standard the legislature apparently deemed insufficient (*Borello*) for dozens of exempted businesses and occupations (amounting to *millions* of workers). And certainly it was irrational to do so *again* just a few months later for millions more workers in AB2257. In doing so, the government "undercut its own rational basis for [its classification] scheme." *Merrifield*, 547 F.3d at 991–92 ("We cannot simultaneously uphold the licensing requirement under due process based on one rationale and then uphold Merrifield's exclusion from the exemption based on a completely contradictory rationale.").

### B. AB5 Singles out Network Companies for Unconstitutionally Disfavored Treatment

Plaintiffs also adequately alleged that the true explanation for AB5's patchwork of exemptions is that its sponsors singled out certain network companies for disfavored treatment based on irrational animus and political favoritism. *See Moreno*, 413 U.S. at 534–35 (invalidating law aimed at targeting disfavored group); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1509 (9th Cir. 1990) (reversing grant of summary judgment to the government on equal protection claim where plaintiffs "contend … [they] were singled out to bear the burden[s]" of the law; "[a]lthough the objective of [the law] is rational, it may not be rational to single out" plaintiffs consistent with the Constitution); *Christopher Lake Dev. Co. v. St. Louis County*, 35 F.3d 1269, 1274–75 (8th Cir. 1994) (similar).

"Nowhere are the protections of the Equal Protection Clause more critical than when legislation singles out one or a few for uniquely disfavored treatment" (*News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 813 (D.C. Cir. 1988)), yet the district court ignored Plaintiffs' allegations that AB5's and AB2257's *real* purpose was to irrationally target network companies while currying the necessary political favor for the bills to become law (2-ER-076–85 (SAC ¶¶ 80–94)).

The recent changes to the referral agency exemption are a perfect example. At the hearing on Plaintiffs' motion for a preliminary injunction, the district court noted that "[f]ood delivery for Uber Eats and Postmates would likely fall under" the referral exemption for "people who run errands." 2-ER-197; *see also* Cal. Lab. Code § 2777(b)(2)(B) ("referrals for services shall include … errands"). In response, the authors of AB2257 adopted urgency legislation that altered the exemption to explicitly exclude Plaintiffs. 2-ER-047, 2-ER-088 (SAC ¶¶ 7, 102); Cal. Lab. Code § 2777(b)(2)(C) (excluding referrals for "delivery, courier, [or] transportation" services). At the same time, AB2257 *expanded* the referral agency exemption to include all *other* referral agencies. 2-ER-047–48, 2-ER-085, 2-ER-088 (SAC ¶¶ 7–8, 95, 101–02); Cal. Lab. Code § 2777(b)(2)(B) (referrals for services covered by the referral agency exemption "shall include, but are not limited to" various enumerated examples). As Assemblymember Gonzalez explained during legislative debate, the exemptions were purposefully designed so there was no way "*Uber*

w[ould] [be able to] just say" it might fall within one.  2-ER-083–84 (SAC ¶ 92).[6] This irrational exclusion of Plaintiffs is enough to show that the statute is unconstitutional as to them.

The intentional exclusion of Plaintiffs is even more obvious when compared to its accommodation of journalism.  A bill sponsored by Assemblymember Gonzalez created an exemption for newspaper distributors and carriers, even though Gonzalez believed it would lead to the "continued misclassification of historically misclassified workers, such as women of color."  2-ER-049 (SAC ¶ 11) (cleaned up).  Under the new exemption, newspaper carriers were exempt from the ABC test and subject to the more lenient *Borello* standard, even though, according to Assemblymember Gonzalez, "newspapers have lost nearly every case brought by carriers under *Borello*."  2-ER-076–77 (SAC ¶ 81).  The author explained that while the exemption was "shameful" and "play[ed] … games with workers' lives," it still passed because of "how much we love journalism."  2-ER-77 (SAC ¶ 81).  And with AB2257, the legislature further accommodated journalists, granting them liberalized

---

[6]  As the principal sponsor of AB5 and AB2257, Gonzalez's statements are "accorded substantial weight in interpreting the" legislature's intent (*Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976)), especially "where, as here, other legislators did not offer any contrary views" (*Kenna v. U.S. Dist. Ct. for C.D.Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006)).

exemptions in response to *their* constitutional challenge to AB5.  2-ER-092 (SAC ¶ 111).

The complaint alleges numerous facts demonstrating the pervasive animus toward network companies, and specifically toward Plaintiffs.  *See*, *e.g.*, 2-ER-051; 2-ER-079; 2-ER-084–85; 2-ER-091; 2-ER-098–01 (SAC ¶¶ 16, 85f, 93, 110, 128, 131–33, 135).  And those "expressions of hostility or antagonism to certain groups" plausibly state an equal protection violation.  *Parr*, 3 Cal. 3d at 864 (citation omitted); *see New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 310 (3d Cir. 2007) (reversing summary judgment in City's favor on equal protection grounds because "records of the City Council hearings contain numerous statements by both public participants and council members expressing opposition based on what can only be characterized as generalized prejudice").  Indeed, the California Court of Appeal determined that "the[] statements by Assemblymember Gonzalez and others are consistent with" the conclusion "that the Legislature 'targeted' ride-sharing companies."  *Uber*, 56 Cal. App. 5th at 297 n.18; 2-ER-081 (SAC ¶ 87).

For this reason, *American Society of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954 (9th Cir. 2021), is readily distinguishable.  As the Court recognized, the legislature did not exhibit any "spite[] or naked favoritism" towards freelance writers and photographers.  *Id.* at 966 (citation omitted).  Far from it:  A mere two days after the plaintiffs filed suit, Assemblymember Gonzalez solicited ideas to alleviate the

burdens on industries inadvertently "caught up" by AB5.  2-ER-068–69, 2-ER-091 (SAC ¶¶ 66, 110 & n.25).  The result was that AB2257 *expanded* the exemption for photographers, photojournalists, freelance writers, editors, and newspaper cartoonists by lifting the 35-submissions limit for those industries.  2-ER-083, 2-ER-092 (SAC ¶¶ 90, 111–12) (Gonzalez touting that the new exemption would provide "[m]ore flexibility for musicians, journalists, photographers, creatives, interpreters & translators"); *see also American Society*, 2021 WL 4568057, at *3.  Here, by contrast, the legislature responded to Plaintiffs' constitutional challenge by *tightening* the referral agency exemption to specifically exclude network companies. 2-ER-088–89 (SAC ¶¶ 102–03).

As Plaintiffs alleged in detail, the only possible explanation for AB5's arbitrary classifications is "to favor economically certain constituents."  *Merrifield*, 547 F.3d at 991.   But the legislature's desire to "protect" favored groups' "expectations" or "respond to the demands of a political constituent" is not a cognizable state interest.  *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016) (reversing dismissal of an equal protection claim given arbitrary "carve out[s]" to select groups); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 878 (1985) (law unconstitutional where its "aim" was "to favor domestic industry within the State").

The district court's utter refusal to acknowledge the import of Plaintiffs' factual allegations, which the court conceded showed "Assemblymember Gonzalez's undeniable disdain for Uber and her specific desire that AB 5 cover Uber in particular" (1-ER-009), was manifest error at the pleadings stage. *See Fowler*, 844 F.3d at 815.

## II. Forced Reclassification Would Irrationally Deprive Plaintiffs of the Right to Pursue Their Chosen Occupation

The complaint also alleged that Defendant's enforcement of AB5 would irrationally deprive Plaintiffs of the right to work in their chosen profession as independent business owners. The district court refused to accept these allegations, instead ruling that "AB 5 is not a complete prohibition on Individual Plaintiffs' ability to pursue any profession." 1-ER-011 (internal quotation marks and citation omitted).[7]

---

[7] The district court relied on *Conn v. Gabbert*, 526 U.S. 286 (1999), for the proposition that only a "complete prohibition" triggers the Due Process Clause. 2-ER-144. In fact, *Conn* held only that the "brief interruption" of the claimant's "daily routine as a result of" the "execution of a search warrant" did not violate the right to pursue one's occupation. 526 U.S. at 292–93. The Supreme Court used the phrase "complete prohibition" to distinguish this doomed claim—that a quick search deprived him of his right to pursue his occupation—from the claims in three earlier cases that involved the same right. *See id.* at 292; *see also PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 9 & n.12 (D.D.C. 2004) ("*Conn* did not purport to articulate a higher standard to prove a deprivation of a liberty interest. Rather, the case narrowly held that the plaintiff's particular, and peculiar, claim lacked merit.").

But the complaint alleged that "[f]orced reclassification … would be a complete prohibition on exercising the right to pursue" the "fundamentally different occupation" of "[b]eing one's own boss." 2-ER-119–20 (SAC ¶ 204); *accord* 2-ER-102–06, 2-ER-111, 2-ER-119–22 (SAC ¶¶ 138–54, 173, 202–12). It "would force many on-demand drivers 'right out of a stable income stream'" (2-ER-104 (SAC ¶ 143) (citation omitted); *accord* 2-ER-100, 2-ER-102 (SAC ¶¶ 134, 137)), and even those lucky few drivers who could be hired would be forced into a very different occupation (2-ER-055–56 (SAC ¶ 37)). Working for someone else, bound by "duties that bind employees, such as the duty of loyalty" (2-ER-120 (SAC ¶ 205)), is fundamentally different from being able to choose whether to work or not work "without requesting permission or even telling anyone," and owing a duty to no boss but yourself (2-ER-103, 2-ER-106 (SAC ¶¶ 140, 153)).

Ms. Olson and Mr. Perez each run their own businesses, which entails "cultivating relationships with local merchants," "choosing the best or most profitable routes," "developing innovative strategies to gain an advantage over the competition," and "exercis[ing] control over the rates and fares they charge and accept." 2-ER-074–75, 2-ER-105–06 (SAC ¶¶ 77, 148, 151). They chose this occupation, rather than choosing to be employees, in full knowledge of these essential differences. 2-ER-105–06 (SAC ¶¶ 146–48, 153–54).

The alleged facts show that being a business owner is not merely a different "classification" but a wholly different occupation. And these allegations must be accepted as true at the pleading stage. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1058, 1068 (9th Cir. 2012) ("accept[ing] as true the well-pleaded facts" and finding plaintiffs "adequately ple[d] a due process violation").

Courts have refused to dismiss claims when presented with similar allegations. For example, California argued that African hair braiding was not its own occupation, but merely a form of cosmetology—just as it asserts here that running a driving business is not its own occupation, but merely a form of driving. *See Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1106–07 (S.D. Cal. 1999). The court rejected the argument; California could not "assume the critical contention at issue—i.e., that natural hair care is part of the profession of cosmetology." *Id.* at 1106; *accord, e.g.*, *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012) (same).

Furthermore, AB5 *is*—under Defendant's own interpretation of the statute— a "complete prohibition." Defendant obtained an injunction under AB5, affirmed on appeal, that completely prohibited (before it was stayed and nullified by Prop 22) *all drivers who use the Uber app* from running their own driving businesses. 2-ER-045, 2-ER-081, 2-ER-098–100 (SAC ¶¶ 2, 87, 128, 131, 134). Defendant's own interpretation of AB5 thus confirms that the statute is no run-of-the-mill labor

regulation or a mere continuation of *Dynamex*. While *Dynamex* simply interpreted the "wage order definitions of 'employ,'" AB5 extends the ABC test to "non-wage-order claims." *Garcia v. Border Transp. Grp., LLC*, 28 Cal. App. 5th 558, 568, 571 (2018). And while *Dynamex* permits workers to operate as business owners so long as they are paid according to the wage order (*see W. States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056, 1072 (E.D. Cal. 2019)), AB5 establishes that workers *cannot be independent contractors* unless they meet the ABC test or fit within an exemption (*see People v. Super. Ct. of L.A. Cty.*, 57 Cal. App. 5th 619, 631 (2020) ("a worker is an employee unless the hiring entity demonstrates certain conditions")).

Even if AB5 did not infringe the fundamental right to pursue a chosen occupation, it *still* would need to satisfy rational basis review. *See*, *e.g.*, *Craigmiles v. Giles*, 312 F.3d 220, 222–29 (6th Cir. 2002) (law imposing irrational requirements to sell caskets violated the Due Process Clause). The district court stated that AB5 has a rational basis "[f]or the reasons stated" in its equal protection analysis. 1-ER-011–12. But this ignores Plaintiffs' factual allegations and the expressed will of the voters.

Defendant is using AB5 to gut the livelihoods of hundreds of thousands and harm millions of customers. *See* 2-ER-102–06, 2-ER-111, 2-ER-119–22 (SAC ¶¶ 137–54, 173, 202–12). Forcing people to choose an employment relationship or

nothing would *erode* "the middle class" and *further* "income inequality." *See*, *e.g.*, 2-ER-102, 2-ER-104, 2-ER-120–22 (SAC ¶¶ 137, 143, 206–09). Indeed, Defendant already nearly shut Uber down, which would have deprived hundreds of thousands of workers of income-earning opportunities. *E.g.*, 2-ER-102, 2-ER-104, 2-ER-120–21 (SAC ¶¶ 137, 143, 206). Uber and Postmates could not possibly hire the hundreds of thousands of drivers using their respective platforms as employees. 2-ER-120–21 (SAC ¶ 206); 2-ER-104 (SAC ¶ 143) (estimating loss of 80–90 percent of available on-demand work opportunities in California under an employment model). And even if they could retain all drivers currently on the platform, Uber and Postmates could not offer the autonomy that drivers currently enjoy. 2-ER-103–04, 2-ER-108, 2-ER-111, 2-ER-120 (SAC ¶¶ 140–42, 162, 174, 205).

The Court must assume the truth of these facts showing AB5's "adverse effect" on the very problems it was supposedly designed to solve—which demonstrate that the law is irrational and violates the Due Process Clause. *See*, *e.g.*, *Craigmiles*, 312 F.3d at 226.

## III. Enforcement of AB5 Would Unconstitutionally Impair Plaintiffs' Contracts

If a law "operate[s] as a substantial impairment of a contractual relationship," it will violate the Contracts Clause unless it "protect[s] a broad societal interest" *and* is "necessary to meet" that "important general social problem." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 247, 249 (1978); *see* Cal. Const. art. I,

§ 9; U.S. Const. art. I, § 10. Plaintiffs alleged in detail how AB5 would severely and unjustifiably impair their contracts, and the district court erred in rejecting Plaintiffs' allegations.

### A. Forced Reclassification Would Severely Impair Plaintiffs' Contractual Relationship

Disrupting a contract's central terms constitutes severe impairment of the agreement. *See Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. State of Washington*, 696 F.2d 692, 697–98 (9th Cir. 1983) (law impaired "central aspect" of the bargain by undermining "the centerpiece of the entire [contractual] arrangement"); *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1005–06 (4th Cir. 1980) (law "severely impair[ed] substantial … contract obligations" by disrupting "a critical feature of [the parties'] total contractual relationship[]"); *Ross v. City of Berkeley*, 655 F. Supp. 820, 828–29 (N.D. Cal. 1987) (contract "impaired substantially" by law that eliminated one of "the most essential bargained-for components of [the parties'] agreement"). Critically, the impairment question is "more suitable for a motion for summary judgment," if not trial, rather than resolution on the pleadings. *San Diego Police Officers' Ass'n v. Aguirre*, 2005 WL 3180000, at *8 (S.D. Cal. Nov. 5, 2005); *see also*, *e.g.*, *Matsuda v. City of Honolulu*, 512 F.3d 1148, 1155 (9th Cir. 2008) (remanding on the impairment analysis for further factual record development).

The contracts here protect the parties' independence. The Postmates Fleet Agreement states that the parties "intend th[e] Agreement to create the relationship

of principal and independent contractor and not that of employer and employee." 2-ER-107 (SAC ¶ 156). Similarly, Uber's Platform Access Agreement provides that the "relationship between the parties is solely as independent business enterprises," and it "is not an employment agreement and [the Driver is] not an employee." 2-ER-109 (SAC ¶ 166). The government seeks to disrupt one of "the most essential bargained-for components of [the] … agreement[s]," "unquestionably upset[ting], in a severe and substantial manner, the bargain struck between" the parties. *Ross*, 655 F. Supp. at 828–29; *see also Allied Structural Steel*, 438 U.S. at 246–47 (violation of "contractual expectations" gauges severity of impairment). Moreover, the government's new classification regime *adds* significant unconsented-to terms, including a duty of loyalty, unemployment coverage, and other employee mandates. 2-ER-123 (SAC ¶ 218).

The complaint also alleges how the new scheme would disrupt drivers' lives and countless others who rely on them: Before the government's preliminary injunction against Uber was dissolved, it threatened to "cause the loss of millions of earning opportunities for Californians" and "immediately restrict more than 158,000 drivers from using Plaintiff Uber's rideshare app alone." 2-ER-100 (SAC ¶ 134). This allegation alone is sufficient to demonstrate that the impairment at stake is severe.

The district court contradicted these allegations, resolving the intensely factual impairment analysis and holding that the impairment was "not severe." 1-ER-013. That was improper. *See Local 101 of the Am. Fed'n of State, Cnty. & Mun. Emps. v. Brown*, 2015 WL 5316296, at *7 (N.D. Cal. Sept. 11, 2015) ("declin[ing] to find as a matter of law at this stage of the proceedings that Plaintiff cannot assert a Contracts Clause claim" given allegations that the state had not previously "mandat[ed] limits to retirement benefits for employees of local agencies at the time the [contract] was negotiated").

The court concluded that *Dynamex* provided notice that the government would embark on its dramatic departure from past regulation of Plaintiffs' working relationships. 1-ER-012–13. But *Dynamex* applied only to wage-order claims. AB5 was a sea change, upsetting several judicial and administrative rulings that had *ratified* the Plaintiffs' bargain and overwhelmingly *upheld* on-demand independent contractor agreements. 2-ER-098, 2-ER-123–25 (SAC ¶¶ 129, 219–21) (citing several examples).

Foreseeability aside, the district court also asserted that, because AB5 applies the ABC test prospectively only, "Plaintiffs were free to address anew their work relationships going forward." 1-ER-013. This in no way reduces the already severe contractual impairment; the impairment analysis hinges on whether the law impacts "contracts in a way that permits destruction of their primary purpose." *Cont'l Ill.*,

696 F.2d at 697–98. The worker classification scheme does exactly that by destroying the *pre-existing* contracts at the heart of Plaintiffs' business relationships *going forward*.

At bottom, the district court proposed that drivers should be prepared to find new jobs—either by reworking their contracts to be employees or finding work elsewhere. This fantasy, which the district court charitably described as "*some impairment*" (2-ER-013 (emphasis added)), ignores (1) the detailed allegations in the complaint that many drivers simply *cannot* work as employees (*e.g.*, 2-ER-102, 2-ER-104, 2-ER-120–21 (SAC ¶¶ 137, 143, 206)), and (2) that there are no allegations in the SAC that those driving opportunities will exist under the government's new worker-classification scheme.

**B. The District Court Failed to Engage in a Searching Review of the Worker-Classification Scheme's Purpose and Its Necessity and Reasonableness**

"Severe impairment" of the type Plaintiffs alleged "push[es] the inquiry into a careful examination of the nature and purpose of the state legislation" (*Allied Structural Steel*, 438 U.S. at 245), including "the reasonableness of the measures employed to achieve the legislation's objectives" (*Ross*, 655 F. Supp. at 832). The district court failed to engage in this careful examination.

Beginning with the purpose of the legislation, the district court concluded that "AB 5 fits within the State's authority to regulate employment relationships" (1-ER-

014), as "an exercise of the State's police power to protect workers aimed at remedying what it perceives to be a broad economic and social problem" (1-ER-033). The court stated that, even if it assumed substantial impairment, it would still defer to the "State's assessment of the reasonableness and necessity of enacting AB 5 to remedy a perceived economic and social problem." 1-ER-013.

But as explained above (Part I, *supra*) and as plainly and plausibly alleged in the complaint, AB5's true purpose is to target Plaintiffs. And even assuming the government's claimed purpose, Plaintiffs' allegations showed that AB5 "benefits only a selected few." *In re Workers' Compensation Refund*, 46 F.3d 813, 821 (8th Cir. 1995). Indeed, rather than myopically focusing on the worker classification scheme's impact on the gig economy (1-ER-014), Plaintiffs alleged in detail that reclassification would *exacerbate* the very problems that AB5 and AB2257 purport to redress. *See Workers' Compensation*, 46 F.3d at 821 (finding state's "justification … unpersuasive" where law did not "achieve[]" purported goals); *In re LaFortune*, 652 F.2d 842, 847–48 (9th Cir. 1981) (same); *Garris*, 630 F.2d at 1008–10 (same). That "[i]t does not benefit all … employ[ment]" relationships shows it "does not create a broad societal class or interest." *Workers' Compensation*, 46 F.3d at 821.

Instead, it "directly targets and adjusts [Plaintiffs'] contractual obligations" (*Ross*, 655 F. Supp. at 833), a tactic "expressly prohibited as a significant and legitimate public interest" (*Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir.

2002); *see Ross*, 655 F. Supp. at 832–33 (same); *McDonald's Corp. v. Nelson*, 822 F. Supp. 597, 608–09 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994) (same); *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844, 876 (N.D. Ill. 2000) ("[T]he Act would seem not only unconstitutionally to impair the parties' contractual relationships but to have done so intentionally")). Thus, AB5 fails to advance the broad "social and economic regulation" that the district court believes is the government's purpose. 1-ER-013.

Even assuming the government's purpose were legitimate, "the legislation must be reasonable under the circumstances." *In re LaFortune*, 652 F.2d 842, 847–48 (9th Cir. 1981) (collecting sources). Rather than assess whether AB5 *is* a reasonable solution to worker misclassification, the district court erred in wholly deferring to the legislature. 1-ER-013; *see Treigle v. Acme Homestead Ass'n*, 297 U.S. 189, 196–98 (1936); *LaFortune*, 652 F.2d at 847–48; *Garris*, 630 F.2d at 1008; *Ross*, 655 F. Supp. at 834–35 (Contracts Clause violation where "no indication that the City seriously considered any less restrictive alternatives"). But the State "cannot avoid Contract Clause analysis merely by establishing that the [law at issue] is an otherwise legitimate exercise of police power." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 893 (9th Cir. 2003). Rather, the Contracts Clause "must be understood to impose … *limits* upon the power of a State to abridge existing

contractual relationships, even in the exercise of its otherwise legitimate police power." *LaFortune*, 652 F.2d at 846 (emphasis added) (citation omitted).

Finally, it is *the government's* burden to demonstrate that the restrictions are "reasonable and necessary to fulfill an important public purpose," not Plaintiffs'. *Univ. of Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1106–07 (9th Cir. 1999) (citation omitted). Particularly at the pleadings stage, the district court's rubber-stamp did not examine "the policy consideration and tailoring that is required to pass scrutiny under plaintiffs' Contracts Clause challenge." *Brown v. New York*, 975 F. Supp. 2d 209, 240 (N.D.N.Y. 2013); *see also Ass'n of L.A. City Attorneys v. City of Los Angeles*, 2012 WL 12887541, at *9 (C.D. Cal. Nov. 20, 2012) (reasonable and necessary inquiry required "further factual development of the record").

## IV. Plaintiffs Sufficiently Alleged AB5, as Amended by AB2257, Is a Bill of Attainder

Finally, Plaintiffs demonstrated that AB5 is a Bill of Attainder. To state a claim under the Bill of Attainder Clause of the United States and California Constitutions, a plaintiff must plausibly aver that the statute "(1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial." *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 668 (9th Cir. 2002); *see People v. Grant*, 973 P.2d 72, 76 (Cal. 1999) (noting that California's bill of attainder clause is "interpret[ed] … no differently than its federal counterpart" (internal quotation

marks and citation omitted)).  The government contests only the first two elements, and Plaintiffs have alleged plausible facts supporting both.  The district court erred in ruling otherwise.

### A.     AB5 and AB2257 Impermissibly Target Network Companies

In determining whether a statute impermissibly targets a person or class, courts consider four non-exhaustive "guideposts" (*SeaRiver*, 309 F.3d at 669), each of which show that the government's worker-misclassification scheme, as enacted in AB5 and AB2257, singles out Plaintiffs for punishment.

The first two guideposts, which are "intricately connected," concern "whether the identity of the individual or class was easily ascertainable when the legislation was passed"—whether on the face of the statute or otherwise.  *Id.* at 669–70 (internal quotation marks and citation omitted).  Critically, "[a] statute need not identify an individual or group by name to incur suspicion." *Id.*  Rather, courts may look to "the intent expressed by [the legislature]" and the statute's "apparent effect" to determine whether the identity of the targeted class is "easily ascertainable." *Id.* (citation omitted).  Were it otherwise, the legislature could "eas[ily] … circumvent" the Bill of Attainder Clause by the simple expedient of omitting the attainted's name. *Reynolds v. Quiros*, 990 F.3d 286, 296 (2d Cir. 2021).

AB5 takes direct aim at the on-demand economy.  Though couched in general terms, its text is pockmarked with exemptions catering to special interest groups.  2-

ER-065–67 (SAC ¶ 64). These exemptions roll back the protections of the ABC test for *millions* of workers, including in "growth industries" that the legislature specifically identified as possessing "some of the highest misclassification rates … in the economy." 2-ER-063–64 (SAC ¶¶ 59, 62). But AB5 makes no similar allowance for network companies. *See Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (statute impermissibly targeted plaintiffs where its applicability "depend[ed] on … a narrow set of circumstances" even though the text "stopped short of including [plaintiffs'] names").

This was no accident. As described above, the legislature repeatedly announced that the goal of AB5 was to target "large companies" that administer app-based platforms. 2-ER-078–81, 2-ER-083–85 (SAC ¶¶ 85–86, 92–93). Assemblymember Gonzalez acknowledged that AB5 was expressly intended to force "'gig' companies such as Uber, Lyft, DoorDash, Handy, and others" to abandon "a contract workforce," while its litany of "exceptions … w[ould] ensure that independent contractors" in other industries could proceed unscathed. Lorena Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them*, Wash. Post. (Sept. 11, 2019), available at https://tinyurl.com/whrx6j4f; *see also* 2-ER-078, 2-ER-081 (SAC ¶¶ 85 n.35, 86b) (Assemblymember Wicks remarking that the chief aim of AB5 was to prevent an "employer [who] uses a smartphone app" from "misclassify[ing workers] as … independent contractor[s]"). Gonzalez called

Plaintiff Uber out *by name* while exhorting the government to bring an enforcement action against Uber the very day the law went into effect. 2-ER-062 (SAC ¶ 56). Gonzalez made no similar exhortations to enforce the bill against other companies. Unsurprisingly, the government answered her clarion call when it sued *only* network companies (including Plaintiff Uber as well as Lyft, DoorDash, and Instacart), while targeting *no one else* for enforcement. 2-ER-099–100 (SAC ¶ 133).

AB2257 further singled out network companies. It dramatically expanded the referral agency exemption to include all businesses that met its requirements, while simultaneously excluding "delivery, courier, [and] transportation" referral agencies like Plaintiffs from the exemption. 2-ER-088 (SAC ¶ 102). The legislature did so in response to the district court's earlier observation that "[f]ood delivery for Uber Eats and Postmates would likely fall under" AB5's referral exemption for "people who run errands." *Id.* (citation omitted) And the legislature made AB2257's new exemptions retroactive to prevent Plaintiffs from asserting the referral agency exemption in ongoing litigation, as Plaintiffs had been doing to that point. 2-ER-092 (SAC ¶ 113).

The final two guideposts, which ask whether a statute defines the class based on irrevocable prior conduct, support Plaintiffs as well. *SeaRiver*, 309 F.3d at 669. Here, the legislature applied the ABC test retroactively with respect to wage-order claims. *See* Cal. Lab. Code § 2785(a). The legislature also passed "urgency"

legislation to exclude network companies from AB5's referral agency exemption, and it made such changes retroactive to ensure that Plaintiffs could not escape the ABC test. *Id.* § 2785(c); 2-ER-092 (SAC ¶ 113).

The upshot was that California's worker-classification system targeted network companies *regardless of any efforts Plaintiffs could make to comply with the law*. Indeed, the government convinced the state courts to enjoin Plaintiff Uber's business model despite numerous, fundamental changes Uber had made to its platform to comply with AB5. The California Court of Appeal expressly noted that the catalogue of "statements by Assemblymember Gonzalez and others are consistent with" the conclusion "that the Legislature 'targeted' ride-sharing companies." *Uber*, 56 Cal. App. 5th at 297 n.18. AB5's plain targeting meant the courts would not even entertain the possibility that Plaintiffs could "escape regulation merely by altering the course of their own present activities." *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 88 (1961); *see People v. Uber Techs., Inc.*, 2020 WL 5440308, at *14 n.19 (Cal. Super. Ct. Aug. 10, 2020) (ignoring recent changes to the Uber app), *aff'd*, 56 Cal. App. 5th 266 (2020). Such a law does not survive constitutional scrutiny.

### B. AB5 Punishes Network Companies

Plaintiffs also alleged that the legislature's worker-classification scheme impermissibly inflicts punishment. On this question, courts scrutinize the statute

under the familiar historical, motivational, and functional tests. *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984). In dismissing Plaintiffs' bill of attainder claim, the district court wholly ignored the first two tests and misapplied the third.

***The Historical Test.*** The district court overlooked that AB5 imposes historical means of punishment. It exposes Plaintiffs to "imprisonment" and the "punitive confiscation of property" should they misclassify workers as independent contractors and fail to provide any associated employee benefits. *Id.*; *see also Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 351 (2d Cir. 2002) (recognizing that such "legislatively imposed harm" is "punitive per se"). For example, violations of California Labor Code § 227 constitute a felony punishable by imprisonment, and the Private Attorneys General Act authorizes significant "[c]ivil penalties … intended to punish the wrongdoer" for violations of California wage-and-hour law. *Kim v. Reins Int'l Cal., Inc.*, 459 P.3d 1123, 1130 (Cal. 2020) (citation omitted); 2-ER-061–62, 2-ER-093–94 (SAC ¶¶ 54, 115–119).

AB5 also empowers the government to pursue injunctive relief to force reclassification of workers as independent contractors (2-ER-0062 (SAC ¶ 55)), thereby vitiating Plaintiffs' contractual rights with drivers and threatening their continued existence in the State (*see* Part III; *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property")). And the

legislature's public stigmatization of network companies is yet another indicator of traditional punishment. *See* 2-ER-049–50, 2-ER-078–81, 2-ER-084–85, 2-ER-091 (SAC ¶¶ 13, 85–86, 93, 109); *Foretich*, 351 F.3d at 1219.

***The Motivational Test.*** The district court also ignored the legislature's pellucid intent to punish network companies. Importantly, the Court's review is not limited to the four corners of "the formal legislative record." *Fowler*, 844 F.3d at 818 n.6. Rather, it considers the entire legislative process, including "the intent expressed by" voting legislators (*SeaRiver*, 309 F.3d at 669) and "the circumstances surrounding the[ statute's] passage" (*Legislature v. Eu*, 816 P.2d 1309, 1330 (Cal. 1991)). "[A] formal legislative announcement of moral blameworthiness" is not necessary to discern an intent to punish (*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 480 (1977)), nor are "[o]utright statements of punitive intent" (*Fowler*, 844 F.3d at 818). "[I]nstead, [courts] look for evidence permitting an *inference* of punitive intent." *Id.* (emphasis added).

No inferences are needed here, however, because outright statements of moral blameworthiness and punitive intent abound. As detailed above (Part I), the legislature publicly and repeatedly pronounced its verdict that "unscrupulous" and "bad actor" gig companies had "skirted labor laws," "exploited" and "misclassified" workers, and engaged in "wage theft." 2-ER-128 (SAC ¶ 241). With AB5, the principal coauthor explained, legislators were "in a position to do something about

that." 2-ER-050 (SAC ¶ 13). But it is for the judge and jury to determine whether Plaintiffs have "skirted" the law or engaged in "theft." *See United States v. Brown*, 381 U.S. 437, 445 (1965) (legislators are "not so well suited as politically independent judges and juries to the task of ruling upon … blameworthiness").

***The Functional Test.*** The district court considered none of the foregoing. Instead, it merely surmised that "the State had a rational basis for addressing misclassification concerns and did not pass AB 5 solely to punish Plaintiffs." 1-ER-015. But the Bill of Attainder Clause is not so easily evaded; a "statute … does not escape unconstitutionality merely because the Government can assert purposes that superficially appear to be nonpunitive." *Foretich*, 351 F.3d at 1223. Courts require "clear and convincing" evidence that the statute, when "viewed in terms of the type and severity of burdens imposed, … further[s] nonpunitive legislative purposes." *Id.* at 1220–21 (quoting *Nixon*, 433 U.S. at 475–76). This "functional test is more exacting than rational basis review": It "demands not some conceivable nonpunitive purpose, but rather an *actual* nonpunitive purpose." *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 456 (D.C. Cir. 2018) (emphasis added) (internal quotation marks and citation omitted); *Pataki*, 292 F.3d at 350 (similar).

As discussed above (Part II), California's worker-classification scheme does not pass even rational basis review. Though purporting to protect workers from misclassification by codifying the stringent ABC test (2-ER-059–60 (SAC ¶¶ 48–

50)), the legislature inexplicably eliminated that test for dozens of similarly situated businesses and millions of workers (2-ER-068, 2-ER-071–75, 2-ER-088–89 (SAC ¶¶ 67, 72–77, 102–04)). The legislature did so fully intending the ABC test to spell the end of the gig economy in California, and it applauded as Plaintiff Uber was brought to the brink of shutting down its platforms. 2-ER-091, 2-ER-128 (SAC ¶¶ 109, 243). That the legislature "*singled out*" network companies "for this severe burden belies the claim that [its] purposes were nonpunitive." *Foretich*, 351 F.3d at 1224.

## V. This Court Should Reverse the Denial of a Preliminary Injunction

The district court's errors described above affected not only the decision on the motion to dismiss, but also the denial of Plaintiffs' motion for a preliminary injunction. The court held that Plaintiffs failed to show that "serious questions exist[ed] as to Plaintiffs' likelihood of success on the merits," based on essentially the same reasoning. 1-ER-023–29 (Equal Protection), 1-ER-029–30 (Due Process), 1-ER-031–34 (Contracts Clause). Because the court's preliminary injunction denial "depended upon its erroneous analysis of the merits," this Court should reverse (or at least vacate) that denial. *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 738 (9th Cir. 2017); *see, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1188 (9th Cir. 2000) ("The district court's dismissal and its denial of a

preliminary injunction are reversed, and the case is remanded for entry of a preliminary injunction[.]").

The district court also erred when it held that the irreparable harm factor "weigh[ed] [only] slightly in Plaintiffs' favor." 1-ER-038. The district court acknowledged that Plaintiffs established "some measure of irreparable harm stemming from threatened municipal enforcement actions." 1-ER-036; *see also* Chamber Br. (No. 20-55267, Dkt. 26) at 8–9 (Company Plaintiffs face "the 'Hobson's Choice' of potentially 'continually violat[ing]' a law and exposing themselves to 'potentially huge liability' or 'suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review.'" (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009))).

The court also acknowledged Individual Plaintiffs' allegations "that they would suffer unrecoverable financial losses and lose customer goodwill, freedom, financial stability, and work satisfaction" if they were forcibly reclassified as employees. 1-ER-036; *see also* App-Based Drivers Br. (No. 20-55267, Dkt. 25) at 1–7 (explaining that "AB 5 poses a direct threat to Amici's"—and "thousands of [other] Californian workers[']"—"income stream, … way of life, … dignity," and "physical and psychological well-being"); IWF Br. (No. 20-55267, Dkt. 20) at 23 ("[AB5] is particularly troubling for women, who dominate certain sectors of the

freelancing world and many of whom desire flexibility and time over the benefits that may come with traditional employment.").

Yet the court erroneously ruled that "the balance of equities and the public interest weigh[ed] against the issuance of injunctive relief." 1-ER-040. In fact, independent work provides innumerable benefits to consumers, workers, and the economy. *See*, *e.g.*, Economists Br. (No. 20-55267, Dkt. 24) at 15 (explaining that independent, temporary, and on-call workers generated $1.28 trillion of revenue for the U.S. economy in 2018, and "in 2015, UberX alone generated $6.8 billion in consumer surplus—the difference between the maximum consumers would pay for the service and its price"); *id.* at 15 ("A key benefit the independent workforce provides to the economy is the ability to respond flexibly to fluctuations in both the needs of workers and consumers."); App-Based Drivers Br. (No. 20-55267, Dkt. 25) at 2, 15–16 (explaining that the option to work as independent contractors has "lifted" amici, and the thousands of workers they represent, "up on the economic ladder … in ways that would not be possible if they were classified as employees").

The district court erred in refusing to enjoin AB5, and this Court should reverse or vacate that decision.

## CONCLUSION

The Court should reverse the district court's orders denying a preliminary injunction and dismissing the case, and order the district court to enter Plaintiffs' requested preliminary injunction.

Dated: November 17, 2021

Respectfully submitted,

*/s/ Theane Evangelis*
Theane Evangelis
Blaine H. Evanson
Heather L. Richardson
Dhananjay S. Manthripragada
Alexander N. Harris

*Attorneys for Appellants Lydia Olson, Miguel Perez, Postmates Inc., and Uber Technologies, Inc.*

# CERTIFICATE OF COMPLIANCE

I certify that pursuant Fed. R. App. P. 32(a)(5)(A), the attached motion is proportionately spaced, has a typeface of 14 points, and complies with the word limitations set forth in 9th Cir. R. 32-1 because it contains 13,690 words.

Dated: November 17, 2021

/s/ *Theane Evangelis*
Theane Evangelis

*Attorneys for Appellants Lydia Olson, Miguel Perez, Postmates Inc., and Uber Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system on November 17, 2021. I certify that all participants in

the case are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.

Dated: November 17, 2021

*/s/ Theane Evangelis*
Theane Evangelis

# ADDENDUM

# ADDENDUM

Pursuant to Circuit Rule 28-2.7, this addendum includes the following pertinent statutory provisions and rules, reproduced verbatim:

**Exhibit A** ........ U.S. Const. art. I, § 10

**Exhibit B** ........ Cal. Const. art. I, § 9

**Exhibit C** ........ AB 5, 2019–20 Reg. Sess. (Cal. 2019)

**Exhibit D** ........ AB 2257, 2019–20 Reg. Sess. (Cal. 2020)

**Exhibit E** ........ Cal. Bus. & Prof. Code § 7451

**Exhibit F** ......... Cal. Bus. & Prof. Code § 7453

**Exhibit G** ........ Cal. Bus. & Prof. Code § 7463

**Exhibit H** ........ Cal. Lab. Code § 225

**Exhibit I** .......... Cal. Lab. Code § 226.6

**Exhibit J** ......... Cal. Lab. Code § 227

**Exhibit K** ........ Cal. Lab. Code § 553

**Exhibit L** ........ Cal. Lab. Code § 1199

**Exhibit M** ....... Cal. Lab. Code § 2775

**Exhibit N** ........ Cal. Lab. Code § 2776

**Exhibit O** ........ Cal. Lab. Code § 2777

**Exhibit P** ......... Cal. Lab. Code § 2778

**Exhibit Q** ........ Cal. Lab. Code § 2779

**Exhibit R** ........ Cal. Lab. Code § 2780

**Exhibit S** ......... Cal. Lab. Code § 2781

**Exhibit T** ......... Cal. Lab. Code § 2782

**Exhibit U** ........ Cal. Lab. Code § 2783

**Exhibit V** ........ Cal. Lab. Code § 2785

**Exhibit W** ....... Cal. Lab. Code § 2786

**Exhibit X** ........ Cal. Unemp. Ins. Code § 976

**Exhibit Y** ........ Cal. Unemp. Ins. Code § 977

**Exhibit Z** ........ Cal. Unemp. Ins. Code § 1088.5

**Exhibit AA** ..... Cal. Unemp. Ins. Code § 1112

**Exhibit AB** ..... Cal. Unemp. Ins. Code § 1126.1

**Exhibit AC** ..... Cal. Unemp. Ins. Code § 13020

**Exhibit AD** ..... Cal. Unemp. Ins. Code § 13021

## EXHIBIT A

U.S. Const. art. I, § 10, cl. 1
Contracts Clause

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

# **EXHIBIT B**

Cal. Const. art. I, § 9
Contracts Clause

A bill of attainder, ex post facto law, or law impairing the obligation of contracts may not be passed

## EXHIBIT C

Assembly Bill No. 5
CHAPTER 296

An act to amend Section 3351 of, and to add Section 2750.3 to, the Labor Code, and to amend Sections 606.5 and 621 of the Unemployment Insurance Code, relating to employment, and making an appropriation therefor.

[ Approved by Governor  September 18, 2019. Filed with Secretary of State
September 18, 2019. ]

LEGISLATIVE COUNSEL'S DIGEST

AB 5, Gonzalez. Worker status: employees and independent contractors.

Existing law, as established in the case of Dynamex Operations West, Inc. v. Superior Court of Los Angeles (2018) 4 Cal.5th 903 (Dynamex), creates a presumption that a worker who performs services for a hirer is an employee for purposes of claims for wages and benefits arising under wage orders issued by the Industrial Welfare Commission. Existing law requires a 3-part test, commonly known as the "ABC" test, to establish that a worker is an independent contractor for those purposes.

Existing law, for purposes of unemployment insurance provisions, requires employers to make contributions with respect to unemployment insurance and disability insurance from the wages paid to their employees. Existing law defines "employee" for those purposes to include, among other individuals, any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.

This bill would state the intent of the Legislature to codify the decision in the Dynamex case and clarify its application. The bill would provide that for purposes of the provisions of the Labor Code, the Unemployment Insurance Code, and the wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that the person is free from the control and direction of the hiring entity in connection with the performance of the work, the person performs work that is outside the usual course of the hiring entity's business, and the person is customarily engaged in an independently established trade, occupation, or business. The bill, notwithstanding

this provision, would provide that any statutory exception from employment status or any extension of employer status or liability remains in effect, and that if a court rules that the 3-part test cannot be applied, then the determination of employee or independent contractor status shall be governed by the test adopted in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341 (Borello). The bill would exempt specified occupations from the application of Dynamex, and would instead provide that these occupations are governed by Borello. These exempt occupations would include, among others, licensed insurance agents, certain licensed health care professionals, registered securities broker-dealers or investment advisers, direct sales salespersons, real estate licensees, commercial fishermen, workers providing licensed barber or cosmetology services, and others performing work under a contract for professional services, with another business entity, or pursuant to a subcontract in the construction industry.

The bill would also require the Employment Development Department, on or before March 1, 2021, and each March 1 thereafter, to issue an annual report to the Legislature on the use of unemployment insurance in the commercial fishing industry. The bill would make the exemption for commercial fishermen applicable only until January 1, 2023, and the exemption for licensed manicurists applicable only until January 1, 2022. The bill would authorize an action for injunctive relief to prevent employee misclassification to be brought by the Attorney General and specified local prosecuting agencies.

This bill would also redefine the definition of "employee" described above, for purposes of unemployment insurance provisions, to include an individual providing labor or services for remuneration who has the status of an employee rather than an independent contractor, unless the hiring entity demonstrates that the individual meets all of specified conditions, including that the individual performs work that is outside the usual course of the hiring entity's business. Because this bill would increase the categories of individuals eligible to receive benefits from, and thus would result in additional moneys being deposited into, the Unemployment Fund, a continuously appropriated fund, the bill would make an appropriation. The bill would state that addition of the provision to the Labor Code does not constitute a change in, but is declaratory of, existing law with regard to violations of the Labor Code relating to wage orders of the Industrial Welfare Commission. The bill would also state that specified Labor Code provisions of the bill apply retroactively to existing claims and actions to the maximum extent permitted by law while other provisions apply to work performed on or after January 1, 2020. The bill would additionally provide that the bill's provisions do not permit an employer to

reclassify an individual who was an employee on January 1, 2019, to an independent contractor due to the bill's enactment.

Existing provisions of the Labor Code make it a crime for an employer to violate specified provisions of law with regard to an employee. The Unemployment Insurance Code also makes it a crime to violate specified provisions of law with regard to benefits and payments.

By expanding the definition of an employee for purposes of these provisions, the bill would expand the definition of a crime, thereby imposing a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Digest Key

Vote: MAJORITY   Appropriation: YES   Fiscal Committee: YES   Local Program: YES

Bill Text

The people of the State of California do enact as follows:

SECTION 1. The Legislature finds and declares all of the following:

(a) On April 30, 2018, the California Supreme Court issued a unanimous decision in Dynamex Operations West, Inc. v. Superior Court of Los Angeles (2018) 4 Cal.5th 903 (Dynamex).

(b) In its decision, the Court cited the harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance.

(c) The misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality.

(d) It is the intent of the Legislature in enacting this act to include provisions that would codify the decision of the California Supreme Court in Dynamex and would clarify the decision's application in state law.

(e) It is also the intent of the Legislature in enacting this act to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave. By codifying the California Supreme Court's landmark, unanimous Dynamex decision, this act restores these important protections to potentially several million workers who have been denied these basic workplace rights that all employees are entitled to under the law.

(f) The Dynamex decision interpreted one of the three alternative definitions of "employ," the "suffer or permit" definition, from the wage orders of the Industrial Welfare Commission (IWC). Nothing in this act is intended to affect the application of alternative definitions from the IWC wage orders of the term "employ," which were not addressed by the holding of Dynamex.

(g) Nothing in this act is intended to diminish the flexibility of employees to work part-time or intermittent schedules or to work for multiple employers.

SEC. 2. Section 2750.3 is added to the Labor Code, to read:

2750.3. (a) (1) For purposes of the provisions of this code and the Unemployment Insurance Code, and for the wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(B) The person performs work that is outside the usual course of the hiring entity's business.

(C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

(2) Notwithstanding paragraph (1), any exceptions to the terms "employee," "employer," "employ," or "independent contractor," and any extensions of employer status or liability, that are expressly made by a provision of this code, the Unemployment Insurance Code, or in an applicable order of the Industrial Welfare Commission, including, but not limited to, the definition of "employee" in subdivision 2(E) of Wage Order No. 2, shall remain in effect for the purposes set forth therein.

(3) If a court of law rules that the three-part test in paragraph (1) cannot be applied to a particular context based on grounds other than an express exception to employment status as provided under paragraph (2), then the determination of employee or independent contractor status in that context shall instead be governed by the California Supreme Court's decision in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341 (Borello).

(b) Subdivision (a) and the holding in Dynamex Operations West, Inc. v. Superior Court of Los Angeles (2018) 4 Cal.5th 903 (Dynamex), do not apply to the following occupations as defined in the paragraphs below, and instead, the determination of employee or independent contractor status for individuals in those occupations shall be governed by Borello.

(1) A person or organization who is licensed by the Department of Insurance pursuant to Chapter 5 (commencing with Section 1621), Chapter 6 (commencing with Section 1760), or Chapter 8 (commencing with Section 1831) of Part 2 of Division 1 of the Insurance Code.

(2) A physician and surgeon, dentist, podiatrist, psychologist, or veterinarian licensed by the State of California pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, performing professional or medical services provided to or by a health care entity, including an entity organized as a sole proprietorship, partnership, or professional corporation as defined in Section 13401 of the Corporations Code. Nothing in this subdivision shall apply to the employment settings currently or potentially governed by collective bargaining agreements for the licensees identified in this paragraph.

(3) An individual who holds an active license from the State of California and is practicing one of the following recognized professions: lawyer, architect, engineer, private investigator, or accountant.

(4) A securities broker-dealer or investment adviser or their agents and representatives that are registered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority or licensed by the State of California under Chapter 2 (commencing with Section 25210) or Chapter 3 (commencing with Section 25230) of Division 1 of Part 3 of Title 4 of the Corporations Code.

(5) A direct sales salesperson as described in Section 650 of the Unemployment Insurance Code, so long as the conditions for exclusion from employment under that section are met.

(6) A commercial fisherman working on an American vessel as defined in subparagraph (A) below.

(A) For the purposes of this paragraph:

(i) "American vessel" has the same meaning as defined in Section 125.5 of the Unemployment Insurance Code.

(ii) "Commercial fisherman" means a person who has a valid, unrevoked commercial fishing license issued pursuant to Article 3 (commencing with Section 7850) of Chapter 1 of Part 3 of Division 6 of the Fish and Game Code.

(iii) "Working on an American vessel" means the taking or the attempt to take fish, shellfish, or other fishery resources of the state by any means, and includes each individual aboard an American vessel operated for fishing purposes who participates directly or indirectly in the taking of these raw fishery products, including maintaining the vessel or equipment used aboard the vessel. However, "working on an American vessel" does not apply to anyone aboard a licensed commercial fishing vessel as a visitor or guest who does not directly or indirectly participate in the taking.

(B) For the purposes of this paragraph, a commercial fisherman working on an American vessel is eligible for unemployment insurance benefits if they meet the definition of "employment" in Section 609 of the Unemployment Insurance Code and are otherwise eligible for those benefits pursuant to the provisions of the Unemployment Insurance Code.

(C) On or before March 1, 2021, and each March 1 thereafter, the Employment Development Department shall issue an annual report to the Legislature on the use of unemployment insurance in the commercial fishing industry. This report shall include, but not be limited to, reporting the number of commercial fishermen who apply for unemployment insurance benefits, the number of commercial fishermen

who have their claims disputed, the number of commercial fishermen who have their claims denied, and the number of commercial fishermen who receive unemployment insurance benefits. The report required by this subparagraph shall be submitted in compliance with Section 9795 of the Government Code.

(D) This paragraph shall become inoperative on January 1, 2023, unless extended by the Legislature.

(c) (1) Subdivision (a) and the holding in Dynamex do not apply to a contract for "professional services" as defined below, and instead the determination of whether the individual is an employee or independent contractor shall be governed by Borello if the hiring entity demonstrates that all of the following factors are satisfied:

(A) The individual maintains a business location, which may include the individual's residence, that is separate from the hiring entity. Nothing in this subdivision prohibits an individual from choosing to perform services at the location of the hiring entity.

(B) If work is performed more than six months after the effective date of this section, the individual has a business license, in addition to any required professional licenses or permits for the individual to practice in their profession.

(C) The individual has the ability to set or negotiate their own rates for the services performed.

(D) Outside of project completion dates and reasonable business hours, the individual has the ability to set the individual's own hours.

(E) The individual is customarily engaged in the same type of work performed under contract with another hiring entity or holds themselves out to other potential customers as available to perform the same type of work.

(F) The individual customarily and regularly exercises discretion and independent judgment in the performance of the services.

(2) For purposes of this subdivision:

(A) An "individual" includes an individual providing services through a sole proprietorship or other business entity.

(B) "Professional services" means services that meet any of the following:

(i) Marketing, provided that the contracted work is original and creative in character and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the contracted work.

(ii) Administrator of human resources, provided that the contracted work is predominantly intellectual and varied in character and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(iii) Travel agent services provided by either of the following: (I) a person regulated by the Attorney General under Article 2.6 (commencing with Section 17550) of Chapter 1 of Part 3 of Division 7 of the Business and Professions Code, or (II) an individual who is a seller of travel within the meaning of subdivision (a) of Section 17550.1 of the Business and Professions Code and who is exempt from the registration under subdivision (g) of Section 17550.20 of the Business and Professions Code.

(iv) Graphic design.

(v) Grant writer.

(vi) Fine artist.

(vii) Services provided by an enrolled agent who is licensed by the United States Department of the Treasury to practice before the Internal Revenue Service pursuant to Part 10 of Subtitle A of Title 31 of the Code of Federal Regulations.

(viii) Payment processing agent through an independent sales organization.

(ix) Services provided by a still photographer or photojournalist who do not license content submissions to the putative employer more than 35 times per year. This clause is not applicable to an individual who works on motion pictures, which includes, but is not limited to, projects produced for theatrical, television, internet streaming for any device, commercial productions, broadcast news, music videos, and live shows, whether distributed live or recorded for later broadcast, regardless of the distribution platform. For purposes of this clause a "submission" is one or more items or forms of content produced by a still photographer or photojournalist that: (I) pertains to a specific event or specific subject; (II) is provided for in a contract that defines the scope of the work; and (III) is accepted by and licensed to the publication or stock photography company and published or posted. Nothing in

this section shall prevent a photographer or artist from displaying their work product for sale.

(x) Services provided by a freelance writer, editor, or newspaper cartoonist who does not provide content submissions to the putative employer more than 35 times per year. Items of content produced on a recurring basis related to a general topic shall be considered separate submissions for purposes of calculating the 35 times per year. For purposes of this clause, a "submission" is one or more items or forms of content by a freelance journalist that: (I) pertains to a specific event or topic; (II) is provided for in a contract that defines the scope of the work; (III) is accepted by the publication or company and published or posted for sale.

(xi) Services provided by a licensed esthetician, licensed electrologist, licensed manicurist, licensed barber, or licensed cosmetologist provided that the individual:

(I) Sets their own rates, processes their own payments, and is paid directly by clients.

(II) Sets their own hours of work and has sole discretion to decide the number of clients and which clients for whom they will provide services.

(III) Has their own book of business and schedules their own appointments.

(IV) Maintains their own business license for the services offered to clients.

(V) If the individual is performing services at the location of the hiring entity, then the individual issues a Form 1099 to the salon or business owner from which they rent their business space.

(VI) This subdivision shall become inoperative, with respect to licensed manicurists, on January 1, 2022.

(d) Subdivision (a) and the holding in Dynamex do not apply to the following, which are subject to the Business and Professions Code:

(1) A real estate licensee licensed by the State of California pursuant to Division 4 (commencing with Section 10000) of the Business and Professions Code, for whom the determination of employee or independent contractor status shall be governed by subdivision (b) of Section 10032 of the Business and Professions Code. If that section is not applicable, then this determination shall be governed as follows: (A) for purposes of unemployment insurance by Section 650 of the Unemployment Insurance Code; (B) for purposes of workers compensation by Section 3200 et seq.;

and (C) for all other purposes in the Labor Code by Borello. The statutorily imposed duties of a responsible broker under Section 10015.1 of the Business and Professions Code are not factors to be considered under the Borello test.

(2) A repossession agency licensed pursuant to Section 7500.2 of the Business and Professions Code, for whom the determination of employee or independent contractor status shall be governed by Section 7500.2 of the Business and Professions Code, if the repossession agency is free from the control and direction of the hiring person or entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(e) Subdivision (a) and the holding in Dynamex do not apply to a bona fide business-to-business contracting relationship, as defined below, under the following conditions:

(1) If a business entity formed as a sole proprietorship, partnership, limited liability company, limited liability partnership, or corporation ("business service provider") contracts to provide services to another such business ("contracting business"), the determination of employee or independent contractor status of the business services provider shall be governed by Borello, if the contracting business demonstrates that all of the following criteria are satisfied:

(A) The business service provider is free from the control and direction of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(B) The business service provider is providing services directly to the contracting business rather than to customers of the contracting business.

(C) The contract with the business service provider is in writing.

(D) If the work is performed in a jurisdiction that requires the business service provider to have a business license or business tax registration, the business service provider has the required business license or business tax registration.

(E) The business service provider maintains a business location that is separate from the business or work location of the contracting business.

(F) The business service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(G) The business service provider actually contracts with other businesses to provide the same or similar services and maintains a clientele without restrictions from the hiring entity.

(H) The business service provider advertises and holds itself out to the public as available to provide the same or similar services.

(I) The business service provider provides its own tools, vehicles, and equipment to perform the services.

(J) The business service provider can negotiate its own rates.

(K) Consistent with the nature of the work, the business service provider can set its own hours and location of work.

(L) The business service provider is not performing the type of work for which a license from the Contractor's State License Board is required, pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code.

(2) This subdivision does not apply to an individual worker, as opposed to a business entity, who performs labor or services for a contracting business.

(3) The determination of whether an individual working for a business service provider is an employee or independent contractor of the business service provider is governed by paragraph (1) of subdivision (a).

(4) This subdivision does not alter or supersede any existing rights under Section 2810.3.

(f) Subdivision (a) and the holding in Dynamex do not apply to the relationship between a contractor and an individual performing work pursuant to a subcontract in the construction industry, and instead the determination of whether the individual is an employee of the contractor shall be governed by Section 2750.5 and by Borello, if the contractor demonstrates that all the following criteria are satisfied:

(1) The subcontract is in writing.

(2) The subcontractor is licensed by the Contractors State License Board and the work is within the scope of that license.

(3) If the subcontractor is domiciled in a jurisdiction that requires the subcontractor to have a business license or business tax registration, the subcontractor has the required business license or business tax registration.

(4) The subcontractor maintains a business location that is separate from the business or work location of the contractor.

(5) The subcontractor has the authority to hire and to fire other persons to provide or to assist in providing the services.

(6) The subcontractor assumes financial responsibility for errors or omissions in labor or services as evidenced by insurance, legally authorized indemnity obligations, performance bonds, or warranties relating to the labor or services being provided.

(7) The subcontractor is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(8) (A) Paragraph (2) shall not apply to a subcontractor providing construction trucking services for which a contractor's license is not required by Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, provided that all of the following criteria are satisfied:

(i) The subcontractor is a business entity formed as a sole proprietorship, partnership, limited liability company, limited liability partnership, or corporation.

(ii) For work performed after January 1, 2020, the subcontractor is registered with the Department of Industrial Relations as a public works contractor pursuant to Section 1725.5, regardless of whether the subcontract involves public work.

(iii) The subcontractor utilizes its own employees to perform the construction trucking services, unless the subcontractor is a sole proprietor who operates their own truck to perform the entire subcontract and holds a valid motor carrier permit issued by the Department of Motor Vehicles.

(iv) The subcontractor negotiates and contracts with, and is compensated directly by, the licensed contractor.

(B) For work performed after January 1, 2020, any business entity that provides construction trucking services to a licensed contractor utilizing more than one truck shall be deemed the employer for all drivers of those trucks.

(C) For purposes of this paragraph, "construction trucking services" mean hauling and trucking services provided in the construction industry pursuant to a contract with a licensed contractor utilizing vehicles that require a commercial driver's license to operate or have a gross vehicle weight rating of 26,001 or more pounds.

(D) This paragraph shall only apply to work performed before January 1, 2022.

(E) Nothing in this paragraph prohibits an individual who owns their truck from working as an employee of a trucking company and utilizing that truck in the scope of that employment. An individual employee providing their own truck for use by an employer trucking company shall be reimbursed by the trucking company for the reasonable expense incurred for the use of the employee owned truck.

(g) Subdivision (a) and the holding in Dynamex do not apply to the relationship between a referral agency and a service provider, as defined below, under the following conditions:

(1) If a business entity formed as a sole proprietor, partnership, limited liability company, limited liability partnership, or corporation ("service provider") provides services to clients through a referral agency, the determination whether the service provider is an employee of the referral agency shall be governed by Borello, if the referral agency demonstrates that all of the following criteria are satisfied:

(A) The service provider is free from the control and direction of the referral agency in connection with the performance of the work for the client, both as a matter of contract and in fact.

(B) If the work for the client is performed in a jurisdiction that requires the service provider to have a business license or business tax registration, the service provider has the required business license or business tax registration.

(C) If the work for the client requires the service provider to hold a state contractor's license pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, the service provider has the required contractor's license.

(D) The service provider delivers services to the client under service provider's name, rather than under the name of the referral agency.

(E) The service provider provides its own tools and supplies to perform the services.

(F) The service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed for the client.

(G) The service provider maintains a clientele without any restrictions from the referral agency and the service provider is free to seek work elsewhere, including through a competing agency.

(H) The service provider sets its own hours and terms of work and is free to accept or reject clients and contracts.

(I) The service provider sets its own rates for services performed, without deduction by the referral agency.

(J) The service provider is not penalized in any form for rejecting clients or contracts. This subparagraph does not apply if the service provider accepts a client or contract and then fails to fulfill any of its contractual obligations.

(2) For purposes of this subdivision, the following definitions apply:

(A) "Animal services" means services related to daytime and nighttime pet care including pet boarding under Section 122380 of the Health and Safety Code.

(B) "Client" means a person or business that engages a service contractor through a referral agency.

(C) "Referral agency" is a business that connects clients with service providers that provide graphic design, photography, tutoring, event planning, minor home repair, moving, home cleaning, errands, furniture assembly, animal services, dog walking, dog grooming, web design, picture hanging, pool cleaning, or yard cleanup.

(D) "Referral agency contract" is the agency's contract with clients and service contractors governing the use of its intermediary services described in subparagraph (C).

(E) "Service provider" means a person or business who agrees to the referral agency's contract and uses the referral agency to connect with clients.

(F) "Tutor" means a person who develops and teaches their own curriculum. A "tutor" does not include a person who teaches a curriculum created by a public school or who contracts with a public school through a referral company for purposes of teaching students of a public school.

(3) This subdivision does not apply to an individual worker, as opposed to a business entity, who performs services for a client through a referral agency. The determination whether such an individual is an employee of a referral agency is governed by subdivision (a).

(h) Subdivision (a) and the holding in Dynamex do not apply to the relationship between a motor club holding a certificate of authority issued pursuant to Chapter 2 (commencing with Section 12160) of Part 5 of Division 2 of the Insurance Code and an individual performing services pursuant to a contract between the motor club and a third party to provide motor club services utilizing the employees and vehicles of the third party and, instead, the determination whether such an individual is an employee of the motor club shall be governed by Borello, if the motor club demonstrates that the third party is a separate and independent business from the motor club.

(i) (1) The addition of subdivision (a) to this section of the Labor Code by this act does not constitute a change in, but is declaratory of, existing law with regard to wage orders of the Industrial Welfare Commission and violations of the Labor Code relating to wage orders.

(2) Insofar as the application of subdivisions (b), (c), (d), (e), (f), (g), and (h) of this section would relieve an employer from liability, those subdivisions shall apply retroactively to existing claims and actions to the maximum extent permitted by law.

(3) Except as provided in paragraphs (1) and (2) of this subdivision, the provisions of this section of the Labor Code shall apply to work performed on or after January 1, 2020.

(j) In addition to any other remedies available, an action for injunctive relief to prevent the continued misclassification of employees as independent contractors may be prosecuted against the putative employer in a court of competent jurisdiction by the Attorney General or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association.

SEC. 3. Section 3351 of the Labor Code, as amended by Section 33 of Chapter 38 of the Statutes of 2019, is amended to read:

3351. "Employee" means every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed, and includes:

(a) Aliens and minors.

(b) All elected and appointed paid public officers.

(c) All officers and members of boards of directors of quasi-public or private corporations while rendering actual service for the corporations for pay. An officer or member of a board of directors may elect to be excluded from coverage in accordance with paragraph (16), (18), or (19) of subdivision (a) of Section 3352.

(d) Except as provided in paragraph (8) of subdivision (a) of Section 3352, any person employed by the owner or occupant of a residential dwelling whose duties are incidental to the ownership, maintenance, or use of the dwelling, including the care and supervision of children, or whose duties are personal and not in the course of the trade, business, profession, or occupation of the owner or occupant.

(e) All persons incarcerated in a state penal or correctional institution while engaged in assigned work or employment as defined in paragraph (1) of subdivision (a) of Section 10021 of Title 8 of the California Code of Regulations, or engaged in work performed under contract.

(f) All working members of a partnership or limited liability company receiving wages irrespective of profits from the partnership or limited liability company. A general partner of a partnership or a managing member of a limited liability company may elect to be excluded from coverage in accordance with paragraph (17) of subdivision (a) of Section 3352.

(g) A person who holds the power to revoke a trust, with respect to shares of a private corporation held in trust or general partnership or limited liability company interests held in trust. To the extent that this person is deemed to be an employee described in subdivision (c) or (f), as applicable, the person may also elect to be excluded from coverage as described in subdivision (c) or (f), as applicable, if that person otherwise meets the criteria for exclusion, as described in Section 3352.

(h) A person committed to a state hospital facility under the State Department of State Hospitals, as defined in Section 4100 of the Welfare and Institutions Code, while engaged in and assigned work in a vocation rehabilitation program, including a sheltered workshop.

(i) Beginning on July 1, 2020, any individual who is an employee pursuant to Section 2750.3. This subdivision shall not apply retroactively.

SEC. 4. Section 606.5 of the Unemployment Insurance Code is amended to read:

606.5. (a) Whether an individual or entity is the employer of specific employees shall be determined pursuant to subdivision (b) of Section 621, except as provided in subdivisions (b) and (c).

(b) As used in this section, a "temporary services employer" and a "leasing employer" is an employing unit that contracts with clients or customers to supply workers to perform services for the client or customer and performs all of the following functions:

(1) Negotiates with clients or customers for such matters as time, place, type of work, working conditions, quality, and price of the services.

(2) Determines assignments or reassignments of workers, even though workers retain the right to refuse specific assignments.

(3) Retains the authority to assign or reassign a worker to other clients or customers when a worker is determined unacceptable by a specific client or customer.

(4) Assigns or reassigns the worker to perform services for a client or customer.

(5) Sets the rate of pay of the worker, whether or not through negotiation.

(6) Pays the worker from its own account or accounts.

(7) Retains the right to hire and terminate workers.

(c) If an individual or entity contracts to supply an employee to perform services for a customer or client, and is a leasing employer or a temporary services employer, the individual or entity is the employer of the employee who performs the services. If an individual or entity contracts to supply an employee to perform services for a client or customer and is not a leasing employer or a temporary services employer, the client or customer is the employer of the employee who performs the services. An individual or entity that contracts to supply an employee to perform services for a customer or client and pays wages to the employee for the services, but is not a leasing employer or a temporary services employer, pays the wages as the agent of the employer.

(d) In circumstances which are in essence the loan of an employee from one employer to another employer wherein direction and control of the manner and means of performing the services changes to the employer to whom the employee is loaned, the loaning employer shall continue to be the employer of the employee if the loaning employer continues to pay remuneration to the employee, whether or not reimbursed by the other employer. If the employer to whom the employee is loaned pays remuneration to the employee for the services performed, that employer shall be considered the employer for the purposes of any remuneration paid to the employee by the employer, regardless of whether the loaning employer also pays remuneration to the employee.

SEC. 5. Section 621 of the Unemployment Insurance Code is amended to read:

621. "Employee" means all of the following:

(a) Any officer of a corporation.

(b) Any individual providing labor or services for remuneration has the status of an employee rather than an independent contractor unless the hiring entity demonstrates all of the following conditions:

(1) The individual is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(2) The individual performs work that is outside the usual course of the hiring entity's business.

(3) The individual is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

(c) (1) Any individual, other than an individual who is an employee under subdivision (a) or (b), who performs services for remuneration for any employing unit if the contract of service contemplates that substantially all of those services are to be performed personally by that individual either:

(A) As an agent-driver or commission-driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages (other than milk), or laundry or drycleaning services, for their principal.

(B) As a traveling or city salesperson, other than as an agent-driver or commission-driver, engaged upon a full-time basis in the solicitation on behalf of, and the

transmission to, their principal (except for sideline sales activities on behalf of some other person) of orders from wholesalers, retailers, contractors, or operators of hotels, restaurants, or other similar establishments for merchandise for resale or supplies for use in their business operations.

(C) As a home worker performing work, according to specifications furnished by the person for whom the services are performed, on materials or goods furnished by that person that are required to be returned to that person or a designee thereof.

(2) An individual shall not be included in the term "employee" under the provisions of this subdivision if that individual has a substantial investment in facilities used in connection with the performance of those services, other than in facilities for transportation, or if the services are in the nature of a single transaction not part of a continuing relationship with the employing unit for whom the services are performed.

(d) Any individual who is an employee pursuant to Section 601.5 or 686.

(e) Any individual whose services are in subject employment pursuant to an election for coverage under any provision of Article 4 (commencing with Section 701) of this chapter.

(f) Any member of a limited liability company that is treated as a corporation for federal income tax purposes.

SEC. 6. No provision of this measure shall permit an employer to reclassify an individual who was an employee on January 1, 2019, to an independent contractor due to this measure's enactment.

SEC. 7. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

Assembly Bill No. 2257
CHAPTER 38

An act to add Article 1.5 (commencing with Section 2775) to Chapter 2 of Division 3 of, and to repeal Section 2750.3 of, the Labor Code, and to amend Sections 17020.12 and 23045.6 of, and to add Sections 18406, 21003.5, and 61001 to, the Revenue and Taxation Code, relating to employment, and declaring the urgency thereof, to take effect immediately.

[ Approved by Governor  September 04, 2020. Filed with Secretary of State September 04, 2020. ]

LEGISLATIVE COUNSEL'S DIGEST

AB 2257, Gonzalez. Worker classification: employees and independent contractors: occupations: professional services.

Existing law requires a 3-part test, commonly known as the "ABC" test, to determine if workers are employees or independent contractors for purposes of the Labor Code, the Unemployment Insurance Code, and the wage orders of the Industrial Welfare Commission. Under the ABC test, a person providing labor or services for remuneration is considered an employee rather than an independent contractor unless the hiring entity demonstrates that the person is free from the control and direction of the hiring entity in connection with the performance of the work, the person performs work that is outside the usual course of the hiring entity's business, and the person is customarily engaged in an independently established trade, occupation, or business. Existing law charges the Labor Commissioner with the enforcement of labor laws, including worker classification.

Existing law exempts specified occupations and business relationships from the application of the ABC test described above. Existing law, instead, provides that these exempt relationships are governed by the multifactor test previously adopted in the case of S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341. Existing exemptions include persons providing professional services under specified circumstances, including certain services provided by still photographers, photojournalists, freelance writers, editors, and newspaper cartoonists.

This bill would revise and recast these provisions. The bill would additionally exempt certain occupations in connection with creating, marketing, promoting, or

distributing sound recordings or musical compositions. The bill would also exempt a musician or musical group for the purpose of a single-engagement live performance event, unless certain conditions apply, and would define related terms. The bill would also exempt an individual performance artist presenting material that is their original work and creative in character and the result of which depends primarily on the individual's invention, imagination, or talent, if certain conditions are satisfied.

This bill would delete the existing professional services exemptions for services provided by still photographers, photojournalists, freelance writers, editors, and newspaper cartoonists. The bill would, instead, establish an exemption for services provided by a still photographer, photojournalist, videographer, or photo editor, as defined, who works under a written contract that specifies certain terms, subject to prescribed restrictions. The bill would establish an exemption for services provided to a digital content aggregator, as defined, by a still photographer, photojournalist, videographer, or photo editor. The bill would establish an exemption for services provided by a fine artist, freelance writer, translator, editor, content contributor, advisor, narrator, cartographer, producer, copy editor, illustrator, or newspaper cartoonist who works under a written contract that specifies certain terms, subject to prescribed restrictions.

This bill would create additional exemptions for various professions and occupations. In this regard, the bill would exempt from the ABC test people who provide underwriting inspections and other services for the insurance industry, a manufactured housing salesperson, subject to certain obligations, people engaged by an international exchange visitor program, as specified, consulting services, animal services, and competition judges with specialized skills, as specified. The bill would also create exceptions for licensed landscape architects, specialized performers teaching master classes, registered professional foresters, real estate appraisers and home inspectors, and feedback aggregators. The bill would revise the conditions pursuant to which business service providers providing services pursuant to contract to another business are exempt. The bill would revise the criteria pursuant to which referral agencies and service providers providing services to clients through referral agencies are exempt and would revise applicable definitions. The bill would also create an exemption for business-to-business relationships between 2 or more sole proprietors, as specified. The bill would provide that a hiring entity need only satisfy all of the conditions of one of the exemption provisions to qualify for the exemption from the ABC Test.

Existing law authorizes an action for injunctive relief to prevent misclassification of employees, to be prosecuted against a putative employer by the Attorney General or a city attorney.

This bill would also authorize a district attorney to prosecute an action for injunctive relief.

Existing provisions of tax law define "employee" for purposes of those provisions.

This bill would make conforming changes to tax law regarding the determination of the status of a worker as either an employee or an independent contractor per the criteria described above.

This bill would declare that it is to take effect immediately as an urgency statute.

Digest Key

Vote: 2/3   Appropriation: NO   Fiscal Committee: YES   Local Program: NO

Bill Text

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

SECTION 1. Section 2750.3 of the Labor Code is repealed.

SEC. 2. Article 1.5 (commencing with Section 2775) is added to Chapter 2 of Division 3 of the Labor Code, to read:

Article  1.5. Worker Status: Employees

2775. (a) As used in this article:

(1) "Dynamex" means Dynamex Operations W. Inc. v. Superior Court (2018) 4 Cal.5th 903.

(2) "Borello" means the California Supreme Court's decision in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341.

(b) (1) For purposes of this code and the Unemployment Insurance Code, and for the purposes of wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an

independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(B) The person performs work that is outside the usual course of the hiring entity's business.

(C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

(2) Notwithstanding paragraph (1), any exceptions to the terms "employee," "employer," "employ," or "independent contractor," and any extensions of employer status or liability, that are expressly made by a provision of this code, the Unemployment Insurance Code, or in an applicable order of the Industrial Welfare Commission, including, but not limited to, the definition of "employee" in subdivision 2(E) of Wage Order No. 2, shall remain in effect for the purposes set forth therein.

(3) If a court of law rules that the three-part test in paragraph (1) cannot be applied to a particular context based on grounds other than an express exception to employment status as provided under paragraph (2), then the determination of employee or independent contractor status in that context shall instead be governed by the California Supreme Court's decision in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341 (Borello).

2776. Section 2775 and the holding in Dynamex do not apply to a bona fide business-to-business contracting relationship, as defined below, under the following conditions:

(a) If an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ("business service provider") contracts to provide services to another such business or to a public agency or quasi-public corporation ("contracting business"), the determination of employee or independent contractor status of the business services provider shall be governed by Borello, if the contracting business demonstrates that all of the following criteria are satisfied:

(1) The business service provider is free from the control and direction of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(2) The business service provider is providing services directly to the contracting business rather than to customers of the contracting business. This subparagraph does not apply if the business service provider's employees are solely performing the services under the contract under the name of the business service provider and the business service provider regularly contracts with other businesses.

(3) The contract with the business service provider is in writing and specifies the payment amount, including any applicable rate of pay, for services to be performed, as well as the due date of payment for such services.

(4) If the work is performed in a jurisdiction that requires the business service provider to have a business license or business tax registration, the business service provider has the required business license or business tax registration.

(5) The business service provider maintains a business location, which may include the business service provider's residence, that is separate from the business or work location of the contracting business.

(6) The business service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(7) The business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring entity.

(8) The business service provider advertises and holds itself out to the public as available to provide the same or similar services.

(9) Consistent with the nature of the work, the business service provider provides its own tools, vehicles, and equipment to perform the services, not including any proprietary materials that may be necessary to perform the services under the contract.

(10) The business service provider can negotiate its own rates.

(11) Consistent with the nature of the work, the business service provider can set its own hours and location of work.

(12) The business service provider is not performing the type of work for which a license from the Contractors' State License Board is required, pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code.

(b) When two bona fide businesses are contracting with one another under the conditions set forth in subdivision (a), the determination of whether an individual worker who is not acting as a sole proprietor or formed as a business entity, is an employee or independent contractor of the business service provider or contracting business is governed by Section 2775.

(c) This section does not alter or supersede any existing rights under Section 2810.3.

2777. Section 2775 and the holding in Dynamex do not apply to the relationship between a referral agency and a service provider, as defined below, under the following conditions:

(a) If an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ("service provider") provides services to clients through a referral agency, the determination of whether the service provider is an employee or independent contractor of the referral agency shall be governed by Borello, if the referral agency demonstrates that all of the following criteria are satisfied:

(1) The service provider is free from the control and direction of the referral agency in connection with the performance of the work for the client, both as a matter of contract and in fact.

(2) If the work for the client is performed in a jurisdiction that requires the service provider to have a business license or business tax registration in order to provide the services under the contract, the service provider shall certify to the referral agency that they have the required business license or business tax registration. The referral agency shall keep the certifications for a period of at least three years. As used in this paragraph:

(A) "Business license" includes a license, tax certificate, fee, or equivalent payment that is required or collected by a local jurisdiction annually, or on some other fixed cycle, as a condition of providing services in the local jurisdiction.

(B) "Local jurisdiction" means a city, county, or city and county, including charter cities.

(3) If the work for the client requires the service provider to hold a state contractor's license pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, the service provider has the required contractor's license.

(4) If there is an applicable professional licensure, permit, certification, or registration administered or recognized by the state available for the type of work being performed for the client, the service provider shall certify to the referral agency that they have the appropriate professional licensure, permit, certification, or registration. The referral agency shall keep the certifications for a period of at least three years.

(5) The service provider delivers services to the client under the service provider's name, without being required to deliver the services under the name of the referral agency.

(6) The service provider provides its own tools and supplies to perform the services.

(7) The service provider is customarily engaged, or was previously engaged, in an independently established business or trade of the same nature as, or related to, the work performed for the client.

(8) The referral agency does not restrict the service provider from maintaining a clientele and the service provider is free to seek work elsewhere, including through a competing referral agency.

(9) The service provider sets their own hours and terms of work or negotiates their hours and terms of work directly with the client.

(10) Without deduction by the referral agency, the service provider sets their own rates, negotiates their rates with the client through the referral agency, negotiates rates directly with the client, or is free to accept or reject rates set by the client.

(11) The service provider is free to accept or reject clients and contracts, without being penalized in any form by the referral agency. This paragraph does not apply if the service provider accepts a client or contract and then fails to fulfill any of its contractual obligations.

(b) For purposes of this section, the following definitions apply:

(1) "Client" means:

(A) A person who utilizes a referral agency to contract for services from a service provider, or

(B) A business that utilizes a referral agency to contract for services from a service provider that are otherwise not provided on a regular basis by employees at the client's business location, or to contract for services that are outside of the client's usual course of business. Notwithstanding subdivision (a), it is the responsibility of a business that utilizes a referral agency to contract for services, to meet the conditions outlined in this subparagraph.

(2) (A) "Referral agency" is a business that provides clients with referrals for service providers to provide services under a contract, with the exception of services in subparagraph (C).

(B) Under this paragraph, referrals for services shall include, but are not limited to, graphic design, web design, photography, tutoring, consulting, youth sports coaching, caddying, wedding or event planning, services provided by wedding and event vendors, minor home repair, moving, errands, furniture assembly, animal services, dog walking, dog grooming, picture hanging, pool cleaning, yard cleanup, and interpreting services.

(C) Under this paragraph, referrals for services do not include services provided in an industry designated by the Division of Occupational Safety and Health or the Department of Industrial Relations as a high hazard industry pursuant to subparagraph (A) of paragraph (3) of subdivision (e) of Section 6401.7 of the Labor Code or referrals for businesses that provide janitorial, delivery, courier, transportation, trucking, agricultural labor, retail, logging, in-home care, or construction services other than minor home repair.

(3) (A) "Referral agency contract" is the agency's contract with clients and service providers governing the use of its intermediary services described in paragraph (2). The intermediary services provided to the service provider by the referral agency are limited to client referrals and other administrative services ancillary to the service provider's business operation.

(B) A referral agency's contract may include a fee or fees to be paid by the client for utilizing the referral agency. This fee shall not be deducted from the rate set or negotiated by the service provider as set forth in paragraph (10) of subdivision (a).

(4) "Service provider" means an individual acting as a sole proprietor or business entity that agrees to the referral agency's contract and uses the referral agency to connect with clients.

(5) "Tutor" means a person who develops and teaches their own curriculum, teaches curriculum that is proprietarily and privately developed, or provides private instruction or supplemental academic enrichment services by using their own teaching methodology or techniques. A "tutor" does not include an individual who contracts with a local education agency or private school through a referral agency for purposes of teaching students of a public or private school in a classroom setting.

(6) (A) "Youth sports coaching" means services provided by a youth sports coach who develops and implements their own curriculum, which may be subject to requirements of a youth sports league, for an athletic program in which youth who are 18 years of age or younger predominantly participate and that is organized for the purposes of training for and engaging in athletic activity and competition. "Youth sports coaching" does not mean services provided by an individual who contracts with a local education agency or private school through a referral agency for purposes of teaching students of a public or private school.

(7) "Interpreting services" means:

(A) Services provided by a certified or registered interpreter in a language with an available certification or registration through the Judicial Council of California, State Personnel Board, or any other agency or department in the State of California, or through a testing organization, agency, or educational institution approved or recognized by the state, or through the Registry of Interpreters for the Deaf, Certification Commission for Healthcare Interpreters, National Board of Certification for Medical Interpreters, International Association of Conference Interpreters, United States Department of State, or the Administrative Office of the United States Courts.

(B) Services provided by an interpreter in a language without an available certification through the entities listed in subparagraph (A).

(8) "Consulting" means providing substantive insight, information, advice, opinions, or analysis that requires the exercise of discretion and independent judgment and is based on an individual's knowledge or expertise of a particular subject matter or field of study.

(9) "Animal services" means services related to daytime and nighttime pet care including pet boarding under Section 122380 of the Health and Safety Code.

(c) The determination of whether an individual worker is an employee of a service provider or whether an individual worker is an employee of a client is governed by Section 2775.

2778. (a) Section 2775 and the holding in Dynamex do not apply to a contract for "professional services" as defined below, and instead the determination of whether the individual is an employee or independent contractor shall be governed by Borello if the hiring entity demonstrates that all of the following factors are satisfied:

(1) The individual maintains a business location, which may include the individual's residence, that is separate from the hiring entity. Nothing in this paragraph prohibits an individual from choosing to perform services at the location of the hiring entity.

(2) If work is performed more than six months after the effective date of this section and the work is performed in a jurisdiction that requires the individual to have a business license or business tax registration, the individual has the required business license or business tax registration in order to provide the services under the contract, in addition to any required professional licenses or permits for the individual to practice in their profession.

(3) The individual has the ability to set or negotiate their own rates for the services performed.

(4) Outside of project completion dates and reasonable business hours, the individual has the ability to set the individual's own hours.

(5) The individual is customarily engaged in the same type of work performed under contract with another hiring entity or holds themselves out to other potential customers as available to perform the same type of work.

(6) The individual customarily and regularly exercises discretion and independent judgment in the performance of the services.

(b) For purposes of this section:

(1) An "individual" includes an individual providing services as a sole proprietor or other business entity.

(2) "Professional services" means services that meet any of the following:

(A) Marketing, provided that the contracted work is original and creative in character and the result of which depends primarily on the invention, imagination, or talent of the individual or work that is an essential part of or necessarily incident to any of the contracted work.

(B) Administrator of human resources, provided that the contracted work is predominantly intellectual and varied in character and is of such character that the

output produced or the result accomplished cannot be standardized in relation to a given period of time.

(C) Travel agent services provided by either of the following:

(i) A person regulated by the Attorney General under Article 2.6 (commencing with Section 17550) of Chapter 1 of Part 3 of Division 7 of the Business and Professions Code.

(ii) An individual who is a seller of travel within the meaning of subdivision (a) of Section 17550.1 of the Business and Professions Code and who is exempt from the registration under subdivision (g) of Section 17550.20 of the Business and Professions Code.

(D) Graphic design.

(E) Grant writer.

(F) (i) Fine artist.

(ii) For the purposes of this subparagraph, "fine artist" means an individual who creates works of art to be appreciated primarily or solely for their imaginative, aesthetic, or intellectual content, including drawings, paintings, sculptures, mosaics, works of calligraphy, works of graphic art, crafts, or mixed media.

(G) Services provided by an enrolled agent who is licensed by the United States Department of the Treasury to practice before the Internal Revenue Service pursuant to Part 10 of Subtitle A of Title 31 of the Code of Federal Regulations.

(H) Payment processing agent through an independent sales organization.

(I) Services provided by any of the following:

(i) By a still photographer, photojournalist, videographer, or photo editor who works under a written contract that specifies the rate of pay and obligation to pay by a defined time, as long as the individual providing the services is not directly replacing an employee who performed the same work at the same volume for the hiring entity; the individual does not primarily perform the work at the hiring entity's business location, notwithstanding paragraph (1) of subdivision (a); and the individual is not restricted from working for more than one hiring entity. This subclause is not applicable to a still photographer, photojournalist, videographer, or photo editor who works on motion pictures, which is inclusive of, but is not limited to, theatrical or commercial productions, broadcast news, television, and music videos. Nothing in

this section restricts a still photographer, photojournalist, photo editor, or videographer from distributing, licensing, or selling their work product to another business, except as prohibited under copyright laws or workplace collective bargaining agreements.

(ii) To a digital content aggregator by a still photographer, photojournalist, videographer, or photo editor.

(iii) For the purposes of this subparagraph the following definitions apply:

(I) "Photo editor" means an individual who performs services ancillary to the creation of digital content, such as retouching, editing, and keywording.

(II) "Digital content aggregator" means a licensing intermediary that obtains a license or assignment of copyright from a still photographer, photojournalist, videographer, or photo editor for the purposes of distributing that copyright by way of sublicense or assignment, to the intermediary's third party end users.

(J) Services provided by a freelance writer, translator, editor, copy editor, illustrator, or newspaper cartoonist who works under a written contract that specifies the rate of pay, intellectual property rights, and obligation to pay by a defined time, as long as the individual providing the services is not directly replacing an employee who performed the same work at the same volume for the hiring entity; the individual does not primarily perform the work at the hiring entity's business location, notwithstanding paragraph (1) of subdivision (a); and the individual is not restricted from working for more than one hiring entity.

(K) Services provided by an individual as a content contributor, advisor, producer, narrator, or cartographer for a journal, book, periodical, evaluation, other publication or educational, academic, or instructional work in any format or media, who works under a written contract that specifies the rate of pay, intellectual property rights and obligation to pay by a defined time, as long as the individual providing the services is not directly replacing an employee who performed the same work at the same volume for the hiring entity, the individual does not primarily perform the work at the hiring entity's business location notwithstanding paragraph (1) of subdivision (a); and the individual is not restricted from working for more than one hiring entity.

(L) Services provided by a licensed esthetician, licensed electrologist, licensed manicurist, licensed barber, or licensed cosmetologist provided that the individual:

(i) Sets their own rates, processes their own payments, and is paid directly by clients.

(ii) Sets their own hours of work and has sole discretion to decide the number of clients and which clients for whom they will provide services.

(iii) Has their own book of business and schedules their own appointments.

(iv) Maintains their own business license for the services offered to clients.

(v) If the individual is performing services at the location of the hiring entity, then the individual issues a Form 1099 to the salon or business owner from which they rent their business space.

(vi) This subparagraph shall become inoperative, with respect to licensed manicurists, on January 1, 2022.

(M) A specialized performer hired by a performing arts company or organization to teach a master class for no more than one week. "Master class" means a specialized course for limited duration that is not regularly offered by the hiring entity and is taught by an expert in a recognized field of artistic endeavor who does not work for the hiring entity to teach on a regular basis.

(N) Services provided by an appraiser, as defined in Part 3 (commencing with Section 11300) of Division 4 of the Business and Professions Code.

(O) Registered professional foresters licensed pursuant to Article 3 (commencing with Section 750) of Chapter 2.5 of Division 1 of the Public Resources Code.

(b) Section 2775 and the holding in Dynamex do not apply to the following, which are subject to the Business and Professions Code:

(1) A real estate licensee licensed by the State of California pursuant to Division 4 (commencing with Section 10000) of the Business and Professions Code, for whom the determination of employee or independent contractor status shall be governed by subdivision (b) of Section 10032 of the Business and Professions Code. If that section is not applicable, then this determination shall be governed as follows:

(A) For purposes of unemployment insurance by Section 650 of the Unemployment Insurance Code.

(B) For purposes of workers' compensation by Section 3200 et seq.

(C) For all other purposes in the Labor Code by Borello. The statutorily imposed duties of a responsible broker under Section 10015.1 of the Business and Professions Code are not factors to be considered under the Borello test.

(2) A home inspector, as defined in Section 7195 of the Business and Professions Code, and subject to the provisions of Chapter 9.3 (commencing with Section 7195) of Division 3 of that code.

(3) A repossession agency licensed pursuant to Section 7500.2 of the Business and Professions Code, for whom the determination of employee or independent contractor status shall be governed by Section 7500.2 of the Business and Professions Code, if the repossession agency is free from the control and direction of the hiring person or entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

2779. (a)Section 2775 and the holding in Dynamex do not apply to the relationship between two individuals wherein each individual is acting as a sole proprietor or separate business entity formed as a partnership, limited liability company, limited liability partnership, or corporation performing work pursuant to a contract for purposes of providing services at the location of a single-engagement event, as defined below, under the following conditions:

(1) Neither individual is subject to control and direction by the other, in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(2) Each individual has the ability to negotiate their rate of pay with the other individual.

(3) The written contract between both individuals specifies the total payment for services provided by both individuals at the single-engagement event, and the specific rate paid to each individual.

(4) Each individual maintains their own business location, which may include the individual's personal residence.

(5) Each individual provides their own tools, vehicles, and equipment to perform the services under the contract.

(6) If the work is performed in a jurisdiction that requires an individual to have a business license or business tax registration, then each individual has the required business license or business tax registration.

(7) Each individual is customarily engaged in the same or similar type of work performed under the contract or each individual separately holds themselves out to other potential customers as available to perform the same type of work.

(8) Each individual can contract with other businesses to provide the same or similar services and maintain their own clientele without restrictions.

(b) "Single-engagement event" means a stand-alone non-recurring event in a single location, or a series of events in the same location no more than once a week.

(c) "Services" under this section do not include services provided in an industry designated by the Division of Occupational Safety and Health or the Department of Industrial Relations as a high hazard industry pursuant to subparagraph (A) of paragraph (3) of subdivision (e) of Section 6401.7 or janitorial, delivery, courier, transportation, trucking, agricultural labor, retail, logging, in-home care, or construction services other than minor home repair.

2780. (a) (1) Section 2775 and the holding in Dynamex do not apply to the following occupations in connection with creating, marketing, promoting, or distributing sound recordings or musical compositions, and instead the holding in Borello shall apply to all of the following:

(A) Recording artists, subject to the below.

(B) Songwriters, lyricists, composers, and proofers.

(C) Managers of recording artists.

(D) Record producers and directors.

(E) Musical engineers and mixers engaged in the creation of sound recordings.

(F) Musicians engaged in the creation of sound recordings, subject to the below.

(G) Vocalists, subject to the below.

(H) Photographers working on recording photo shoots, album covers, and other press and publicity purposes.

(I) Independent radio promoters.

(J) Any other individual engaged to render any creative, production, marketing, or independent music publicist services related primarily to the creation, marketing, promotion, or distribution of sound recordings or musical compositions.

(2) This subdivision shall not apply to any of the following:

(A) Film and television unit production crews, as such term is commonly used in the film and television industries, working on live or recorded performances for audiovisual works, including still photographers and cinematographers.

(B) Publicists who are not independent music publicists.

(3) Notwithstanding Section 2775, paragraphs (1) and (2), and the holding in Dynamex, the terms and conditions of any current or future collective bargaining agreements or contractual agreements between the applicable labor unions and respective employers shall govern the determination of employment status in all events.

(4) The following shall apply to recording artists, musicians, and vocalists:

(A) Recording artists, musicians, and vocalists shall not be precluded from organizing under applicable provisions of labor law, or otherwise exercising rights granted to employees under the National Labor Relations Act (29 U.S.C. Sec. 151 et seq.).

(B) (i) Musicians and vocalists who are not royalty-based participants in the work created during any specific engagement shall be treated as employees solely for purposes of receiving minimum and overtime wages for hours worked during the engagement, as well as any damages and penalties due to the failure to receive minimum or overtime wages. Any such wages, damages, and penalties owed under this subparagraph shall be determined according to the applicable provisions of this code, wage orders of the Industrial Welfare Commission, or applicable local laws.

(ii) "Royalty-based participant" means an individual who has either negotiated for the collection or direct administration of royalties derived from the exploitation of a sound recording or musical composition, or is entitled to control, administer or collect royalties related to the exploitation of a sound recording or musical composition as a co-author or joint owner thereof.

(C) In all events, and notwithstanding subparagraph (B), the terms and conditions of any current or future collective bargaining agreements or contractual agreements between the applicable labor unions and respective employers shall govern the determination of employment status.

(b) (1) Section 2775 and the holding in Dynamex do not apply to a musician or musical group for the purpose of a single-engagement live performance event, and instead the determination of employee or independent contractor status shall be governed by Borello, unless one of the following conditions is met:

(A) The musical group is performing as a symphony orchestra, the musical group is performing at a theme park or amusement park, or a musician is performing in a musical theater production.

(B) The musical group is an event headliner for a performance taking place in a venue location with more than 1,500 attendees.

(C) The musical group is performing at a festival that sells more than 18,000 tickets per day.

(2) This subdivision is inclusive of rehearsals related to the single-engagement live performance event.

(3) As used in this subdivision:

(A) "Event headliner" means the musical group that appears most prominently in an event program, advertisement, or on a marquee.

(B) "Festival" means a single day or multiday event in a single venue location that occurs once a year, featuring performances by various musical groups.

(C) "Musical group" means a solo artist, band, or a group of musicians who perform under a distinct name.

(D) "Musical theater production" means a form of theatrical performance that combines songs, spoken dialogue, acting, and dance.

(E) "Musician" means an individual performing instrumental, electronic, or vocal music in a live setting.

(F) "Single-engagement live performance event" means a stand-alone musical performance in a single venue location, or a series of performances in the same venue location no more than once a week. This does not include performances that are part of a tour or series of live performances at various locations.

(G) "Venue location" means an indoor or outdoor location used primarily as a space to hold a concert or musical performance. "Venue location" includes, but is not limited to, a restaurant, bar, or brewery that regularly offers live musical entertainment.

(c) Section 2775 and the holding in Dynamex do not apply to the following, and instead, the determination of employee or independent contractor status shall be governed by Borello:

(1) An individual performance artist performing material that is their original work and creative in character and the result of which depends primarily on the individual's invention, imagination, or talent, given all of the following conditions are satisfied:

(A) The individual is free from the control and direction of the hiring entity in connection with the performance of the work, both as a matter of contract and in fact. This includes, and is not limited to, the right for the performer to exercise artistic control over all elements of the performance.

(B) The individual retains the rights to their intellectual property that was created in connection with the performance.

(C) Consistent with the nature of the work, the individual sets their terms of work and has the ability to set or negotiate their rates.

(D) The individual is free to accept or reject each individual performance engagement without being penalized in any form by the hiring entity.

(2) "Individual performance artist" shall include, but is not limited to, an individual performing comedy, improvisation, stage magic, illusion, mime, spoken word, storytelling, or puppetry.

(3) This subdivision does not apply to an individual participating in a theatrical production, or a musician or musical group as defined in subdivision (b).

(4) In all events, notwithstanding paragraph (1), the terms and conditions of any current or future collective bargaining agreements or contractual agreements between the applicable labor unions and respective employer shall govern the determination of employment status.

2781. Section 2775 and the holding in Dynamex do not apply to the relationship between a contractor and an individual performing work pursuant to a subcontract in the construction industry, and instead the determination of whether the individual is an employee of the contractor shall be governed by Section 2750.5 and by Borello, if the contractor demonstrates that all the following criteria are satisfied:

(a) The subcontract is in writing.

(b) The subcontractor is licensed by the Contractors' State License Board and the work is within the scope of that license.

(c) If the subcontractor is domiciled in a jurisdiction that requires the subcontractor to have a business license or business tax registration, the subcontractor has the required business license or business tax registration.

(d) The subcontractor maintains a business location that is separate from the business or work location of the contractor.

(e) The subcontractor has the authority to hire and to fire other persons to provide or to assist in providing the services.

(f) The subcontractor assumes financial responsibility for errors or omissions in labor or services as evidenced by insurance, legally authorized indemnity obligations, performance bonds, or warranties relating to the labor or services being provided.

(g) The subcontractor is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(h) (1) Subdivision (b) shall not apply to a subcontractor providing construction trucking services for which a contractor's license is not required by Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, provided that all of the following criteria are satisfied:

(A) The subcontractor is a business entity formed as a sole proprietorship, partnership, limited liability company, limited liability partnership, or corporation.

(B) For work performed after January 1, 2020, the subcontractor is registered with the Department of Industrial Relations as a public works contractor pursuant to Section 1725.5, regardless of whether the subcontract involves public work.

(C) The subcontractor utilizes its own employees to perform the construction trucking services, unless the subcontractor is a sole proprietor who operates their own truck to perform the entire subcontract and holds a valid motor carrier permit issued by the Department of Motor Vehicles.

(D) The subcontractor negotiates and contracts with, and is compensated directly by, the licensed contractor.

(2) For work performed after January 1, 2020, any business entity that provides construction trucking services to a licensed contractor utilizing more than one truck shall be deemed the employer for all drivers of those trucks.

(3) For purposes of this subdivision, "construction trucking services" mean hauling and trucking services provided in the construction industry pursuant to a contract with a licensed contractor utilizing vehicles that require a commercial driver's license to operate or have a gross vehicle weight rating of 26,001 or more pounds.

(4) This subdivision shall only apply to work performed before January 1, 2022.

(5) Nothing in this subdivision prohibits an individual who owns their truck from working as an employee of a trucking company and utilizing that truck in the scope of that employment. An individual employee providing their own truck for use by an employer trucking company shall be reimbursed by the trucking company for the reasonable expense incurred for the use of the employee-owned truck.

2782. (a) (1) Section 2775 and the holding in Dynamex do not apply to the relationship between a data aggregator and an individual providing feedback to the data aggregator, and instead the holding in Borello shall apply, under the following conditions:

(A) The individual is free from control and direction from the data aggregator with respect to the substance and content of the feedback.

(B) Any consideration paid for the feedback provided, if prorated to an hourly basis, is an amount equivalent to or greater than the minimum wage.

(C) The nature of the feedback requested requires the individual providing feedback to the data aggregator to exercise independent judgment and discretion.

(D) The individual has the ability to reject feedback requests, without being penalized in any form by the data aggregator.

(2) As used in this section:

(A) "Data aggregator" is a business, research institution, or organization that requests and gathers feedback on user interface, products, services, people, concepts, ideas, offerings, or experiences from individuals willing to provide it.

(B) "Minimum wage" is local or state minimum wage, whichever is greater.

2783. Section 2775 and the holding in Dynamex do not apply to the following occupations as defined in the paragraphs below, and instead, the determination of employee or independent contractor status for individuals in those occupations shall be governed by Borello:

(a) A person or organization who is licensed by the Department of Insurance pursuant to Chapter 5 (commencing with Section 1621), Chapter 6 (commencing with Section 1760), or Chapter 8 (commencing with Section 1831) of Part 2 of Division 1 of the Insurance Code or a person who provides underwriting inspections, premium audits, risk management, or loss control work for the insurance and financial service industries.

(b) A physician and surgeon, dentist, podiatrist, psychologist, or veterinarian licensed by the State of California pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, performing professional or medical services provided to or by a health care entity, including an entity organized as a sole proprietorship, partnership, or professional corporation as defined in Section 13401 of the Corporations Code. Nothing in this subdivision shall circumvent, undermine, or restrict the rights under federal law to organize and collectively bargain.

(c) An individual who holds an active license from the State of California and is practicing one of the following recognized professions: lawyer, architect, landscape architect, engineer, private investigator, or accountant.

(d) A securities broker-dealer or investment adviser or their agents and representatives that are either of the following:

(1) Registered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority.

(2) Licensed by the State of California under Chapter 2 (commencing with Section 25210) or Chapter 3 (commencing with Section 25230) of Division 1 of Part 3 of Title 4 of the Corporations Code.

(e) A direct sales salesperson as described in Section 650 of the Unemployment Insurance Code, so long as the conditions for exclusion from employment under that section are met.

(f) A manufactured housing salesperson, subject to all obligations under Part 2 (commencing with Section 18000) of Division 13 of the Health and Safety Code, including all regulations promulgated by the Department of Housing and Community Development relating to manufactured home salespersons and all other obligations of manufactured housing salespersons to members of the public.

(g) A commercial fisher working on an American vessel.

(1) For the purposes of this subdivision:

(A) "American vessel" has the same meaning as defined in Section 125.5 of the Unemployment Insurance Code.

(B) "Commercial fisher" means a person who has a valid, unrevoked commercial fishing license issued pursuant to Article 3 (commencing with Section 7850) of Chapter 1 of Part 3 of Division 6 of the Fish and Game Code.

(C) "Working on an American vessel" means the taking or the attempt to take fish, shellfish, or other fishery resources of the state by any means, and includes each individual aboard an American vessel operated for fishing purposes who participates directly or indirectly in the taking of these raw fishery products, including maintaining the vessel or equipment used aboard the vessel. However, "working on an American vessel" does not apply to anyone aboard a licensed commercial fishing vessel as a visitor or guest who does not directly or indirectly participate in the taking.

(2) For the purposes of this subdivision, a commercial fisher working on an American vessel is eligible for unemployment insurance benefits if they meet the definition of "employment" in Section 609 of the Unemployment Insurance Code and are otherwise eligible for those benefits pursuant to the provisions of the Unemployment Insurance Code.

(3) On or before March 1, 2021, and each March 1 thereafter, the Employment Development Department shall issue an annual report to the Legislature on the use of unemployment insurance in the commercial fishing industry. This report shall include, but not be limited to, the number of commercial fishers who apply for unemployment insurance benefits, the number of commercial fishers who have their claims disputed, the number of commercial fishers who have their claims denied, and the number of commercial fishers who receive unemployment insurance benefits. The report required by this subparagraph shall be submitted in compliance with Section 9795 of the Government Code.

(4) This subdivision shall become inoperative on January 1, 2023, unless extended by the Legislature.

(h) A newspaper distributor working under contract with a newspaper publisher, as defined in subparagraph (A), and a newspaper carrier working under contract either with a newspaper publisher or newspaper distributor.

(1) For purposes of this subdivision:

(A) "Newspaper" means a newspaper of general circulation, as defined in Section 6000 of the Government Code, and any other publication circulated to the community in general as an extension of or substitute for that newspaper's own publication, whether that publication be designated a "shoppers' guide," as a zoned edition, or otherwise.

(B) "Publisher" means the natural or corporate person that manages the newspaper's business operations, including circulation.

(C) "Newspaper distributor" means a person or entity that contracts with a publisher to distribute newspapers to the community.

(D) "Carrier" means a person who effects physical delivery of the newspaper to the customer or reader.

(2) This subdivision shall become inoperative on January 1, 2021, unless extended by the Legislature.

(i) An individual who is engaged by an international exchange visitor program that has obtained and maintains full official designation by the United States Department of State under Part 62 (commencing with Section 62.1) of Title 22 of the Code of Federal Regulations for the purpose of conducting, instead of participating in, international and cultural exchange visitor programs and is in full compliance with Part 62 (commencing with Section 62.1) of Title 22 of the Code of Federal Regulations.

(j) A competition judge with a specialized skill set or expertise providing services that require the exercise of discretion and independent judgment to an organization for the purposes of determining the outcome or enforcing the rules of a competition. This includes, but is not limited to, an amateur umpire or referee.


2784. Section 2775 and the holding in Dynamex do not apply to the relationship between a motor club holding a certificate of authority issued pursuant to Chapter 2 (commencing with Section 12160) of Part 5 of Division 2 of the Insurance Code and an individual performing services pursuant to a contract between the motor club and a third party to provide motor club services utilizing the employees and vehicles of the third party and, instead, the determination of whether such an individual is an employee of the motor club shall be governed by Borello, if the motor club demonstrates that the third party is a separate and independent business from the motor club.

2785. (a) Section 2775 does not constitute a change in, but is declaratory of, existing law with regard to wage orders of the Industrial Welfare Commission and violations of this code relating to wage orders.

(b) Insofar as the application of Sections 2776 to Section 2784 would relieve an employer from liability, those sections shall apply retroactively to existing claims and actions to the maximum extent permitted by law.

(c) Except as provided in subdivisions (a) and (b) of this section, this article shall apply to work performed on or after January 1, 2020.

(d) If a hiring entity can demonstrate compliance with all of conditions set forth in any one of Sections 2776 to 2784, inclusive, then Section 2775 and the holding in Dynamex do not apply to that entity, and instead the determination of an individual's employment status as an employee or independent contractor shall be governed by Borello.

2786. In addition to any other remedies available, an action for injunctive relief to prevent the continued misclassification of employees as independent contractors may be prosecuted against the putative employer in a court of competent jurisdiction by the Attorney General, by a district attorney, or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association.

2787. The provisions of this Article are severable. If any provision of this Article or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

SEC. 3. Section 17020.12 of the Revenue and Taxation Code is amended to read:

17020.12. (a) For the purposes of this part, except as otherwise provided, the determination of whether an individual is an employee shall be governed by Section 1 of Article 1.5 of the Labor Code.

(b) Section 7701(a)(20) of the Internal Revenue Code, relating to definition of "employee," shall apply, except as otherwise provided.

SEC. 4. Section 18406 is added to the Revenue and Taxation Code, to read:

18406. For the purposes of this part, except as otherwise provided, the determination of whether an individual is an employee shall be governed by Article 1.5 (commencing with Section 2775) of Chapter 2 of Division 3 of the Labor Code.

SEC. 5. Section 21003.5 is added to the Revenue and Taxation Code, to read:

21003.5. For the purposes of this part, except as otherwise provided, the determination of whether an individual is an employee shall be governed by Article 1.5 (commencing with Section 2775) of Chapter 2 of Division 3 of the Labor Code.

SEC. 6. Section 23045.6 of the Revenue and Taxation Code is amended to read:

23045.6. (a) For the purposes of this part, except as otherwise provided, the determination of whether an individual is an employee shall be governed by of Article 1.5 (commencing with Section 2775) of Chapter 2 of Division 3 of the Labor Code.

(b) Section 7701(a)(20) of the Internal Revenue Code, relating to the definition of "employee," shall apply, except as otherwise provided.

SEC. 7. Section 61001 is added to the Revenue and Taxation Code, to read:

61001. For the purposes of this part, except as otherwise provided, the determination of whether an individual is an employee shall be governed by Article 1.5 (commencing with Section 2775) of Chapter 2 of Division 3 of the Labor Code.

SEC. 8. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are:

In order to ensure businesses and workers have immediate clarity on the specific standards used to determine an individual's employment classification working in the professions impacted by this legislation, including musicians, various professionals in the music recording industry, writers, photographers, videographers, photo editors, and illustrators, and others, it is necessary for this act to take effect immediately.

# EXHIBIT E

## Cal. Bus. & Prof. Code § 7451

**§ 7451.** Protecting Independence. Notwithstanding any other provision of law, including, but not limited to, the Labor Code, the Unemployment Insurance Code, and any orders, regulations, or opinions of the Department of Industrial Relations or any board, division, or commission within the Department of Industrial Relations, an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company if the following conditions are met:

(a) The network company does not unilaterally prescribe specific dates, times of day, or a minimum number of hours during which the app-based driver must be logged into the network company's online-enabled application or platform.

(b) The network company does not require the app-based driver to accept any specific rideshare service or delivery service request as a condition of maintaining access to the network company's online-enabled application or platform.

(c) The network company does not restrict the app-based driver from performing rideshare services or delivery services through other network companies except during engaged time.

(d) The network company does not restrict the app-based driver from working in any other lawful occupation or business.

# EXHIBIT F

## Cal. Bus. & Prof. Code § 7453

**§ 7453.**  Earnings Guarantee. (a) A network company shall ensure that for each earnings period, an app-based driver is compensated at not less than the net earnings floor as set forth in this section. The net earnings floor establishes a guaranteed minimum level of compensation for app-based drivers that cannot be reduced. In no way does the net earnings floor prohibit app-based drivers from earning a higher level of compensation.

(b) For each earnings period, a network company shall compare an app-based driver's net earnings against the net earnings floor for that app-based driver during the earnings period. In the event that the app-based driver's net earnings in the earnings period are less than the net earnings floor for that earnings period, the network company shall include an additional sum accounting for the difference in the app-based driver's earnings no later than during the next earnings period.

(c) No network company or agent shall take, receive, or retain any gratuity or a part thereof that is paid, given to, or left for an app-based driver by a customer or deduct any amount from the earnings due to an app-based driver for a ride or delivery on account of a gratuity paid in connection with the ride or delivery. A network company that permits customers to pay gratuities by credit card shall pay the app-based driver the full amount of the gratuity that the customer indicated on the credit card receipt, without any deductions for any credit card payment processing fees or costs that may be charged to the network company by the credit card company.

(d) For purposes of this chapter, the following definitions apply:

(1) "Applicable minimum wage" means the state mandated minimum wage for all industries or, if a passenger or item is picked up within the boundaries of a local government that has a higher minimum wage that is generally applicable to all industries, the local minimum wage of that local government. The applicable minimum wage shall be determined at the location where a passenger or item is picked up and shall apply for all engaged time spent completing that rideshare request or delivery request.

(2) "Earnings period" means a pay period, set by the network company, not to exceed 14 consecutive calendar days.

(3) "Net earnings" means all earnings received by an app-based driver in an earnings period, provided that the amount conforms to both of the following standards:

(A) The amount does not include gratuities, tolls, cleaning fees, airport fees, or other customer pass-throughs.

(B) The amount may include incentives or other bonuses.

(4) "Net earnings floor" means, for any earnings period, a total amount that is comprised of:

(A) For all engaged time, the sum of 120 percent of the applicable minimum wage for that engaged time.

(B) (i) The per-mile compensation for vehicle expenses set forth in this subparagraph multiplied by the total number of engaged miles.

(ii) After the effective date of this chapter and for the 2021 calendar year, the per-mile compensation for vehicle expenses shall be thirty cents ($0.30) per engaged mile. For calendar years after 2021, the amount per engaged mile shall be adjusted pursuant to clause (iii).

(iii) For calendar years following 2021, the per-mile compensation for vehicle expenses described in clause (ii) shall be adjusted annually to reflect any increase in inflation as measured by the Consumer Price Index for All Urban Consumers (CPI-U) published by the United States Bureau of Labor Statistics. The Treasurer's Office shall calculate and publish the adjustments required by this subparagraph.

(e) Nothing in this section shall be interpreted to require a network company to provide a particular amount of compensation to an app-based driver for any given rideshare or delivery request, as long as the app-based driver's net earnings for each earnings period equals or exceeds that app-based driver's net earnings floor for that earnings period as set forth in subdivision (b). For clarity, the net earnings floor in this section may be calculated on an average basis over the course of each earnings period.

# EXHIBIT G

Cal. Bus. & Prof. Code § 7463

**§ 7463.**     For purposes of this chapter, the following definitions shall apply:

(a) "App-based driver" means an individual who is a DNC courier, TNC driver, or TCP driver or permit holder; and for whom the conditions set forth in subdivisions (a) to (d), inclusive, of Section 7451 are satisfied.

(b) "Average ACA contribution" means 82 percent of the dollar amount of the average monthly Covered California premium.

(c) "Average monthly Covered California premium" equals the dollar amount published pursuant to subdivision (g) of Section 7454.

(d) "Covered California" means the California Health Benefit Exchange, codified in Title 22 (commencing with Section 100500) of the Government Code.

(e) "Customer" means one or more natural persons or business entities.

(f) "Delivery network company" (DNC) means a business entity that maintains an online-enabled application or platform used to facilitate delivery services within the State of California on an on-demand basis, and maintains a record of the amount of engaged time and engaged miles accumulated by DNC couriers. Deliveries are facilitated on an on-demand basis if DNC couriers are provided with the option to accept or decline each delivery request and the DNC does not require the DNC courier to accept any specific delivery request as a condition of maintaining access to the DNC's online-enabled application or platform.

(g) "Delivery network company courier" (DNC courier) means an individual who provides delivery services through a DNC's online-enabled application or platform.

(h) "Delivery services" means the fulfillment of delivery requests, meaning the pickup from any location of any item or items and the delivery of the items using a passenger vehicle, bicycle, scooter, walking, public transportation, or other similar means of transportation, to a location selected by the customer located within 50 miles of the pickup location. A delivery request may include more than one, but not more than 12, distinct orders placed by different customers. Delivery services may include the selection, collection, or purchase of items by a DNC courier provided that those tasks are done in connection with a delivery that the DNC

courier has agreed to deliver. Delivery services do not include deliveries that are subject to Section 26090, as that section read on October 29, 2019.

(i) "Engaged miles" means all miles driven during engaged time in a passenger vehicle that is not owned, leased, or rented by the network company.

(j) (1) "Engaged time" means, subject to the conditions set forth in paragraph (2), the period of time, as recorded in a network company's online-enabled application or platform, from when an app-based driver accepts a rideshare request or delivery request to when the app-based driver completes that rideshare request or delivery request.

(2) (A) Engaged time shall not include the following:

(i) Any time spent performing a rideshare service or delivery service after the request has been canceled by the customer.

(ii) Any time spent on a rideshare service or delivery service where the app-based driver abandons performance of the service prior to completion.

(B) Network companies may also exclude time if doing so is reasonably necessary to remedy or prevent fraudulent use of the network company's online-enabled application or platform.

(k) "Local government" means a city, county, city and county, charter city, or charter county.

(l) "Network company" means a business entity that is a DNC or a TNC.

(m) "Passenger vehicle" means a passenger vehicle as defined in Section 465 of the Vehicle Code.

(n) "Qualifying health plan" means a health insurance plan in which the app-based driver is the subscriber, that is not sponsored by an employer, and that is not a Medicare or Medicaid plan.

(o) "Rideshare service" means the transportation of one or more persons.

(p) "Transportation network company" (TNC) has the same meaning as the definition contained in subdivision (c) of Section 5431 of the Public Utilities Code.

(q) "Transportation network company driver" (TNC driver) has the same meaning as the definition of driver contained in subdivision (a) of Section 5431 of the Public Utilities Code.

(r) "Charter-party carrier of passengers" (TCP) shall have the same meaning as the definition contained in Section 5360 of the Public Utilities Code, provided the driver is providing rideshare services using a passenger vehicle through a network company's online-enabled application or platform.

## **EXHIBIT H**

Cal. Labor Code § 225

**§ 225.**     The violation of any provision of Sections 221, 222, 222.5, or 223 is a misdemeanor.

# EXHIBIT I

Cal. Labor Code § 226.6

**§ 226.6.**      Any employer who knowingly and intentionally violates the provisions of Section 226, or any officer, agent, employee, fiduciary, or other person who has the control, receipt, custody, or disposal of, or pays, the wages due any employee, and who knowingly and intentionally participates or aids in the violation of any provision of Section 226 is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than one thousand dollars ($1,000) or be imprisoned not to exceed one year, or both, at the discretion of the court. That fine or imprisonment, or both, shall be in addition to any other penalty provided by law.

Cal. Labor Code § 227

**§ 227.** If an employer has made withholdings from an employee's wages pursuant to state, local, or federal law, or has agreed with any employee to make payments to a health or welfare fund, pension fund, or vacation plan, or other similar plan for the benefit of the employees, or a negotiated industrial promotion fund, or has entered into a collective bargaining agreement providing for these payments, it shall be unlawful for that employer willfully or with intent to defraud to fail to remit the withholdings to the proper agency or to fail to make the payments required by the terms of that agreement. A violation of any provision of this section when the amount the employer failed to pay into the fund or funds exceeds five hundred dollars ($500) shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, or in a county jail for a period of not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both that imprisonment and fine. All other violations shall be punishable as a misdemeanor. In a criminal proceeding under this section, any withholdings that are recovered from an employer shall be forwarded to the appropriate fund or plan and, if restitution is imposed, the court shall direct to which agency, entity, or person it shall be paid.

# **EXHIBIT K**

Cal. Labor Code § 553

**§ 553.**     Any person who violates this chapter is guilty of a misdemeanor.

# **EXHIBIT L**

Cal. Labor Code § 1199

§ **1199.**        Every employer or other person acting either individually or as an officer, agent, or employee of another person is guilty of a misdemeanor and is punishable by a fine of not less than one hundred dollars ($100) or by imprisonment for not less than 30 days, or by both, who does any of the following:

(a) Requires or causes any employee to work for longer hours than those fixed, or under conditions of labor prohibited by an order of the commission.

(b) Pays or causes to be paid to any employee a wage less than the minimum fixed by an order of the commission.

(c) Violates or refuses or neglects to comply with any provision of this chapter or any order or ruling of the commission.

# EXHIBIT M

## Cal. Lab. Code § 2775

**§ 2775.**     (a) As used in this article:

(1) "Dynamex" means Dynamex Operations W. Inc. v. Superior Court (2018) 4 Cal.5th 903.

(2) "Borello" means the California Supreme Court's decision in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341.

(b) (1) For purposes of this code and the Unemployment Insurance Code, and for the purposes of wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(B) The person performs work that is outside the usual course of the hiring entity's business.

(C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

(2) Notwithstanding paragraph (1), any exceptions to the terms "employee," "employer," "employ," or "independent contractor," and any extensions of employer status or liability, that are expressly made by a provision of this code, the Unemployment Insurance Code, or in an applicable order of the Industrial Welfare Commission, including, but not limited to, the definition of "employee" in subdivision 2(E) of Wage Order No. 2, shall remain in effect for the purposes set forth therein.

(3) If a court of law rules that the three-part test in paragraph (1) cannot be applied to a particular context based on grounds other than an express exception to employment status as provided under paragraph (2), then the determination of employee or independent contractor status in that context shall instead be governed by the California Supreme Court's decision in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341 (Borello).

Cal. Lab. Code § 2776

**§ 2776.** Section 2775 and the holding in Dynamex do not apply to a bona fide business-to-business contracting relationship, as defined below, under the following conditions:

(a) If an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ("business service provider") contracts to provide services to another such business or to a public agency or quasi-public corporation ("contracting business"), the determination of employee or independent contractor status of the business services provider shall be governed by Borello, if the contracting business demonstrates that all of the following criteria are satisfied:

(1) The business service provider is free from the control and direction of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(2) The business service provider is providing services directly to the contracting business rather than to customers of the contracting business. This subparagraph does not apply if the business service provider's employees are solely performing the services under the contract under the name of the business service provider and the business service provider regularly contracts with other businesses.

(3) The contract with the business service provider is in writing and specifies the payment amount, including any applicable rate of pay, for services to be performed, as well as the due date of payment for such services.

(4) If the work is performed in a jurisdiction that requires the business service provider to have a business license or business tax registration, the business service provider has the required business license or business tax registration.

(5) The business service provider maintains a business location, which may include the business service provider's residence, that is separate from the business or work location of the contracting business.

(6) The business service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(7) The business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring entity.

(8) The business service provider advertises and holds itself out to the public as available to provide the same or similar services.

(9) Consistent with the nature of the work, the business service provider provides its own tools, vehicles, and equipment to perform the services, not including any proprietary materials that may be necessary to perform the services under the contract.

(10) The business service provider can negotiate its own rates.

(11) Consistent with the nature of the work, the business service provider can set its own hours and location of work.

(12) The business service provider is not performing the type of work for which a license from the Contractors' State License Board is required, pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code.

(b) When two bona fide businesses are contracting with one another under the conditions set forth in subdivision (a), the determination of whether an individual worker who is not acting as a sole proprietor or formed as a business entity, is an employee or independent contractor of the business service provider or contracting business is governed by Section 2775.

(c) This section does not alter or supersede any existing rights under Section 2810.3.

Cal. Lab. Code § 2777

**§ 2777.**     Section 2775 and the holding in Dynamex do not apply to the relationship between a referral agency and a service provider, as defined below, under the following conditions:

(a) If an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ("service provider") provides services to clients through a referral agency, the determination of whether the service provider is an employee or independent contractor of the referral agency shall be governed by Borello, if the referral agency demonstrates that all of the following criteria are satisfied:

(1) The service provider is free from the control and direction of the referral agency in connection with the performance of the work for the client, both as a matter of contract and in fact.

(2) If the work for the client is performed in a jurisdiction that requires the service provider to have a business license or business tax registration in order to provide the services under the contract, the service provider shall certify to the referral agency that they have the required business license or business tax registration. The referral agency shall keep the certifications for a period of at least three years. As used in this paragraph:

(A) "Business license" includes a license, tax certificate, fee, or equivalent payment that is required or collected by a local jurisdiction annually, or on some other fixed cycle, as a condition of providing services in the local jurisdiction.

(B) "Local jurisdiction" means a city, county, or city and county, including charter cities.

(3) If the work for the client requires the service provider to hold a state contractor's license pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, the service provider has the required contractor's license.

(4) If there is an applicable professional licensure, permit, certification, or registration administered or recognized by the state available for the type of work being performed for the client, the service provider shall certify to the referral agency that they have the appropriate professional licensure, permit, certification, or

registration. The referral agency shall keep the certifications for a period of at least three years.

(5) The service provider delivers services to the client under the service provider's name, without being required to deliver the services under the name of the referral agency.

(6) The service provider provides its own tools and supplies to perform the services.

(7) The service provider is customarily engaged, or was previously engaged, in an independently established business or trade of the same nature as, or related to, the work performed for the client.

(8) The referral agency does not restrict the service provider from maintaining a clientele and the service provider is free to seek work elsewhere, including through a competing referral agency.

(9) The service provider sets their own hours and terms of work or negotiates their hours and terms of work directly with the client.

(10) Without deduction by the referral agency, the service provider sets their own rates, negotiates their rates with the client through the referral agency, negotiates rates directly with the client, or is free to accept or reject rates set by the client.

(11) The service provider is free to accept or reject clients and contracts, without being penalized in any form by the referral agency. This paragraph does not apply if the service provider accepts a client or contract and then fails to fulfill any of its contractual obligations.

(b) For purposes of this section, the following definitions apply:

(1) "Client" means:

(A) A person who utilizes a referral agency to contract for services from a service provider, or

(B) A business that utilizes a referral agency to contract for services from a service provider that are otherwise not provided on a regular basis by employees at the client's business location, or to contract for services that are outside of the client's usual course of business. Notwithstanding subdivision (a), it is the responsibility of a business that utilizes a referral agency to contract for services, to meet the conditions outlined in this subparagraph.

(2) (A) "Referral agency" is a business that provides clients with referrals for service providers to provide services under a contract, with the exception of services in subparagraph (C).

(B) Under this paragraph, referrals for services shall include, but are not limited to, graphic design, web design, photography, tutoring, consulting, youth sports coaching, caddying, wedding or event planning, services provided by wedding and event vendors, minor home repair, moving, errands, furniture assembly, animal services, dog walking, dog grooming, picture hanging, pool cleaning, yard cleanup, and interpreting services.

(C) Under this paragraph, referrals for services do not include services provided in an industry designated by the Division of Occupational Safety and Health or the Department of Industrial Relations as a high hazard industry pursuant to subparagraph (A) of paragraph (3) of subdivision (e) of Section 6401.7 of the Labor Code or referrals for businesses that provide janitorial, delivery, courier, transportation, trucking, agricultural labor, retail, logging, in-home care, or construction services other than minor home repair.

(3) (A) "Referral agency contract" is the agency's contract with clients and service providers governing the use of its intermediary services described in paragraph (2). The intermediary services provided to the service provider by the referral agency are limited to client referrals and other administrative services ancillary to the service provider's business operation.

(B) A referral agency's contract may include a fee or fees to be paid by the client for utilizing the referral agency. This fee shall not be deducted from the rate set or negotiated by the service provider as set forth in paragraph (10) of subdivision (a).

(4) "Service provider" means an individual acting as a sole proprietor or business entity that agrees to the referral agency's contract and uses the referral agency to connect with clients.

(5) "Tutor" means a person who develops and teaches their own curriculum, teaches curriculum that is proprietarily and privately developed, or provides private instruction or supplemental academic enrichment services by using their own teaching methodology or techniques. A "tutor" does not include an individual who contracts with a local education agency or private school through a referral agency for purposes of teaching students of a public or private school in a classroom setting.

(6) (A) "Youth sports coaching" means services provided by a youth sports coach who develops and implements their own curriculum, which may be subject to

requirements of a youth sports league, for an athletic program in which youth who are 18 years of age or younger predominantly participate and that is organized for the purposes of training for and engaging in athletic activity and competition. "Youth sports coaching" does not mean services provided by an individual who contracts with a local education agency or private school through a referral agency for purposes of teaching students of a public or private school.

(7) "Interpreting services" means:

(A) Services provided by a certified or registered interpreter in a language with an available certification or registration through the Judicial Council of California, State Personnel Board, or any other agency or department in the State of California, or through a testing organization, agency, or educational institution approved or recognized by the state, or through the Registry of Interpreters for the Deaf, Certification Commission for Healthcare Interpreters, National Board of Certification for Medical Interpreters, International Association of Conference Interpreters, United States Department of State, or the Administrative Office of the United States Courts.

(B) Services provided by an interpreter in a language without an available certification through the entities listed in subparagraph (A).

(8) "Consulting" means providing substantive insight, information, advice, opinions, or analysis that requires the exercise of discretion and independent judgment and is based on an individual's knowledge or expertise of a particular subject matter or field of study.

(9) "Animal services" means services related to daytime and nighttime pet care including pet boarding under Section 122380 of the Health and Safety Code.

(c) The determination of whether an individual worker is an employee of a service provider or whether an individual worker is an employee of a client is governed by Section 2775.

Cal. Lab. Code § 2778

**§ 2778.**      (a) Section 2775 and the holding in Dynamex do not apply to a contract for "professional services" as defined below, and instead the determination of whether the individual is an employee or independent contractor shall be governed by Borello if the hiring entity demonstrates that all of the following factors are satisfied:

(1) The individual maintains a business location, which may include the individual's residence, that is separate from the hiring entity. Nothing in this paragraph prohibits an individual from choosing to perform services at the location of the hiring entity.

(2) If work is performed more than six months after the effective date of this section and the work is performed in a jurisdiction that requires the individual to have a business license or business tax registration, the individual has the required business license or business tax registration in order to provide the services under the contract, in addition to any required professional licenses or permits for the individual to practice in their profession.

(3) The individual has the ability to set or negotiate their own rates for the services performed.

(4) Outside of project completion dates and reasonable business hours, the individual has the ability to set the individual's own hours.

(5) The individual is customarily engaged in the same type of work performed under contract with another hiring entity or holds themselves out to other potential customers as available to perform the same type of work.

(6) The individual customarily and regularly exercises discretion and independent judgment in the performance of the services.

(b) For purposes of this section:

(1) An "individual" includes an individual providing services as a sole proprietor or other business entity.

(2) "Professional services" means services that meet any of the following:

(A) Marketing, provided that the contracted work is original and creative in character and the result of which depends primarily on the invention, imagination, or talent of

the individual or work that is an essential part of or necessarily incident to any of the contracted work.

(B) Administrator of human resources, provided that the contracted work is predominantly intellectual and varied in character and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(C) Travel agent services provided by either of the following:

(i) A person regulated by the Attorney General under Article 2.6 (commencing with Section 17550) of Chapter 1 of Part 3 of Division 7 of the Business and Professions Code.

(ii) An individual who is a seller of travel within the meaning of subdivision (a) of Section 17550.1 of the Business and Professions Code and who is exempt from the registration under subdivision (g) of Section 17550.20 of the Business and Professions Code.

(D) Graphic design.

(E) Grant writer.

(F) (i) Fine artist.

(ii) For the purposes of this subparagraph, "fine artist" means an individual who creates works of art to be appreciated primarily or solely for their imaginative, aesthetic, or intellectual content, including drawings, paintings, sculptures, mosaics, works of calligraphy, works of graphic art, crafts, or mixed media.

(G) Services provided by an enrolled agent who is licensed by the United States Department of the Treasury to practice before the Internal Revenue Service pursuant to Part 10 of Subtitle A of Title 31 of the Code of Federal Regulations.

(H) Payment processing agent through an independent sales organization.

(I) Services provided by any of the following:

(i) By a still photographer, photojournalist, videographer, or photo editor who works under a written contract that specifies the rate of pay and obligation to pay by a defined time, as long as the individual providing the services is not directly replacing an employee who performed the same work at the same volume for the hiring entity; the individual does not primarily perform the work at the hiring entity's business

location, notwithstanding paragraph (1) of subdivision (a); and the individual is not restricted from working for more than one hiring entity. This subclause is not applicable to a still photographer, photojournalist, videographer, or photo editor who works on motion pictures, which is inclusive of, but is not limited to, theatrical or commercial productions, broadcast news, television, and music videos. Nothing in this section restricts a still photographer, photojournalist, photo editor, or videographer from distributing, licensing, or selling their work product to another business, except as prohibited under copyright laws or workplace collective bargaining agreements.

(ii) To a digital content aggregator by a still photographer, photojournalist, videographer, or photo editor.

(iii) For the purposes of this subparagraph the following definitions apply:

(I) "Photo editor" means an individual who performs services ancillary to the creation of digital content, such as retouching, editing, and keywording.

(II) "Digital content aggregator" means a licensing intermediary that obtains a license or assignment of copyright from a still photographer, photojournalist, videographer, or photo editor for the purposes of distributing that copyright by way of sublicense or assignment, to the intermediary's third party end users.

(J) Services provided by a freelance writer, translator, editor, copy editor, illustrator, or newspaper cartoonist who works under a written contract that specifies the rate of pay, intellectual property rights, and obligation to pay by a defined time, as long as the individual providing the services is not directly replacing an employee who performed the same work at the same volume for the hiring entity; the individual does not primarily perform the work at the hiring entity's business location, notwithstanding paragraph (1) of subdivision (a); and the individual is not restricted from working for more than one hiring entity.

(K) Services provided by an individual as a content contributor, advisor, producer, narrator, or cartographer for a journal, book, periodical, evaluation, other publication or educational, academic, or instructional work in any format or media, who works under a written contract that specifies the rate of pay, intellectual property rights and obligation to pay by a defined time, as long as the individual providing the services is not directly replacing an employee who performed the same work at the same volume for the hiring entity, the individual does not primarily perform the work at the hiring entity's business location notwithstanding paragraph (1) of subdivision (a); and the individual is not restricted from working for more than one hiring entity.

(L) Services provided by a licensed esthetician, licensed electrologist, licensed manicurist, licensed barber, or licensed cosmetologist provided that the individual:

(i) Sets their own rates, processes their own payments, and is paid directly by clients.

(ii) Sets their own hours of work and has sole discretion to decide the number of clients and which clients for whom they will provide services.

(iii) Has their own book of business and schedules their own appointments.

(iv) Maintains their own business license for the services offered to clients.

(v) If the individual is performing services at the location of the hiring entity, then the individual issues a Form 1099 to the salon or business owner from which they rent their business space.

(vi) This subparagraph shall become inoperative, with respect to licensed manicurists, on January 1, 2022.

(M) A specialized performer hired by a performing arts company or organization to teach a master class for no more than one week. "Master class" means a specialized course for limited duration that is not regularly offered by the hiring entity and is taught by an expert in a recognized field of artistic endeavor who does not work for the hiring entity to teach on a regular basis.

(N) Services provided by an appraiser, as defined in Part 3 (commencing with Section 11300) of Division 4 of the Business and Professions Code.

(O) Registered professional foresters licensed pursuant to Article 3 (commencing with Section 750) of Chapter 2.5 of Division 1 of the Public Resources Code.

(b) Section 2775 and the holding in Dynamex do not apply to the following, which are subject to the Business and Professions Code:

(1) A real estate licensee licensed by the State of California pursuant to Division 4 (commencing with Section 10000) of the Business and Professions Code, for whom the determination of employee or independent contractor status shall be governed by subdivision (b) of Section 10032 of the Business and Professions Code. If that section is not applicable, then this determination shall be governed as follows:

(A) For purposes of unemployment insurance by Section 650 of the Unemployment Insurance Code.

(B) For purposes of workers' compensation by Section 3200 et seq.

(C) For all other purposes in the Labor Code by Borello. The statutorily imposed duties of a responsible broker under Section 10015.1 of the Business and Professions Code are not factors to be considered under the Borello test.

(2) A home inspector, as defined in Section 7195 of the Business and Professions Code, and subject to the provisions of Chapter 9.3 (commencing with Section 7195) of Division 3 of that code.

(3) A repossession agency licensed pursuant to Section 7500.2 of the Business and Professions Code, for whom the determination of employee or independent contractor status shall be governed by Section 7500.2 of the Business and Professions Code, if the repossession agency is free from the control and direction of the hiring person or entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

# EXHIBIT Q

## Cal. Lab. Code § 2779

**§ 2779.**     (a)Section 2775 and the holding in Dynamex do not apply to the relationship between two individuals wherein each individual is acting as a sole proprietor or separate business entity formed as a partnership, limited liability company, limited liability partnership, or corporation performing work pursuant to a contract for purposes of providing services at the location of a single-engagement event, as defined below, under the following conditions:

(1) Neither individual is subject to control and direction by the other, in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(2) Each individual has the ability to negotiate their rate of pay with the other individual.

(3) The written contract between both individuals specifies the total payment for services provided by both individuals at the single-engagement event, and the specific rate paid to each individual.

(4) Each individual maintains their own business location, which may include the individual's personal residence.

(5) Each individual provides their own tools, vehicles, and equipment to perform the services under the contract.

(6) If the work is performed in a jurisdiction that requires an individual to have a business license or business tax registration, then each individual has the required business license or business tax registration.

(7) Each individual is customarily engaged in the same or similar type of work performed under the contract or each individual separately holds themselves out to other potential customers as available to perform the same type of work.

(8) Each individual can contract with other businesses to provide the same or similar services and maintain their own clientele without restrictions.

(b) "Single-engagement event" means a stand-alone non-recurring event in a single location, or a series of events in the same location no more than once a week.

(c) "Services" under this section do not include services provided in an industry designated by the Division of Occupational Safety and Health or the Department of Industrial Relations as a high hazard industry pursuant to subparagraph (A) of paragraph (3) of subdivision (e) of Section 6401.7 or janitorial, delivery, courier, transportation, trucking, agricultural labor, retail, logging, in-home care, or construction services other than minor home repair.

# EXHIBIT R

## Cal. Lab. Code § 2780

**§ 2780.** (a) (1) Section 2775 and the holding in Dynamex do not apply to the following occupations in connection with creating, marketing, promoting, or distributing sound recordings or musical compositions, and instead the holding in Borello shall apply to all of the following:

(A) Recording artists, subject to the below.

(B) Songwriters, lyricists, composers, and proofers.

(C) Managers of recording artists.

(D) Record producers and directors.

(E) Musical engineers and mixers engaged in the creation of sound recordings.

(F) Musicians engaged in the creation of sound recordings, subject to the below.

(G) Vocalists, subject to the below.

(H) Photographers working on recording photo shoots, album covers, and other press and publicity purposes.

(I) Independent radio promoters.

(J) Any other individual engaged to render any creative, production, marketing, or independent music publicist services related primarily to the creation, marketing, promotion, or distribution of sound recordings or musical compositions.

(2) This subdivision shall not apply to any of the following:

(A) Film and television unit production crews, as such term is commonly used in the film and television industries, working on live or recorded performances for audiovisual works, including still photographers and cinematographers.

(B) Publicists who are not independent music publicists.

(3) Notwithstanding Section 2775, paragraphs (1) and (2), and the holding in Dynamex, the terms and conditions of any current or future collective bargaining agreements or contractual agreements between the applicable labor unions and

respective employers shall govern the determination of employment status in all events.

(4) The following shall apply to recording artists, musicians, and vocalists:

(A) Recording artists, musicians, and vocalists shall not be precluded from organizing under applicable provisions of labor law, or otherwise exercising rights granted to employees under the National Labor Relations Act (29 U.S.C. Sec. 151 et seq.).

(B) (i) Musicians and vocalists who are not royalty-based participants in the work created during any specific engagement shall be treated as employees solely for purposes of receiving minimum and overtime wages for hours worked during the engagement, as well as any damages and penalties due to the failure to receive minimum or overtime wages. Any such wages, damages, and penalties owed under this subparagraph shall be determined according to the applicable provisions of this code, wage orders of the Industrial Welfare Commission, or applicable local laws.

(ii) "Royalty-based participant" means an individual who has either negotiated for the collection or direct administration of royalties derived from the exploitation of a sound recording or musical composition, or is entitled to control, administer or collect royalties related to the exploitation of a sound recording or musical composition as a co-author or joint owner thereof.

(C) In all events, and notwithstanding subparagraph (B), the terms and conditions of any current or future collective bargaining agreements or contractual agreements between the applicable labor unions and respective employers shall govern the determination of employment status.

(b) (1) Section 2775 and the holding in Dynamex do not apply to a musician or musical group for the purpose of a single-engagement live performance event, and instead the determination of employee or independent contractor status shall be governed by Borello, unless one of the following conditions is met:

(A) The musical group is performing as a symphony orchestra, the musical group is performing at a theme park or amusement park, or a musician is performing in a musical theater production.

(B) The musical group is an event headliner for a performance taking place in a venue location with more than 1,500 attendees.

(C) The musical group is performing at a festival that sells more than 18,000 tickets per day.

(2) This subdivision is inclusive of rehearsals related to the single-engagement live performance event.

(3) As used in this subdivision:

(A) "Event headliner" means the musical group that appears most prominently in an event program, advertisement, or on a marquee.

(B) "Festival" means a single day or multiday event in a single venue location that occurs once a year, featuring performances by various musical groups.

(C) "Musical group" means a solo artist, band, or a group of musicians who perform under a distinct name.

(D) "Musical theater production" means a form of theatrical performance that combines songs, spoken dialogue, acting, and dance.

(E) "Musician" means an individual performing instrumental, electronic, or vocal music in a live setting.

(F) "Single-engagement live performance event" means a stand-alone musical performance in a single venue location, or a series of performances in the same venue location no more than once a week. This does not include performances that are part of a tour or series of live performances at various locations.

(G) "Venue location" means an indoor or outdoor location used primarily as a space to hold a concert or musical performance. "Venue location" includes, but is not limited to, a restaurant, bar, or brewery that regularly offers live musical entertainment.

(c) Section 2775 and the holding in Dynamex do not apply to the following, and instead, the determination of employee or independent contractor status shall be governed by Borello:

(1) An individual performance artist performing material that is their original work and creative in character and the result of which depends primarily on the individual's invention, imagination, or talent, given all of the following conditions are satisfied:

(A) The individual is free from the control and direction of the hiring entity in connection with the performance of the work, both as a matter of contract and in fact. This includes, and is not limited to, the right for the performer to exercise artistic control over all elements of the performance.

(B) The individual retains the rights to their intellectual property that was created in connection with the performance.

(C) Consistent with the nature of the work, the individual sets their terms of work and has the ability to set or negotiate their rates.

(D) The individual is free to accept or reject each individual performance engagement without being penalized in any form by the hiring entity.

(2) "Individual performance artist" shall include, but is not limited to, an individual performing comedy, improvisation, stage magic, illusion, mime, spoken word, storytelling, or puppetry.

(3) This subdivision does not apply to an individual participating in a theatrical production, or a musician or musical group as defined in subdivision (b).

(4) In all events, notwithstanding paragraph (1), the terms and conditions of any current or future collective bargaining agreements or contractual agreements between the applicable labor unions and respective employer shall govern the determination of employment status.

Cal. Lab. Code § 2781

**§ 2781.** Section 2775 and the holding in Dynamex do not apply to the relationship between a contractor and an individual performing work pursuant to a subcontract in the construction industry, and instead the determination of whether the individual is an employee of the contractor shall be governed by Section 2750.5 and by Borello, if the contractor demonstrates that all the following criteria are satisfied:

(a) The subcontract is in writing.

(b) The subcontractor is licensed by the Contractors' State License Board and the work is within the scope of that license.

(c) If the subcontractor is domiciled in a jurisdiction that requires the subcontractor to have a business license or business tax registration, the subcontractor has the required business license or business tax registration.

(d) The subcontractor maintains a business location that is separate from the business or work location of the contractor.

(e) The subcontractor has the authority to hire and to fire other persons to provide or to assist in providing the services.

(f) The subcontractor assumes financial responsibility for errors or omissions in labor or services as evidenced by insurance, legally authorized indemnity obligations, performance bonds, or warranties relating to the labor or services being provided.

(g) The subcontractor is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(h) (1) Subdivision (b) shall not apply to a subcontractor providing construction trucking services for which a contractor's license is not required by Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, provided that all of the following criteria are satisfied:

(A) The subcontractor is a business entity formed as a sole proprietorship, partnership, limited liability company, limited liability partnership, or corporation.

(B) For work performed after January 1, 2020, the subcontractor is registered with the Department of Industrial Relations as a public works contractor pursuant to Section 1725.5, regardless of whether the subcontract involves public work.

(C) The subcontractor utilizes its own employees to perform the construction trucking services, unless the subcontractor is a sole proprietor who operates their own truck to perform the entire subcontract and holds a valid motor carrier permit issued by the Department of Motor Vehicles.

(D) The subcontractor negotiates and contracts with, and is compensated directly by, the licensed contractor.

(2) For work performed after January 1, 2020, any business entity that provides construction trucking services to a licensed contractor utilizing more than one truck shall be deemed the employer for all drivers of those trucks.

(3) For purposes of this subdivision, "construction trucking services" mean hauling and trucking services provided in the construction industry pursuant to a contract with a licensed contractor utilizing vehicles that require a commercial driver's license to operate or have a gross vehicle weight rating of 26,001 or more pounds.

(4) This subdivision shall only apply to work performed before January 1, 2022.

(5) Nothing in this subdivision prohibits an individual who owns their truck from working as an employee of a trucking company and utilizing that truck in the scope of that employment. An individual employee providing their own truck for use by an employer trucking company shall be reimbursed by the trucking company for the reasonable expense incurred for the use of the employee-owned truck.

Cal. Lab. Code § 2782

**§ 2782.**  (a) (1) Section 2775 and the holding in Dynamex do not apply to the relationship between a data aggregator and an individual providing feedback to the data aggregator, and instead the holding in Borello shall apply, under the following conditions:

(A) The individual is free from control and direction from the data aggregator with respect to the substance and content of the feedback.

(B) Any consideration paid for the feedback provided, if prorated to an hourly basis, is an amount equivalent to or greater than the minimum wage.

(C) The nature of the feedback requested requires the individual providing feedback to the data aggregator to exercise independent judgment and discretion.

(D) The individual has the ability to reject feedback requests, without being penalized in any form by the data aggregator.

(2) As used in this section:

(A) "Data aggregator" is a business, research institution, or organization that requests and gathers feedback on user interface, products, services, people, concepts, ideas, offerings, or experiences from individuals willing to provide it.

(B) "Minimum wage" is local or state minimum wage, whichever is greater.

# EXHIBIT U

## Cal. Lab. Code § 2783

**§ 2783.** Section 2775 and the holding in Dynamex do not apply to the following occupations as defined in the paragraphs below, and instead, the determination of employee or independent contractor status for individuals in those occupations shall be governed by Borello:

(a) A person or organization who is licensed by the Department of Insurance pursuant to Chapter 5 (commencing with Section 1621), Chapter 6 (commencing with Section 1760), or Chapter 8 (commencing with Section 1831) of Part 2 of Division 1 of the Insurance Code or a person who provides underwriting inspections, premium audits, risk management, or loss control work for the insurance and financial service industries.

(b) A physician and surgeon, dentist, podiatrist, psychologist, or veterinarian licensed by the State of California pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, performing professional or medical services provided to or by a health care entity, including an entity organized as a sole proprietorship, partnership, or professional corporation as defined in Section 13401 of the Corporations Code. Nothing in this subdivision shall circumvent, undermine, or restrict the rights under federal law to organize and collectively bargain.

(c) An individual who holds an active license from the State of California and is practicing one of the following recognized professions: lawyer, architect, landscape architect, engineer, private investigator, or accountant.

(d) A securities broker-dealer or investment adviser or their agents and representatives that are either of the following:

(1) Registered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority.

(2) Licensed by the State of California under Chapter 2 (commencing with Section 25210) or Chapter 3 (commencing with Section 25230) of Division 1 of Part 3 of Title 4 of the Corporations Code.

(e) A direct sales salesperson as described in Section 650 of the Unemployment Insurance Code, so long as the conditions for exclusion from employment under that section are met.

(f) A manufactured housing salesperson, subject to all obligations under Part 2 (commencing with Section 18000) of Division 13 of the Health and Safety Code, including all regulations promulgated by the Department of Housing and Community Development relating to manufactured home salespersons and all other obligations of manufactured housing salespersons to members of the public.

(g) A commercial fisher working on an American vessel.

(1) For the purposes of this subdivision:

(A) "American vessel" has the same meaning as defined in Section 125.5 of the Unemployment Insurance Code.

(B) "Commercial fisher" means a person who has a valid, unrevoked commercial fishing license issued pursuant to Article 3 (commencing with Section 7850) of Chapter 1 of Part 3 of Division 6 of the Fish and Game Code.

(C) "Working on an American vessel" means the taking or the attempt to take fish, shellfish, or other fishery resources of the state by any means, and includes each individual aboard an American vessel operated for fishing purposes who participates directly or indirectly in the taking of these raw fishery products, including maintaining the vessel or equipment used aboard the vessel. However, "working on an American vessel" does not apply to anyone aboard a licensed commercial fishing vessel as a visitor or guest who does not directly or indirectly participate in the taking.

(2) For the purposes of this subdivision, a commercial fisher working on an American vessel is eligible for unemployment insurance benefits if they meet the definition of "employment" in Section 609 of the Unemployment Insurance Code and are otherwise eligible for those benefits pursuant to the provisions of the Unemployment Insurance Code.

(3) (A) On or before March 1, 2021, and each March 1 thereafter, the Employment Development Department shall issue an annual report to the Legislature on the use of unemployment insurance in the commercial fishing industry. This report shall include, but not be limited to, all of the following:

(i) Reporting the number of commercial fishers who apply for unemployment insurance benefits.

(ii) The number of commercial fishers who have their claims disputed.

(iii) The number of commercial fishers who have their claims denied.

(iv) The number of commercial fishers who receive unemployment insurance benefits.

(B) The report required by this subparagraph shall be submitted in compliance with Section 9795 of the Government Code.

(4) This subdivision shall become inoperative on January 1, 2023, unless extended by the Legislature.

(h) (1) A newspaper distributor working under contract with a newspaper publisher, as defined in paragraph (2), or a newspaper carrier.

(2) For purposes of this subdivision:

(A) "Newspaper" means a newspaper of general circulation, as defined in Section 6000 of the Government Code, and any other publication circulated to the community in general as an extension of or substitute for that newspaper's own publication, whether that publication be designated a "shoppers' guide," as a zoned edition, or otherwise.

(B) "Publisher" means the natural or corporate person that manages the newspaper's business operations, including circulation.

(C) "Newspaper distributor" means a person or entity that contracts with a publisher to distribute newspapers to the community.

(D) "Carrier" means a person who effects physical delivery of the newspaper to the customer or reader.

(3) This subdivision shall become inoperative on January 1, 2022, unless extended by the Legislature.

(i) An individual who is engaged by an international exchange visitor program that has obtained and maintains full official designation by the United States Department of State under Part 62 (commencing with Section 62.1) of Title 22 of the Code of Federal Regulations for the purpose of conducting, instead of participating in, international and cultural exchange visitor programs and is in full compliance with Part 62 (commencing with Section 62.1) of Title 22 of the Code of Federal Regulations.

(j) A competition judge with a specialized skill set or expertise providing services that require the exercise of discretion and independent judgment to an organization for the purposes of determining the outcome or enforcing the rules of a competition. This includes, but is not limited to, an amateur umpire or referee.

# EXHIBIT V

Cal. Lab. Code § 2785

**§ 2785.** (a) Section 2775 does not constitute a change in, but is declaratory of, existing law with regard to wage orders of the Industrial Welfare Commission and violations of this code relating to wage orders.

(b) Insofar as the application of Sections 2776 to Section 2784 would relieve an employer from liability, those sections shall apply retroactively to existing claims and actions to the maximum extent permitted by law.

(c) Except as provided in subdivisions (a) and (b) of this section, this article shall apply to work performed on or after January 1, 2020.

(d) If a hiring entity can demonstrate compliance with all of conditions set forth in any one of Sections 2776 to 2784, inclusive, then Section 2775 and the holding in Dynamex do not apply to that entity, and instead the determination of an individual's employment status as an employee or independent contractor shall be governed by Borello.

# EXHIBIT W

## Cal. Lab. Code § 2786

§ 2786.  In addition to any other remedies available, an action for injunctive relief to prevent the continued misclassification of employees as independent contractors may be prosecuted against the putative employer in a court of competent jurisdiction by the Attorney General, by a district attorney, or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association.

# **EXHIBIT X**

Cal. Unemployment Insurance Code § 976

§ **976.** Employer contributions to the Unemployment Fund shall accrue and become payable by every employer, except an employer as defined by Section 676, for each calendar year with respect to wages paid for employment. The contributions are due and shall be paid to the department for the Unemployment Fund by each employer in accordance with this division and shall not be deducted in whole or in part from the wages of individuals in his employ.

.

# **EXHIBIT Y**

## Cal. Unemployment Insurance Code § 977

**§ 977.**     (a) Except as provided in subdivision (c), if, as of the computation date, the employer's net balance of reserve equals or exceeds that percentage of his or her average base payroll which appears on any line in column 1 of the following table, but is less than that percentage of his or her average base payroll which appears on the same line in column 2 of that table, his or her contribution rate shall be the figure appearing on that same line in the appropriate schedule, as defined in subdivision (b), which shall be a percentage of the wages specified in Section 930.

| Line | Reserve Ratio Column 1 | Column 2 | AA | A | B | C | D | E | F |
|------|------|------|-----|-----|-----|-----|-----|-----|-----|
| 01 | less than –20 | | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 |
| 02 | –20 to –18 | | 5.2 | 5.3 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 |
| 03 | –18 to –16 | | 5.1 | 5.2 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 |
| 04 | –16 to –14 | | 5.0 | 5.1 | 5.3 | 5.4 | 5.4 | 5.4 | 5.4 |
| 05 | –14 to –12 | | 4.9 | 5.0 | 5.3 | 5.4 | 5.4 | 5.4 | 5.4 |
| 06 | –12 to –11 | | 4.8 | 4.9 | 5.2 | 5.4 | 5.4 | 5.4 | 5.4 |
| 07 | –11 to –10 | | 4.7 | 4.8 | 5.1 | 5.3 | 5.4 | 5.4 | 5.4 |
| 08 | –10 to –09 | | 4.6 | 4.7 | 5.1 | 5.4 | 5.4 | 5.4 | 5.4 |
| 09 | –09 to –08 | | 4.5 | 4.6 | 4.9 | 5.2 | 5.4 | 5.4 | 5.4 |
| 10 | –08 to –07 | | 4.4 | 4.5 | 4.8 | 5.1 | 5.3 | 5.4 | 5.4 |
| 11 | –07 to –06 | | 4.3 | 4.4 | 4.7 | 5.0 | 5.3 | 5.4 | 5.4 |
| 12 | –06 to –05 | | 4.2 | 4.3 | 4.6 | 4.9 | 5.2 | 5.4 | 5.4 |
| 13 | –05 to –04 | | 4.1 | 4.2 | 4.5 | 4.8 | 5.1 | 5.3 | 5.4 |
| 14 | –04 to –03 | | 4.0 | 4.1 | 4.4 | 4.7 | 5.0 | 5.3 | 5.4 |
| 15 | –03 to –02 | | 3.9 | 4.0 | 4.3 | 4.6 | 4.9 | 5.2 | 5.4 |
| 16 | –02 to –01 | | 3.8 | 3.9 | 4.2 | 4.5 | 4.8 | 5.1 | 5.4 |
| 17 | –01 to 00 | | 3.7 | 3.8 | 4.1 | 4.4 | 4.7 | 5.0 | 5.4 |
| 18 | 00 to 01 | | 3.4 | 3.6 | 3.9 | 4.2 | 4.5 | 4.8 | 5.1 |
| 19 | 01 to 02 | | 3.2 | 3.4 | 3.7 | 4.0 | 4.3 | 4.6 | 4.9 |
| 20 | 02 to 03 | | 3.0 | 3.2 | 3.5 | 3.8 | 4.1 | 4.4 | 4.7 |

| 21 | | 03 to 04 | 2.8 | 3.0 | 3.3 | 3.6 | 3.9 | 4.2 | 4.5 |
| 22 | | 04 to 05 | 2.6 | 2.8 | 3.1 | 3.4 | 3.7 | 4.0 | 4.3 |
| 23 | | 05 to 06 | 2.4 | 2.6 | 2.9 | 3.2 | 3.5 | 3.8 | 4.1 |
| 24 | | 06 to 07 | 2.2 | 2.4 | 2.7 | 3.0 | 3.3 | 3.6 | 3.9 |
| 25 | | 07 to 08 | 2.0 | 2.2 | 2.5 | 2.8 | 3.1 | 3.4 | 3.7 |
| 26 | | 08 to 09 | 1.8 | 2.0 | 2.3 | 2.6 | 2.9 | 3.2 | 3.5 |
| 27 | | 09 to 10 | 1.6 | 1.8 | 2.1 | 2.4 | 2.7 | 3.0 | 3.3 |
| 28 | | 10 to 11 | 1.4 | 1.6 | 1.9 | 2.2 | 2.5 | 2.8 | 3.1 |
| 29 | | 11 to 12 | 1.2 | 1.4 | 1.7 | 2.0 | 2.3 | 2.6 | 2.9 |
| 30 | | 12 to 13 | 1.0 | 1.2 | 1.5 | 1.8 | 2.1 | 2.4 | 2.7 |
| 31 | | 13 to 14 | 0.8 | 1.0 | 1.3 | 1.6 | 1.9 | 2.2 | 2.5 |
| 32 | | 14 to 15 | 0.7 | 0.9 | 1.1 | 1.4 | 1.7 | 2.0 | 2.3 |
| 33 | | 15 to 16 | 0.6 | 0.8 | 1.0 | 1.2 | 1.5 | 1.8 | 2.1 |
| 34 | | 16 to 17 | 0.5 | 0.7 | 0.9 | 1.1 | 1.3 | 1.6 | 1.9 |
| 35 | | 17 to 18 | 0.4 | 0.6 | 0.8 | 1.0 | 1.2 | 1.4 | 1.7 |
| 36 | | 18 to 19 | 0.3 | 0.5 | 0.7 | 0.9 | 1.1 | 1.3 | 1.5 |
| 37 | | 19 to 20 | 0.2 | 0.4 | 0.6 | 0.8 | 1.0 | 1.2 | 1.4 |
| 38 | | 20 or more | 0.1 | 0.3 | 0.5 | 0.7 | 0.9 | 1.1 | 1.3 |

(b) (1) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is greater than 1.8 percent of the wages (as defined by Section 940) in employment subject to this part paid during the 12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule AA.

(2) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is equal to or less than 1.8 percent and greater than 1.6 percent of the wages (as defined by Section 940) in employment subject to this part paid during the 12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule A.

(3) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is equal to or less than 1.6 percent and greater than 1.4 percent of the wages (as defined by Section 940) in employment subject to this part paid during the

12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule B.

(4) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is equal to or less than 1.4 percent and greater than 1.2 percent of the wages (as defined by Section 940) in employment subject to this part paid during the 12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule C.

(5) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is equal to or less than 1.2 percent and greater than 1.0 percent of the wages (as defined by Section 940) in employment subject to this part paid during the 12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule D.

(6) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is equal to or less than 1.0 percent and greater than or equal to 0.8 percent of the wages (as defined by Section 940) in employment subject to this part paid during the 12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule E.

(7) Whenever the balance in the Unemployment Fund on September 30 of any calendar year is less than 0.8 percent and greater than or equal to 0.6 percent of the wages (as defined by Section 940) in employment subject to this part paid during the 12-month period ending upon the computation date, employers shall pay into the Unemployment Fund contributions for the succeeding calendar year upon all wages with respect to employment at the rates specified in Schedule F.

(c) For each rating period beginning on or after January 1, 2005, in which an employer obtains or attempts to obtain a more favorable rate of contributions under this section due to deliberate ignorance, reckless disregard, fraud, intent to evade, misrepresentation, or willful nondisclosure, the director shall assign the maximum contribution rate plus 2 percent for each applicable rating period, the current rating period, and the subsequent rating period.

# EXHIBIT Z

Cal. Unemployment Insurance Code § 1088.5

§ **1088.5.**    (a) In addition to information reported in accordance with Section 1088, effective July 1, 1998, each employer shall file, with the department, the information provided for in subdivision (b) on new employees.

(b) Each employer shall report the hiring of any employee who works in this state and to whom the employer anticipates paying wages, and also shall report the hiring of any employee who previously worked for the employer but had been separated from that prior employment for at least 60 consecutive days.

(c) (1) This section shall not apply to any department, agency, or instrumentality of the United States.

(2) State agency employers shall not be required to report employees performing intelligence or counterintelligence functions, if the head of the agency has determined that reporting pursuant to this section would endanger the safety of the employee or compromise an ongoing investigation or intelligence mission.

(d) (1) Employers shall submit a report as described in paragraph (4) within 20 days of hiring any employee whom the employer is required to report pursuant to this section.

(2) Notwithstanding subdivision (a), employers transmitting reports magnetically or electronically shall submit the report by two monthly transmissions not less than 12 days and not more than 16 days apart.

(3) For purposes of this section, an employer that has employees in two or more states and that transmits reports magnetically or electronically may designate one state in which the employer has employees to which the employer will transmit the report described in paragraph (4). Any employer that transmits reports pursuant to this paragraph shall notify the Secretary of Health and Human Services in writing as to which state the employer designates for the purpose of sending reports.

(4) The report shall contain the following:

(A) The name, address, and social security number of the employees.

(B) The employer's name, address, state employer identification number (if one has been issued), and identifying number assigned to the employer under Section 6109 of the Internal Revenue Code of 1986.

(C) The first date the employee worked.

(5) Employers may report pursuant to this section by submitting a copy of the employee's W-4 form, a form provided by the department, or any other hiring document transmitted by first-class mail, magnetically, or electronically.

(e) For each failure to report the hiring of an employee, as required and within the time required by this section, unless the failure is due to good cause, the department may assess a penalty of twenty-four dollars ($24), or four hundred ninety dollars ($490) if the failure is the result of conspiracy between the employer and employee not to supply the required report or to supply a false or incomplete report.

(f) (1) On and after January 1, 2013, and before January 1, 2019, information collected pursuant to this section may be used for the following purposes:

(A) Administration of this code, including, but not limited to, providing employer or employee information to participating members of the Joint Enforcement Strike Force on the Underground Economy pursuant to Section 329 for the purposes of auditing, investigating, and prosecuting violations of tax and cash-pay reporting laws.

(B) Locating individuals for purposes of establishing paternity and establishing, modifying, and enforcing child support obligations.

(C) Administration of employment security and workers' compensation programs.

(D) Providing employer or employee information to the Franchise Tax Board and the State Board of Equalization for the purpose of tax or fee enforcement.

(E) Verification of eligibility of applicants for, or recipients of, the public assistance programs listed in Section 1320b-7(b) of Title 42 of the United States Code.

(F) Providing employer or employee information to the Contractors' State License Board and the State Compensation Insurance Fund for the purpose of workers' compensation payroll reporting.

(G) Providing employer or employee information to the State Department of Health Care Services, the California Health Benefit Exchange, the Managed Risk Medical Insurance Board, and county departments and agencies for the purpose of:

(i) Verifying or determining the eligibility of an applicant for, or a recipient of, state health subsidy programs, limited to the Medi-Cal program, provided pursuant to Chapter 7 (commencing with Section 14000) of Part 3 of Division 9 of the Welfare

and Institutions Code, the Healthy Families Program, provided pursuant to Part 6.2 (commencing with Section 12693) of Division 2 of the Insurance Code, and the Access for Infants and Mothers Program, provided pursuant to Part 6.3 (commencing with Section 12695) of Division 2 of the Insurance Code, where the verification or determination is directly connected with, and limited to, the administration of the state health subsidy programs referenced in this clause.

(ii) Verifying or determining the eligibility of an applicant for, or a recipient of, federal subsidies offered through the California Health Benefit Exchange, provided pursuant to Title 22 (commencing with Section 100500) of the Government Code, including federal tax credits and cost-sharing assistance pursuant to the federal Patient Protection and Affordable Care Act, (Public Law 111-148), as amended by the federal Health Care and Education Reconciliation Act of 2010 (Public Law 111-152), where the verification or determination is directly connected with, and limited to, the administration of the California Health Benefit Exchange.

(iii) Verifying or determining the eligibility of employees and employers for health coverage through the Small Business Health Options Program, provided pursuant to Section 100502 of the Government Code, where the verification or determination is directly connected with, and limited to, the administration of the Small Business Health Options Program.

(2) On and after January 1, 2019, information collected pursuant to this section may be used for the following purposes:

(A) Administration of this code.

(B) Locating individuals for purposes of establishing paternity and establishing, modifying, and enforcing child support obligations.

(C) Administration of employment security and workers' compensation programs.

(D) Providing employer or employee information to the Franchise Tax Board and to the State Board of Equalization for the purposes of tax or fee enforcement.

(E) Verification of eligibility of applicants for, or recipients of, the public assistance programs listed in Section 1320b-7(b) of Title 42 of the United States Code.

(F) Providing employer or employee information to the State Department of Health Care Services, the California Health Benefit Exchange, the Managed Risk Medical Insurance Board, and county departments and agencies for the purpose of:

(i) Verifying or determining the eligibility of an applicant for, or a recipient of, state health subsidy programs, limited to the Medi-Cal program, provided pursuant to Chapter 7 (commencing with Section 14000) of Part 3 of Division 9 of the Welfare and Institutions Code, the Healthy Families Program, provided pursuant to Part 6.2 (commencing with Section 12693) of Division 2 of the Insurance Code, and the Access for Infants and Mothers Program, provided pursuant to Part 6.3 (commencing with Section 12695) of Division 2 of the Insurance Code, where the verification or determination is directly connected with, and limited to, the administration of the state health subsidy programs referenced in this clause.

(ii) Verifying or determining the eligibility of an applicant for, or a recipient of, federal subsidies offered through the California Health Benefit Exchange, provided pursuant to Title 22 (commencing with Section 100500) of the Government Code, including federal tax credits and cost-sharing assistance pursuant to the federal Patient Protection and Affordable Care Act, (Public Law 111-148), as amended by the federal Health Care and Education Reconciliation Act of 2010 (Public Law 111-152), where the verification or determination is directly connected with, and limited to, the administration of the California Health Benefit Exchange.

(iii) Verifying or determining the eligibility of employees and employers for health coverage through the Small Business Health Options Program, provided pursuant to Section 100502 of the Government Code, where the verification or determination is directly connected with, and limited to, the administration of the Small Business Health Options Program.

(g) For purposes of this section, "employer" includes a labor union hiring hall.

(h) This section shall become operative on July 1, 1998.

# EXHIBIT AA

Cal. Unemployment Insurance Code § 1112

§ **1112.**     (a) Any employer who without good cause fails to pay any contributions required of him or her or of his or her workers, except amounts assessed under Article 8 (commencing with Section 1126), within the time required shall pay a penalty of 15 percent of the amount of those contributions.

(b) Any employer required to remit payments electronically who without good cause remits those amounts by means other than electronic shall pay a penalty of 15 percent of the amount of those contributions.

(c) Notwithstanding subdivision (b), on and after January 1, 2017, and before January 1, 2019, an employer required to remit payments electronically, excluding employers previously required to remit payments by electronic funds transfer under Section 13021, who remits those amounts within the time required by means that are not electronic shall not be subject to the penalty described in subdivision (b).

(d) The changes made to this section by Chapter 28 of the Statutes of 2014 shall apply on and after July 1, 2014.

# EXHIBIT AB

Cal. Unemployment Insurance Code § 1126.1

§ **1126.1.**     (a) If any employing unit fails to register with the department as required under Section 1086, and the failure is due to intentional disregard or intent to evade this division or authorized regulations, a penalty of one hundred dollars ($100) per nonreported employee shall be added to an assessment issued in accordance with Section 1126.

(b) For purposes of this section, the number of nonreported employees shall be defined as the highest number of employees determined by the department to have been engaged by the employer during any single calendar quarter included in the assessment under Section 1126.

Cal. Unemployment Insurance Code § 13020

§ **13020.**  (a) (1) Every employer who pays wages to a resident employee for services performed either within or without this state, or to a nonresident employee for services performed in this state, shall deduct and withhold from those wages, except as provided in subdivision (c) and Sections 13025 and 13026, for each payroll period, a tax computed in that manner as to produce, so far as practicable, with due regard to the credits for personal exemptions allowable under Section 17054 of the Revenue and Taxation Code, a sum which is substantially equivalent to the amount of tax reasonably estimated to be due under Part 10 (commencing with Section 17001) of Division 2 of the Revenue and Taxation Code resulting from the inclusion in the gross income of the employee of the wages which were subject to withholding. The method of determining the amount to be withheld shall be prescribed by the Franchise Tax Board pursuant to Section 18663 of the Revenue and Taxation Code.

(2) For each payroll period ending on or after November 1, 2009, the sum shall comport with the changes made to Section 18663 of the Revenue and Taxation Code, by the act adding this paragraph.

(b) The department upon request may permit the use of accounting machines to calculate the proper amount to be deducted and withheld from wages, if the calculation produces an amount substantially equivalent to the amount of tax required to be withheld under subdivision (a).

(c) Withholding shall not be required by this section with respect to wages, salaries, fees, or other compensation paid by a corporation for services performed in California for that corporation to a nonresident corporate director for director services, including attendance at a board of directors' meeting.

# EXHIBIT AD

Cal. Unemployment Insurance Code § 13021

§ **13021.**     (a) Every employer required to withhold any tax under Section 13020 shall for each calendar quarter, whether or not wages or payments are paid in the quarter, file a withholding report, a quarterly return, as described in subdivision (a) of Section 1088, and a report of wages in a form prescribed by the department, and pay over the taxes so required to be withheld. The report of wages shall include individual amounts required to be withheld under Section 13020 or withheld under Section 13028. Except as provided in subdivisions (c) and (d), the employer shall file a withholding report, a quarterly return, as described in subdivision (a) of Section 1088, and a report of wages, and remit the total amount of income taxes withheld during the calendar quarter on or before the last day of the month following the close of the calendar quarter.

(b) Every employer electing to file a single annual return under subdivision (d) of Section 1110 shall report and pay any taxes withheld under Section 13020 on an annual basis within the time specified in subdivision (d) of Section 1110.

(c) (1) Effective January 1, 1995, whenever an employer is required, for federal income tax purposes, to remit the total amount of withheld federal income tax in accordance with Section 6302 of the Internal Revenue Code and regulations thereunder, and the accumulated amount of state income tax withheld is more than five hundred dollars ($500), the employer shall remit the total amount of income tax withheld for state income tax purposes within the number of business days as specified for withheld federal income taxes by Section 6302 of the Internal Revenue Code, and regulations thereunder.

(2) Effective January 1, 1996, the five hundred dollar ($500) amount referred to in paragraph (1) shall be adjusted annually as follows, based on the annual average rate of interest earned on the Pooled Money Investment Account as of June 30 in the prior fiscal year:

| Average Rate of Interest | |
|---|---|
| Greater than or equal to 9 percent: | $ 75 |
| Less than 9 percent, but greater than or equal to 7 percent: | 250 |

| | |
|---|---|
| Less than 7 percent, but greater than or equal to 4 percent: | 400 |
| Less than 4 percent: | 500 |

(d) (1) Notwithstanding subdivisions (a) and (c), for calendar years beginning on and after January 1, 1995, if in the 12-month period ending June 30 of the prior year, the cumulative average payment made pursuant to this division or Section 1110 for any deposit periods, as described under Section 6302 of the Internal Revenue Code and regulations thereunder, was twenty thousand dollars ($20,000) or more, the employer shall remit the total amount of income tax withheld within the number of business days as specified for filing federal income taxes by Section 6302 of the Internal Revenue Code, relating to mode or time of collection, and regulations thereunder. For purposes of this subdivision, payment shall be made by electronic funds transfer in accordance with Section 13021.5, for one calendar year beginning on January 1. Payment is deemed complete on the date the electronic funds transfer is initiated if settlement to the state's demand account occurs on or before the business day following the date the transfer is initiated. If settlement to the state's demand account does not occur on or before the business day following the date the transfer is initiated, payment is deemed complete on the date settlement occurs. The department shall, on or before October 31 of the prior year, notify all employers required by this paragraph to make payments by electronic funds transfer of these requirements.

(2) Effective January 1, 2017, paragraph (1) shall not apply to an employer subject to the electronic filing requirements of Section 1088. Effective January 1, 2017, an employer subject to the electronic filing requirements of Section 1088 shall remit the total amount of income tax withheld within the number of business days specified in Section 6302 of the Internal Revenue Code and the regulations adopted thereunder for filing federal income taxes. Payment shall be deemed complete on the date the electronic funds transfer is initiated if settlement to the state's demand account occurs on or before the business day following the date the transfer is initiated. If settlement to the state's demand account does not occur on or before the business day following the date the transfer is initiated, payment is deemed complete on the date settlement occurs.

(3) Notwithstanding paragraphs (1) and (2), effective January 1, 1995, electronic funds transfer payments that are subject to the one-day deposit rule, as described by Section 6302 of the Internal Revenue Code and regulations thereunder, shall be

deemed timely if the payment settles to the state's demand account within three business days after the date the employer meets the threshold for the one-day deposit rule.

(4) Any taxpayer required to remit payments pursuant to paragraphs (1) and (2) may request from the department a waiver of those requirements. The department may grant a waiver only if it determines that the particular amount paid in excess of twenty thousand dollars ($20,000), as stated in paragraph (1) was the result of an unprecedented occurrence for that employer, and was not representative of the employer's cumulative average payment in prior years.

(5) A state agency required to remit payments pursuant to paragraphs (1) and (2) may request a waiver of those requirements from the department. The department may grant a waiver if it determines that there will not be a negative impact on the interest earnings of the General Fund. If there is a negative impact to the General Fund, the department may grant a waiver if the requesting state agency follows procedures designated by the department to mitigate the impact to the General Fund.

(e) An employer not required to make payment pursuant to subdivision (d) may elect to make payment by electronic funds transfer in accordance with Section 13021.5 under the following conditions:

(1) The election shall be made in a form, and shall contain information, as prescribed by the director, and shall be subject to approval by the department.

(2) If approved, the election shall be effective on the date specified in the notification to the employer of approval.

(3) The election shall be operative from the date specified in the notification of approval, and shall continue in effect until terminated by the employer or the department.

(4) Funds remitted by electronic funds transfer pursuant to this subdivision shall be deemed complete in accordance with subdivision (d) or as deemed appropriate by the director to encourage use of this payment method.

(f) Notwithstanding Section 1112, interest and penalties shall not be assessed against an employer that remits at least 95 percent of the amount required by subdivision (c) or (d) if the failure to remit the full amount is not willful and any remaining amount due is paid with the next payment. The director may allow any employer to submit the amounts due from multiple locations upon a showing that those submissions are necessary to comply with subdivision (c) or (d).

(g) The department may, if it believes that action is necessary, require any employer to make the report or return required by this section and pay to it the tax deducted and withheld at any time, or from time to time but no less frequently than provided for in subdivision (a).

(h) An employer required to withhold any tax and that is not required to make payment under subdivision (c) shall remit the total amount of income tax withheld during each month of each calendar quarter, on or before the 15th day of the subsequent month if the income tax withheld for any of the three months or, cumulatively for two or more months, is three hundred fifty dollars ($350) or more.

(i) For purposes of subdivisions (a), (c), and (h), payment that is not required to be made by electronic funds transfer is deemed complete when it is placed in a properly addressed envelope, bearing the correct postage, and it is deposited in the United States mail.

(j) (1) In addition to the withholding report, quarterly return, and report of wages described in subdivision (a), each employer shall file with the director an annual reconciliation return showing the amount required to be withheld under Section 13020, and any other information the director shall prescribe. This annual reconciliation return shall be due on the first day of January following the close of the prior calendar year and shall become delinquent if not filed on or before the last day of that month.

(2) The requirement to file the annual reconciliation return for the prior calendar year under this subdivision shall not apply to the 2012 calendar year and thereafter.

(k) The requirement in subdivision (a) to file a quarterly return shall begin with the first calendar quarter of the 2011 calendar year.

(l) The changes made to this section by Chapter 783 of the Statutes of 2012 shall apply on and after January 1, 2013.