**No. 21-55757**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

LYDIA OLSON, et al.,
*Plaintiffs-Appellants*,

v.

STATE OF CALIFORNIA, et al.,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the
Central District of California, Case No. 2:19-cv-10956-DMG-RAO
Honorable Dolly M. Gee

_____

**AMICUS CURIAE BRIEF OF INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, SERVICE EMPLOYEES INTERNATIONAL
UNION CALIFORNIA STATE COUNCIL, AND UNITED FOOD AND
COMMERCIAL WORKERS UNION WESTERN STATES COUNCIL
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

Scott A. Kronland, CA #171693
Stacey M. Leyton, CA #203827
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: 415/421-7151
skronland@altber.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The amici curiae, International Brotherhood of Teamsters, Service Employees International Union California State Council, and United Food and Commercial Workers Union Western States Council are not corporations and have no parent corporations. No publicly held corporation owns any stock in any of the amici curiae.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF THE AMICI CURIAE ................................................1

INTRODUCTION .................................................................................3

ARGUMENT ..........................................................................................6

    I.  The District Court Properly Dismissed Plaintiffs' Equal
        Protection Claim ........................................................................6

        A. Plaintiffs' analysis cannot be squared with the rational basis
            test for reviewing ordinary economic legislation..............................6

        B. Rational basis challenges are properly dismissed on the
            pleadings where the plaintiffs' allegations fail to negate
            every possible rational basis for statutory distinctions .....................9

        C. Plaintiffs' allegations of animus do not change the
            relevant constitutional analysis ....................................... 11

        D. There are many rational reasons for applying the ABC
            test specifically to gig workers, and particularly
            ridesharing and delivery drivers ...................................... 17

    II. Plaintiffs' Other Constitutional Claims Are Likewise Entirely
        Meritless........................................................................... 24

        A. AB 5 does not violate substantive due process by
            depriving individuals of a fundamental right ................... 24

        B. AB 5 does not violate the contracts clause...................... 25

        C. AB 5 is not a bill of attainder .......................................... 26

CONCLUSION ................................................................................ 27

CERTIFICATE OF COMPLIANCE.................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Abernathy v. DoorDash, Inc.*
  438 F.Supp.3d 1062 (N.D. Cal. 2020)................................................................22

*Adams v. Postmates, Inc.*
  414 F.Supp.3d 1246 (N.D. Cal. 2019)................................................................22

*Allied Concrete & Supply Co. v. Baker*
  904 F.3d 1053 (9th Cir. 2018) ...........................................................................8

*Am. Soc'y of Journalists & Authors, Inc. v. Bonta*
  15 F.4th 954 (9th Cir. 2021) .....................................................................*passim*

*Animal Legal Def. Fund v. Wasden*
  878 F.3d 1184 (9th Cir. 2018) ...........................................................5, 12, 13

*Ashaheed v. Currington*
  7 F.4th 1236 (10th Cir. 2021) .........................................................................10

*City of Cleburne v. Cleburne Living Ctr.*
  473 U.S. 432 (1985)..........................................................................................13

*City of New Orleans v. Dukes*
  427 U.S. 297 (1976)............................................................................................6

*Conn v. Gabbert*
  526 U.S. 286 (1999)..........................................................................................24

*Davis v. Weir*
  497 F.2d 139 (5th Cir. 1974) ............................................................................9

*Dynamex Operations West, Inc. v. Superior Court*
  4 Cal.5th 903 (2018) ..........................................................................3, 8, 9, 27

*Energy Reserves Group, Inc. v. Kan. Power & Light Co.*
  459 U.S. 400 (1983)....................................................................................25, 26

*Engquist v. Oregon Dep't of Agric.*
  478 F.3d 985 (9th Cir. 2007) ..........................................................................24

*FCC v. Beach Commc'ns, Inc.*
   508 U.S. 307 (1993) .................................................................................*passim*

*Fowler Packing Co., Inc. v. Lanier*
   844 F.3d 809 (9th Cir. 2016) ...................................................................14, 19

*Fresno Rifle & Pistol Club, Inc. v. Van De Kamp*
   965 F.2d 723 (9th Cir. 1992) ....................................................................26, 27

*Gallinger v. Becerra*
   898 F.3d 1012 (9th Cir. 2018) ........................................................................13

*Heller v. Doe*
   509 U.S. 312 (1993)..........................................................................................17

*Hu v. City of New York*
   927 F.3d 81 (2d Cir. 2019) ..............................................................................10

*Lawrence v. Texas*
   539 U.S. 558 (2003)..........................................................................................13

*Merrifield v. Lockyer*
   547 F.3d 978 (9th Cir. 2008) .........................................................................7, 8

*Mohamed v. Uber Technologies, Inc.*
   109 F.Supp.3d 1185 (N.D. Cal. 2015).............................................................26

*Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*
   919 F.2d 593 (9th Cir. 1990) .................................................................5, 12, 13

*Nixon v. Adm'r of Gen. Serv.*
   433 U.S. 425 (1977)..........................................................................................26

*O'Neal v. City of Seattle*
   66 F.3d 1064 (9th Cir. 1995) .............................................................................9

*Olson v. Bonta*
   No. CV1910956, 2021 WL 3474015 (C.D. Cal. July 16, 2021) .......................19

*RUI One Corp v. City of Berkeley*
   371 F.3d 1137 (9th Cir. 2004) .........................................................................20

*S. California Gas Co. v. City of Santa Ana*
    336 F.3d 885 (9th Cir. 2003) ...............................................................25

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*
    309 F.3d 662 (9th Cir. 2002) ...............................................................27

*SmithKline Beecham Corp. v. Abbott Laboratories*
    740 F.3d 471 (9th Cir. 2014) .........................................................11, 12

*U.S. Dep't of Agriculture v. Moreno*
    413 U.S. 528 (1973) ......................................................................13, 16

*United States v. Windsor*
    570 U.S. 744 (2013) ..............................................................................12

*Williamson v. Lee Optical of Okla. Inc.*
    348 U.S. 483 (1955) ................................................................................7

*Wis. Educ. Ass'n Council v. Walker*
    705 F.3d 640 (7th Cir. 2013) .........................................................10, 11

**STATUTES**

Assembly Bill 5 (AB 5), Ch. 296, 2019-2020 Reg. Sess. (Cal. 2019) ............*passim*

Cal. Bus. & Prof. Code § 7449 ...............................................................18

**LEGISLATIVE MATERIALS**

Assemb. Comm. on Lab. & Emp., AB 5, 2019–2020 Reg. Sess. (Cal.
    July 5, 2019)...........................................................................................20

S.B. 279, 2021–2022 Legis. Sess. (Kan. 2021) ......................................15

Ordinance 126091, Seattle, Wash., Municipal Code §§3.02.125,
    6.208.020.................................................................................................23

**OTHER AUTHORITIES**

Press Release, George M. Borrello, *Senator Borrello Calls for Wind
    Turbine Moratorium* (Apr. 27, 2021),
    https://www.nysenate.gov/newsroom/press-releases/george-m-
    borrello/senator-borrello-calls-wind-turbine-moratorium ...............................16

Harry Campbell, *Lyft and Uber Driver Survey 2019: Uber Driver Satisfaction Takes a Big Hit*, Rideshare Guy (Nov. 19, 2019), https://tinyurl.com/y8aj2ryt ...............................................................22

Daniella Cheslow, *Consumer Protection Bureau Aims to Roll Back Rule for Payday Lending*, NPR (Jan. 6, 2019), https://www.npr.org/2019/02/06/691944789/ ...................................16

Maria Figueroa, et al., *Essential but Unprotected: App-based Food Couriers in New York City,* Cornell Univ. Indus. and Labor Relations Sch. & Workers' Justice Project at 8 (Sept. 14, 2021), https://img1.wsimg.com/blobby/go/6c0bc951-f473-4720-be3e-797bd8c26b8e/09142021CHARTSLos%20Deliveristas%20Unidos-v02.pdf ..................................................................................21

Patrick Fort, Ruth Tam, *Gig Work: The Fine Print of Food Delivery*, WAMU 88.5 (June 10, 2021), https://wamu.org/story/21/06/10/gig-work-the-fine-print-of-food-delivery/ .................................................................................19

Henry Goodwin, *EU Gives Gig Economy Workers Full Employee Rights in New Legislation New Legislation*, London Economic (Dec. 12, 2021), https://www.thelondoneconomic.com/politics/eu-gives-gig-economy-workers-full-employee-rights-in-new-legislation-304312/ .................................................................23

Ground Water Protection Council, State Oil and Natural Gas Regulations Designed to Protect Water Resources (3rd. ed. 2017), https://www.gwpc.org/sites/gwpc/uploads/documents/publications/State_Regulations_Report_2017_Final.pdf.........................................15

Raphael Holoszyc-Pimentel, *Reconciling Rational-Basis Review: When Does Rational Basis Bite?*, 90 N.Y.U. L. Rev. 2070, 2072 (2015) .................................................................................13

Shawn Hubler, *California's Governor Seeks to Ban New Fracking and Halt Oil Production, But Not Immediately*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/04/23/us/politics/gavin-newsom-california-fracking.html ...................................................16

Mike Isaac, et al., *Uber Buys Postmates for $2.65 Billion*, N.Y. Times (July 5, 2020), https://tinyurl.com/y8fv66o6.......................................3

*Laws and Regulations*, Department of Cannabis Control,
https://cannabis.ca.gov/resources/laws-and-regulations/ .....................................15

Tracey Lien, *Uber Tries to Limit Size in Class-Action Lawsuits with New Driver Contract* L.A. Times (Dec. 11, 2015),
https://tinyurl.com/ycu9m57b...........................................................................29

Aarian Marshall, *With $200 Million, Uber and Lyft Write Their Own Labor Law*, Wired (Nov. 4, 2020),
https://www.wired.com/story/200-million-uber-lyft-write-own-labor-law/ ...........................................................................................14

Jeffrey C. Mays, *New York Passes Sweeping Bills to Improve Conditions for Delivery Workers*, N.Y. Times (Sept. 23, 2021),
https://www.nytimes.com/2021/09/23/nyregion/nyc-food-delivery-workers.html .....................................................................................23

Lawrence Mishel, *Uber and the Labor Market*, Economic Policy Institute (May 15, 2018), https://tinyurl.com/y9m59zkd ....................................22

Heather Morton, *Payday Lending State Statutes*, NCSL (Nov. 12, 2020), https://www.ncsl.org/research/financial-services-and-commerce/payday-lending-state-statutes.aspx ....................................15

Jennifer Pinsof, *A New Take on an Old Problem: Employee Misclassification in the Modern Gig- Economy*, 22 Mich. Telecomm. & Tech. L. Rev. 341, 347 (2016) .....................................22

Noah Smith, *Uber Better Not Be the Future of Work,* Bloomberg (Mar. 8, 2018), https://tinyurl.com/y8d3kocg .....................................21

*STATE System Preemption Fact Sheet*, Centers for Disease Control and Prevention (Feb. 14, 2022), https://www.cdc.gov/statesystem/factsheets/preemption/Preemption.html ...........................................18

**INTEREST OF THE AMICI CURIAE[1]**

The International Brotherhood of Teamsters ("IBT") is a labor organization that represents 1.4 million workers across North America. The IBT started in 1903 as a merger of two leading team driver associations and has grown to represent workers in virtually every occupation imaginable. The IBT advocates for the rights and aspirations of all working men and women. The IBT works in coalition with Gig Workers Rising, a campaign supporting and educating nearly 10,000 gig economy workers across California, including Uber/Postmates drivers. Gig Workers Rising supports drivers as they organize for better wages, job protections, and a voice at work.

The Service Employees International Union California State Council ("SEIU California") is comprised of SEIU local unions that represent over 700,000 California workers throughout the state economy. SEIU California's mission is to secure economic fairness for working people and create an equitable, just and prosperous California. SEIU California's affiliated local unions include SEIU Local 721, which represents over 95,000 workers in Southern California, and SEIU Local 1021, which represents nearly 60,000 workers in Northern California. SEIU Local 721 supports gig economy workers through its project Mobile Workers Alliance. Mobile Workers Alliance includes

---

[1] This brief is filed with the consent of all parties. No party's counsel authored the brief in whole or in part or contributed money intended to fund preparing or submitting the brief. No person, other than amici curiae, their members, or their counsel, contributed money intended to fund preparing or submitting the brief.

approximately 18,000 Southern California app drivers, including Uber/Postmates drivers, and provides drivers with resources to access and organize for better employment protections and benefits. SEIU Local 1021 supports gig workers through its project We Drive Progress, a movement joined by over 6,500 drivers, including Uber/Postmates drivers, that fights for better wages, benefits, and working conditions for drivers. SEIU California also supports other gig workers advocacy projects including Gig Workers Rising.

The United Food and Commercial Workers Union Western States Council ("UFCW Council") is a chartered body of the UFCW International Union made up of local unions that represent over 200,000 California workers throughout the food chain. UFCW Council believes in the power of ordinary people coming together to improve their lives and make a lasting difference for all working people. UFCW members work in grocery and retail stores, pharmacies, health care and manufacturing facilities, and in food processing and meat packing industries. Gig economy companies that treat their workers as independent contractors rather than employees have taken over work that grocery employees have historically performed, both in and outside their stores. The UFCW has a concrete interest in seeing that all food delivery workers and other gig workers are properly classified as employees so that they can enjoy the fundamental rights to which California employees are entitled.

## **INTRODUCTION**

Plaintiffs-Appellants Uber/Postmates[2] are in the transportation business. Uber offers ride-hailing services and delivers food from restaurants. Postmates delivers food and other goods. The companies hire drivers to transport the passengers and make deliveries. For as long as these companies have been in business, they have misclassified their drivers as independent contractors rather than employees. By doing so, Uber/Postmates have avoided the legal obligations to pay minimum wages and overtime; reimburse drivers for fuel and other vehicle operation costs; provide paid sick leave, family medical leave, unemployment insurance, disability insurance, and worker's compensation; follow occupational safety and health standards; and comply with other laws that protect employees. The companies' misclassification has also prevented the drivers from forming unions to obtain bargaining power. The companies have also avoided paying hundreds of millions of dollars in employer taxes and obtained an advantage over competitors.

In April 2018, *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018), held that workers who are employees under the easy-to-apply ABC test are "employees" for purposes of California's Wage Orders. *Dynamex* removed any colorable basis (if there ever was such a basis) for companies like Uber/Postmates to continue to pretend that their drivers are

---

[2] On July 5, 2020, Uber agreed to purchase Postmates. *See* Mike Isaac, et al., *Uber Buys Postmates for $2.65 Billion*, N.Y. Times (July 5, 2020), https://tinyurl.com/y8fv66o6.

3

independent contractors.

In September 2019, after vigorous public debate, California's Legislature adopted Assembly Bill 5 ("AB 5") to codify the ABC test and apply that test to most occupations for purposes of determining "employee" status under California's Labor Code, Unemployment Insurance Code, and Wage Orders. The Legislature found that "misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality" and that AB 5 would "restore[] … important protections to potentially several million workers who have been denied ... basic workplace rights." AB 5 §§1(c), (e). The Legislature also found that AB 5 would end "the unfairness to employers who must compete with companies that misclassify" and "the loss to the state of needed revenue from … payment of payroll taxes, [and] payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance." *Id.* §1(b).

Plaintiffs' lawsuit challenges the Legislature's exercise of its broad power to regulate in the economic sphere. *Amici*'s brief demonstrates that Plaintiffs' challenges to AB 5 lack any merit.

As an initial matter, the Legislature's decision to adopt AB 5[3] easily passes rational basis review under the Equal Protection Clause. AB 5 is a law of general application, not a law designed to "target Plaintiffs," "single[] out network companies," or regulate only the gig economy, as Plaintiffs (sometimes

---

[3] AB 5 (2019) was amended by AB 2257 (2020). For convenience, both statutes are referred to collectively as "AB 5."

inconsistently) contend. AOB at 48, 53. The law applies the ABC test to workers across industries in California. To be sure, AB 5 excludes from the ABC test "licensed doctors, lawyers, architects, engineers, and accountants, as well as certain commercial fishermen, salesmen, and investment advisers, among many others." *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 959 (9th Cir. 2021) (*ASJA*). But exceptions are commonplace in economic legislation, and part of the Legislature's role is to draw such lines. In *ASJA*, for example, this Court held that the Legislature could have had rational reasons for making occupational distinctions in AB 5 between freelance writers/photographers and other professionals and, therefore, that the distinctions do not violate equal protection. *Id.* at 957. The same is true for the AB 5 distinctions that Plaintiffs highlight. There are rationally conceivable reasons for those distinctions, and nothing more is required.

Plaintiffs contend that the analysis in *ASJA* does not control here, because AB 5 purportedly was the product of animus toward network companies, like Plaintiffs, that provide transportation and delivery services using an app. But rideshare and delivery companies are not suspect classifications, so the law must be upheld unless Plaintiffs show *both* that "the statute serves no legitimate governmental purpose *and* ... impermissible animus toward an unpopular group prompted the statute's enactment." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018) (*ALDF*) (emphasis in original) (quoting *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598 (9th Cir. 1990)). Here, AB 5 serves the legitimate purpose of addressing worker

misclassification, which the Legislature could have rationally judged to be particularly endemic and harmful in the gig economy. Indeed, even if the legislation did target rideshare companies (and it does not), such targeting rationally could have been based not on "impermissible animus toward an unpopular group" or "fears about that group," *id.* (internal quotation marks omitted), but on legislators' judgments that Uber and other ridesharing companies were causing the harms AB 5 sought to address.

Plaintiffs' Equal Protection claim is, at its heart, a policy disagreement with the Legislature's conclusions and priorities. But "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). Plaintiffs also did not show that AB 5 is an unconstitutional Bill of Attainder or that it violates the Contract Clause or substantive due process. The statute is ordinary economic regulation that falls well within the Legislature's broad authority. The district court therefore did not err in dismissing the complaint.

## **ARGUMENT**

### I. **The District Court Properly Dismissed Plaintiffs' Equal Protection Claim**

#### A. **Plaintiffs' analysis cannot be squared with the rational basis test for reviewing ordinary economic legislation**

In the area of economic regulation, courts give great deference to legislative policy judgments. Courts must "uphold economic classifications so long as 'there is any reasonably conceivable state of facts that could provide a rational basis' for

them." *ASJA*, 15 F.4th at 965 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "The day is gone" when courts "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488 (1955). Yet Plaintiffs seek to use the Equal Protection Clause to return to *Lochner*-era review of economic legislation, in which federal courts question the wisdom, providence, and efficacy of each distinction drawn by legislatures. That review cannot be reconciled with modern jurisprudence.

Plaintiffs misconstrue *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008), as announcing a heretofore unrecognized revolution in equal protection analysis, rather than as a case with unique facts. The *Merrifield* plaintiff challenged on due process grounds the application of California's pesticide licensing scheme to pest controllers *who did not use pesticides*. This Court was willing to reject that due process challenge based on the (dubious) public health rationale asserted by the State. *Id.* at 987-88. But the plaintiff also challenged the selective exemption from that licensing regime of persons who captured or removed "vertebrate pests" without using pesticide; bats, raccoons, skunks, and squirrels were considered vertebrate pests, but mice, rats, and pigeons were not. *Id.* at 981-82. In defending that selective exemption, the State offered reasoning that flatly contradicted its proffered public health rationale for the scheme as a whole. *Id.* at 991-92.

The rationales were contradictory because the government had justified its requirement that pest controllers who do not use pesticides obtain licenses on the

ground that they might interact with pesticides or need the skill to suggest pesticide use when appropriate, but the exempted pest controllers were *more* likely to encounter prior pesticide use and to recommend pesticide use to clients than those who remained subject to the licensing requirement. *Id.* at 990-92.

In striking down the selective exemption in *Merryfield* on equal protection grounds, this Court's reasoning was straightforward: "We cannot simultaneously uphold the licensing requirement under due process based on one rationale and then uphold *Merrifield*'s exclusion from the exemption *based on a completely contradictory rationale.*" *Id.* at 991 (emphasis added); *see also id.* (characterizing the "rationale [as] so weak that it undercuts the principle of non-contradiction"). *Merrifield* thus "presented a unique set of facts." *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1065 (9th Cir. 2018).

Plaintiffs contend that AB 5, like the statute in *Merrifield*, irrationally undercuts the Legislature's purpose by "affirmatively reinstat[ing] the *Borello* test for millions of workers that would otherwise be governed by the ABC test." AOB at 33. But Plaintiffs cannot show, as a threshold matter, that the Legislature's *only* constitutional purpose in enacting AB 5 was to apply the ABC test to *all* workers, so there is no contradiction. Rather, there are many plausible and constitutional rationales for applying the ABC test to only some occupations, as discussed in section D, *infra*, including the legitimate interest in applying the ABC test to workers most vulnerable to misclassification.

Plaintiffs also mischaracterize the state of the law at the time the Legislature enacted AB 5. *Dynamex* applied the ABC test to claims based on wage orders

themselves but left open the question whether that test applies to causes of action brought under Labor Code provisions or other statutes that do not rely on wage orders. 4 Cal.5th at 915 n.5, 942. The Legislature's extension of the ABC test to all provisions of the California Labor Code and Unemployment Insurance Code, and exemption of some occupations from the ABC test, clarified the applicable standards for all statutes and types of workers and expanded protections for many workers—both legitimate purposes of legislation.

Plaintiffs rely on *O'Neal v. City of Seattle*, 66 F.3d 1064 (9th Cir. 1995) and *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974), but those two cases only highlight how Plaintiffs seek to abrogate the rational basis test. AOB at 32. *O'Neal* and *Davis* held that it was irrational for the government to refuse to provide water service to tenants based on whether their residences were "encumbered with a pre-existing debt (for which they are not liable)," because the government had no legitimate interest in collecting debts from parties not liable for those debts. *Davis*, 497 F.2d at 144; *accord O'Neal*, 66 F.3d at 1067. Here, Plaintiffs Uber/Postmates are being regulated based on *their own* treatment of workers, not the decisions of unrelated third parties. That is the basis for all rational economic legislation.

## B. Rational basis challenges are properly dismissed on the pleadings where the plaintiffs' allegations fail to negate every possible rational basis for statutory distinctions.

Plaintiffs contend throughout their brief that the district court should not have dismissed their equal protection challenge on the pleadings because their claim requires the resolution of disputed issues of fact. To the contrary, as this Court explained in *ASJA*, which affirmed the dismissal on the pleadings of another

9

equal protection challenge to AB 5, "the party attacking a law must 'negate every conceivable basis which might have supported' the distinctions drawn." 15 F.4th at 965 (quoting *Angelotti Chiropractic v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015)). Moreover, legislative judgments "may be based on rational speculation unsupported by evidence or empirical data" and are not subject to second guessing through courtroom factfinding. *Beach Commc'ns*, 508 U.S. at 315. Thus, if is possible to conceive of a rational basis for a distinction, a plaintiff's equal protection claim must be dismissed on the pleadings. "Each level of the judiciary is charged with using its imagination to identify any possible legitimate reason for the challenged law." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 671 (7th Cir. 2013) (Hamilton, J., concurring and dissenting).

Plaintiffs argue that the district court was required to accept as true their contention that the law treats similarly situated companies differently. AOB at 25-26. But Plaintiffs rely for this argument on cases alleging discriminatory treatment based on suspect classifications, not rational basis cases.

In *Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021), the plaintiff alleged that he had been treated "differently from similarly situated non-Muslim prisoners." Likewise, *Hu v. City of New York*, 927 F.3d 81, 94 (2d Cir. 2019), involved allegations of selective enforcement of building codes against Asian workers and business owners. In racial or religious differential treatment cases, a plaintiff's prima facie showing of similarly situated comparators and plausible allegation of improper motive defeats a motion to dismiss, because the government then "bears the burden of proof on strict scrutiny." *Ashaheed*, 7 F.4th at 1251. By

10

contrast, simply alleging that companies distinguished by the law are similarly situated is not enough to defeat a motion to dismiss under *rational basis review* if the district court can conceive of a legitimate reason for the distinction. To hold otherwise would open the door to discovery and potential trial every time a company alleges in its pleadings that two companies regulated differently are "similarly situated." And such judicial second-guessing would contradict the firmly established rule that, for purposes of rational basis review, legislative judgments can be based on reasonable speculation, unsupported by evidence. *Beach Commc'ns*, 508 U.S. at 315.

### C. Plaintiffs' allegations of animus do not change the relevant constitutional analysis.

Plaintiffs appear to be seeking a form of heightened scrutiny by asserting that AB 5 was based on "animus" toward ridesharing companies. They ask the federal courts to look beyond the text of the statute to discover the law's "*real* purpose." AOB at 35 (emphasis in original). But if there is any conceivable rational basis for the distinctions the Legislature draws, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315; *see also Wis. Educ. Ass'n Council*, 705 F.3d at 654 ("For our purposes, animus only invalidates a law when no rational basis exists.").

Caselaw about discrimination based on sexual orientation provides a clear example of the difference between rational basis review and the sort of searching inquiry into the "true" motives of the Legislature that Plaintiffs seek here. In

*SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 480-81 (9th Cir. 2014), *reh'g en banc denied*, 759 F.3d 990 (9th Cir. 2014), this Court determined that, although the Supreme Court had not announced a level of scrutiny for laws discriminating on the basis of sexual orientation, the Supreme Court had in fact applied heightened scrutiny when striking down the Defense of Marriage Act in *United States v. Windsor*, 570 U.S. 744 (2013). Key to this Court's analysis was the conclusion that "*Windsor* … requires not that we conceive of hypothetical purposes, but that we scrutinize Congress's actual purposes. *Windsor*'s 'careful consideration' of DOMA's actual purpose and its failure to consider other unsupported bases is *antithetical to the very concept of rational basis review*." *SmithKline Beecham*, 740 F.3d at 482 (emphasis added) (quoting *Windsor,* 570 U.S. at 770). Plaintiffs here seek a similar heightened review focused on "the statute's *real* purpose," and characterize the district court's entirely proper consideration of hypothetical purposes as making "false extra-record assumptions." AOB at 21-22 (emphasis in original). But the inquiry Plaintiffs suggest is entirely inappropriate for review of economic regulation.

Beyond the sexual orientation context, "[w]hen a law exhibits a desire to harm an unpopular group, courts will often apply a 'more searching' application of rational basis review." *ALDF*, 878 F.3d at 1200. Even under that "more searching" analysis, however, the challenged statute can be invalidated based on the Equal Protection Clause only "'if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment.'" *Id.* (emphasis in original) (quoting *Mountain Water*, 919

12

F.2d at 598).  Plaintiffs cannot meet this test.  They have not demonstrated that AB 5 serves no legitimate purpose.

Equally to the point, Plaintiffs are not a "politically unpopular group" at risk of being targeted for harm by the democratic majority.  *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring).  Among the examples of "more searching" review given in *ALDF* are two cases on which Plaintiffs rely: *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985), and *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973).  *See* AOB at 23, 32.  *City of Cleburne* addressed a classification based on intellectual disability, and *Moreno* held that a "purpose to discriminate against hippies" alone was not a rational basis for legislating. 413 U.S. at 534.  By contrast, this Court applied "ordinary rational-basis review" to the Gun-Free School Zone Act's exceptions for concealed carry permit holders and retired peace officers, holding that successful lobbying efforts by interest groups do not inherently demonstrate impermissible animus.  *Gallinger v. Becerra*, 898 F.3d 1012, 1021 & n.9 (9th Cir. 2018).  Under this line of cases, more searching rational basis review protects politically powerless groups likely to be irrationally targeted for their personal or immutable characteristics, often with some history of similar discrimination.[4]  Uber and other gig economy companies, by contrast, are subject to a classification based on business model, not an

---

[4] *See* Raphael Holoszyc-Pimentel, *Reconciling Rational-Basis Review: When Does Rational Basis Bite?*, 90 N.Y.U. L. Rev. 2070, 2072 (2015) (identifying nine factors typically appearing in so-called "rational basis with bite" cases: "history of discrimination, political powerlessness, capacity to contribute to society, immutability, burdening a significant right, animus, federalism concerns, discrimination of an unusual character, and inhibiting personal relationships").

immutable personal trait. And they are the opposite of a politically powerless group: Plaintiffs have immense power within the democratic process, as demonstrated by their successful $200-million campaign to pass Proposition 22 and amend AB 5 through the initiative process.[5]

The Legislature also did not "single[] out" Uber/Postmates by treating them differently from other app-based rideshare and delivery companies like Lyft, DoorDash, or GrubHub. AOB at 34. Plaintiffs cite *Fowler Packing Co., Inc. v. Lanier* for the proposition that the Legislature cannot give "arbitrary 'carve out[s]' to select groups." AOB at 39 (quoting *Fowler*, 44 F.3d 809, 815 (9th Cir. 2016)). But *Fowler* involved cut-off dates in a statute that corresponded precisely to cases against three specific *employers* such that the statute would exempt only those companies. 44 F.3d at 815. Legislative classifications that regulate some but not all types of businesses are different from carve-outs of specific employers that fall within in the same category, which was the issue in *Fowler*.

Plaintiffs seek a novel test unprecedented in modern equal protection jurisprudence—under which economic legislation targeting types of businesses or industries would be a sign of impermissible animus—that would destroy the Legislature's ability to regulate in the economic sphere. Legislatures frequently determine that specific industries pose particular risks of harm to the public and therefore regulate those businesses while excluding others. Legislators concerned

---

[5] *See* Aarian Marshall, *With $200 Million, Uber and Lyft Write Their Own Labor Law*, Wired (Nov. 4, 2020), https://www.wired.com/story/200-million-uber-lyft-write-own-labor-law/ (noting that the campaign was "the most expensive in California history").

about climate change or environmental destruction may pass laws regulating oil and gas companies differently than other energy companies.[6] Others concerned about the negative impacts of wind turbines have proposed legislation distinguishing wind turbines from other renewable energy infrastructure.[7] Many state legislatures have adopted specific regulations of payday lenders that differentiate them from other types of lenders based on the risk of harm to borrowers.[8] Legislatures concerned about the health effects of smoking have enacted laws raising taxes on cigarette companies or restricting the sale or distribution of cigarettes to minors.[9] States that have legalized marijuana have similarly imposed regulations specific to cannabis businesses.[10] The decision to regulate a type of business that the Legislature determines to be doing harm is not irrational animus, but rather entirely commonplace legislating.

Nor can Plaintiffs rely on comments by individual legislators to avoid

---

[6] *See, e.g.*, Ground Water Protection Council, State Oil and Natural Gas Regulations Designed to Protect Water Resources (3rd. ed. 2017), https://www.gwpc.org/sites/gwpc/uploads/documents/publications/State_Regulations_Report_2017_Final.pdf.

[7] *See, e.g.*, S.B. 279, 2021–2022 Legis. Sess. (Kan. 2021), http://www.kslegislature.org/li/b2021_22/measures/sb279/.

[8] Heather Morton, *Payday Lending State Statutes*, NCSL (Nov. 12, 2020), https://www.ncsl.org/research/financial-services-and-commerce/payday-lending-state-statutes.aspx.

[9] *See STATE System Preemption Fact Sheet*, Centers for Disease Control and Prevention (Feb. 14, 2022), https://www.cdc.gov/statesystem/factsheets/preemption/Preemption.html.

[10] *See Laws and Regulations*, Department of Cannabis Control, https://cannabis.ca.gov/resources/laws-and-regulations/.

meeting their burden to show that there are *no possible* rational bases for AB 5. First, as a general matter, politicians often speak out about the harms they are looking to remedy and highlight the industries doing harm.[11] Those comments alone do not demonstrate that the related laws were based on irrational animus or a "bare congressional desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534.

Here, in fact, the statements Plaintiffs cite are related to the harms the Legislature was aiming to mitigate by passing AB 5. Plaintiffs contend that AB 5's distinctions are irrational because a sponsor "call[ed] for enforcement against network companies" and explained that she "fought so hard for #AB5 with no gig carve-outs" and was not open to exemptions for "app-based ride hailing and delivery giants." AOB at 4 n.1, 9. But none of these statements show that she was

---

[11] *See, e.g.*, Shawn Hubler, *California's Governor Seeks to Ban New Fracking and Halt Oil Production, But Not Immediately*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/04/23/us/politics/gavin-newsom-california-fracking.html ("As we move to swiftly ... create a healthier future for our children, I've made it clear I don't see a role for fracking in that future and, similarly, believe that California needs to move beyond oil." (quoting Governor Newsom)); Press Release, George M. Borrello, *Senator Borrello Calls for Wind Turbine Moratorium* (Apr. 27, 2021), https://www.nysenate.gov/newsroom/press-releases/george-m-borrello/senator-borrello-calls-wind-turbine-moratorium ("Industrial wind turbines are a serious threat to our lakes and the local economies and quality of life that they support. They are also a threat to human health."); Daniella Cheslow, *Consumer Protection Bureau Aims to Roll Back Rule for Payday Lending*, NPR (Jan. 6, 2019), https://www.npr.org/2019/02/06/691944789/consumer-protection-bureau-aims-to-roll-back-rules-for-payday-lending (quoting President Obama in 2016, warning "[i]f you're making that profit by trapping hardworking Americans into a vicious cycle of debt, you've got to find a new business model.").

16

seeking to include ridesharing and delivery companies for an irrational reason—instead, the statements highlight the industries she determined most needed regulation to prevent misclassification of employees. Calling the gig economy "f—ing feudalism all over again" may involve crude language, but it is a statement about an industry's negative effects on the economy, which is a rational target of regulation.

Plaintiffs appear to contend that these statements were inappropriate and irrational merely because they disagree with statements that "the gig economy is ... a continuation of hundreds of years of corporations trying to screw over workers" and network companies are "exploit[ing] working people." AOB at 9. But this policy disagreement does not make the statements a product of invidious and unconstitutional animus. "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quoting *Beach Commc'ns*, 508 U.S. at 313).

Accusations of animus therefore cannot alter the fundamental, and deferential, test articulated and reaffirmed in case after case for assessing economic regulation. If the court can think of a rational basis for the distinctions drawn by the legislature, a law must be upheld.

### D. There are many rational reasons for applying the ABC test specifically to gig workers, and particularly ridesharing and delivery drivers.

As this Court and others have previously held, AB 5 is a law of general application, regulating employment relationships in many industries across

17

California. *See* Answering Brief at 25. And, as Appellees correctly note, AB 5 does not draw any distinctions between app-based companies and traditional companies. *Id.* at 9. But even if the Legislature *had* chosen to regulate only transportation and delivery network companies such as Plaintiffs, such legislation would have been rationally related to the legitimate legislative priorities supporting AB 5.

*First*, despite contending that AB 5 irrationally differentiates between different types of gig services, Plaintiffs themselves have supported such distinctions. Plaintiffs object to AB 5's exemption of services like TaskRabbit and Wag! because those two companies have "nearly identical business models as the Company Plaintiffs." AOB at 18. But Proposition 22, an initiative that Plaintiffs supported and funded, created new employment regulations specific to only "app-based rideshare and delivery platforms." Cal. Bus. & Prof. Code § 7449(a). Proposition 22 did not, by its terms, apply to any other gig services, whether subject to AB 5 or not. In its findings and declarations, Proposition 22 cited the impact ridesharing and delivery companies have on "our state's economy as a whole" and the need for drivers to have "benefits and protections not available under current law." *Id.* § 7449(c), (f). Plaintiffs cannot argue that there is no rational reason for the Legislature to have focused on regulating transportation and delivery platform companies in AB 5 while simultaneously contending that it is fully constitutional for the State to have enacted different employment regulations targeted at transportation and delivery network companies under Proposition 22.

*Second*, there are many rational reasons to differentiate between covered

18

companies like Plaintiffs and exempt companies like TaskRabbit and Wag!  The district court offered several.  For example, because errand-running and dog-walking "likely involve entering a client's home, the client and individual service provider likely exert more control over the service than the depersonalized referral agency."  In addition, "the [TaskRabbit and Wag!] service providers may have their supplies provided by the client."  *Olson v. Bonta*, No. CV1910956, 2021 WL 3474015, at *5 (C.D. Cal. July 16, 2021).  By contrast, delivery and rideshare drivers incur significant costs due to required equipment, including costs of gas, vehicle maintenance, automobile insurance, and insulated delivery bags, so they have more need for employment law protections, which include the right to be reimbursed for expenses.[12]

Plaintiffs did not directly refute any of these plausible bases for distinguishing drivers from other task providers.  Instead, they argued that it was not "appropriate for the district court to adopt *any* such conceivable difference between similarly-situated parties."  AOB at 26.  But it was precisely the district court's role on rational basis review to "imagine any conceivable basis supporting a law, even if not advanced by the government."  *Fowler*, 844 F.3d at 815 n.3; *see* section A, *supra*.  Plaintiffs have failed to meet their burden to negate every conceivable rationale for the economic classifications in AB 5 because they have not even negated the rationales the district court offered.

---

[12] *See* Patrick Fort, Ruth Tam, *Gig Work: The Fine Print of Food Delivery*, WAMU 88.5 (June 10, 2021), https://wamu.org/story/21/06/10/gig-work-the-fine-print-of-food-delivery/.

*Third*, it would be entirely rational for the Legislature to choose to regulate in stages beginning with network companies. "[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Beach Commc'ns*, 508 U.S. at 316 (internal quotations and citation omitted); *see also RUI One Corp v. City of Berkeley*, 371 F.3d 1137, 1155 (9th Cir. 2004). The gig economy—and rideshare and delivery network companies in particular—present harms to workers that could easily have seemed "most acute in the legislative mind." The Legislature stated that "[r]ecent research … finds some of the highest misclassification rates in the economy's growth industries, including home care, janitorial, trucking, construction, hospitality, security, and the app-based 'on demand' sector." Assemb. Comm. on Lab. & Emp., AB 5, 2019–2020 Reg. Sess., at 2 (Cal. July 5, 2019). Contrary to Plaintiffs' contentions, under *Beach Communications*, the Legislature was not required to address all the areas with the highest misclassification rates at once.

The distinctions AB 5 draws within the "growth industries" at risk of misclassification are rational. Plaintiffs assert that app-based drivers "heavily direct their rates" by choosing "whether to take advantage of peak-hours pricing or pass on less lucrative trips," and contrast that pricing system with exempted construction subcontractors, who are selected by a general contractor after submitting the lowest bid. AOB at 29. But Plaintiffs' characterization entirely reverses the relevant analysis, which is whether *the worker* sets the rates. Drivers can select jobs or decide when to drive, but they typically are limited in their

20

choices to prices offered by the apps.  By contrast, a subcontractor has the full freedom to name her price for a job, regardless of whether the general contractor eventually selects her bid.  AB 5's distinction between construction subcontractors and app-based drivers was therefore rationally related to protecting vulnerable workers—those with less power to set their own rates—regardless of whether Plaintiffs disagree with the Legislature's conclusions.

Moreover, there are other rational reasons the Legislature could have determined that app-based drivers were particularly vulnerable to exploitation and, therefore, a good subject for initial regulation.  App-based ridesharing companies "disrupted a century of municipal regulations that workers had leveraged for their security" and placed "legal and financial risk and responsibility on ... independent contractor driver 'partners.'"[13]  Delivery workers face additional physical risks that are heightened when making food deliveries on a bike or electric bike.  In one New York study, 49% of delivery workers reported having been in accident or crash, and 75% paid for medical care themselves.[14]  Despite incurring these extra costs and risks, app-based drivers make significantly below the state's minimum wage.[15]

---

[13] Veena B. Dubal, *The Drive to Precarity: A Political History of Work, Regulation, & Labor Advocacy in San Francisco's Taxi & Uber Economies*, 38 Berkeley J. Emp. & Lab. L. 73, 80 (2017).

[14] Maria Figueroa, et al., *Essential but Unprotected: App-based Food Couriers in New York City*, Cornell Univ. Indus. and Labor Relations Sch. & Workers' Justice Project at 8 (Sept. 14, 2021), https://img1.wsimg.com/blobby/go/6c0bc951-f473-4720-be3e-797bd8c26b8e/09142021CHARTSLos%20Deliveristas%20Unidos-v02.pdf.

[15] *See, e.g.*, Noah Smith, *Uber Better Not Be the Future of Work*, Bloomberg (Mar. 8, 2018), https://tinyurl.com/y8d3kocg ("[T]he true amount

Given these acute problems in the ridesharing and delivery industry, the Legislature had an entirely rational basis for beginning there while (at least for now) exempting other types of gig companies like Taskrabbit or Wag! from the ABC test.

*Fourth*, the Legislature had a legitimate interest in adopting an easy-to-apply test for employment status in general and it could rationally have concluded that the simplicity of the ABC test was especially needed in the ridesharing and delivery industries.[16] Those industries have given rise to multitudes of lawsuits and arbitrations challenging the classification of workers. *See Adams v. Postmates, Inc.*, 414 F.Supp.3d 1246, 1248 (N.D. Cal. 2019), *aff'd*, 823 F. App'x 535 (9th Cir. 2020) ("Petitioners are 5,257 individuals who work as 'couriers' ... [and] have submitted arbitration demands to the designated arbitrator, alleging that they have been misclassified as independent contractors ...."); *Abernathy v. DoorDash, Inc.*, 438 F.Supp.3d 1062, 1064 (N.D. Cal. 2020) ("[I]n August 2019, petitioners'

––––––––––––––––––

that the average Uber driver makes, net of all costs, is probably about $10 an hour."); Lawrence Mishel, *Uber and the Labor Market*, Economic Policy Institute (May 15, 2018), https://tinyurl.com/y9m59zkd (finding that, after deducting fees, expenses, and taxes, Uber driver compensation averages $10.87 an hour); Harry Campbell, *Lyft and Uber Driver Survey 2019: Uber Driver Satisfaction Takes a Big Hit*, Rideshare Guy (Nov. 19, 2019), https://tinyurl.com/y8aj2ryt (finding that, after deducting fees and expenses, Lyft driver compensation averages $11.55 an hour).

[16] Jennifer Pinsof, *A New Take on an Old Problem: Employee Misclassification in the Modern Gig- Economy*, 22 Mich. Telecomm. & Tech. L. Rev. 341, 347 (2016), https://tinyurl.com/y8kykt7b ("[I]t is difficult to understate the importance of a clear and consistent way to distinguish between employees and contractors that accurately reflects the modern economy.").

counsel filed individual demands for arbitration with the AAA on behalf of 2,250 individuals" alleging misclassification). Plaintiffs offer evidence of one case brought against Wag! for misclassification, AOB at 26, but that example does not show that the Legislature had no rational basis for believing that a clear classification test was most necessary for rideshare and delivery drivers.

*Finally*, the existence of a rational basis for specifically regulating transportation and delivery companies is demonstrated by the wide range of localities and foreign governments enacting such laws. The presence of similar statutes does not dictate the constitutionality of a challenged law, but the fact that other legislative bodies are choosing to take similar steps in response to the same harm suggests that regulation of app-based driving companies is a rational way to further a state's interest in addressing misclassification.[17] Several cities have also enacted regulations providing specific protections or payments to gig workers, and particularly to delivery drivers.[18]

---

[17] *See, e.g.*, Henry Goodwin, *EU Gives Gig Economy Workers Full Employee Rights in New Legislation*, London Economic (Dec. 12, 2021), https://www.thelondoneconomic.com/politics/eu-gives-gig-economy-workers-full-employee-rights-in-new-legislation-304312/ (applying employment rights to gig workers and quoting an EU commissioner explaining "that internet platforms 'have used grey zones in our legislation' to develop their business models, leading to the 'misclassification' of millions of workers").

[18] *See, e.g.,* Ordinance 126091, Seattle, Wash., Municipal Code §§3.02.125, 6.208.020, https://library.municode.com/wa/seattle/ordinances/municipal_code?nodeId=1026201 (requiring paid sick and safe time for gig workers); Jeffrey C. Mays, *New York Passes Sweeping Bills to Improve Conditions for Delivery Workers*, N.Y. Times (Sept. 23, 2021), https://www.nytimes.com/2021/09/23/nyregion/nyc-food-delivery-workers.html.

In sum, AB 5 does not treat "materially identical" companies differently. AOB at 2, 24. Even if AB 5 did not apply generally, there are myriad rationally conceivable bases that would have supported distinguishing app-based ridesharing and delivery drivers from workers in the traditional economy and from workers in other gig economy companies. Plaintiffs have not negated any of them, let alone met their burden to negate every possible distinction. *See ASJA*, 15 F.4th at 959.

## II. Plaintiffs' Other Constitutional Claims Are Likewise Entirely Meritless

### A. AB 5 does not violate substantive due process by depriving individuals of a fundamental right

The "Due Process Clause includes some generalized due process right to choose one's field of private employment," but that right is "subject to reasonable government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999). A plaintiff can make out a substantive due process claim only "if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), *aff'd on other grounds* 553 U.S. 591 (2008).

Plaintiffs admit that AB 5 does not prevent anyone from working as a ride-hailing or delivery driver. They nevertheless contend that the statute is "'a complete prohibition on exercising the right to pursue' the 'fundamentally different occupation' of '[b]eing one's own boss.'" AOB at 40 (quoting SAC ¶ 204). But this contention cannot be true—individuals retain the right to be their own bosses, such as by setting up their own independent driving businesses.

The only thing that AB 5 prevents drivers from doing is working as employees of Plaintiffs Uber/Postmates while being classified as independent contractors. Job classification does not create a profession; it is merely the legal basis for determining which worker protections should apply. And, in any event, even if a statute that prevents individuals from working for Uber/Postmates without receiving employment law protections were equivalent to a prohibition on pursuing a chosen occupation, the Legislature has a rational basis for its law, *see* Part I.D, *supra,* so there would be no substantive due process violation.

### B. AB 5 does not violate the contracts clause

Plaintiffs contend that AB5 unconstitutionally impairs the adhesion contracts they require drivers to sign. But "the Supreme Court narrowly construes the Contract Clause to ensure that local governments can effectively exercise their police powers." *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). States "must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result." *Id.* (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977)).

Regulations affecting employment relations are "foreseeable as the type of law that would alter contract obligations," and thus do not substantially impair Plaintiffs' contracts. *See Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 416 (1983). California extensively regulates employment, including defining who qualifies as an employee and the rights to which they are entitled. Uber could not have entered into contracts with drivers

without an awareness that those contracts might be affected by changes in state employment law. Moreover, companies like Uber/Postmates change their contracts with drivers all the time.[19] In 2015, Uber abruptly changed its drivers' contracts two days after an unfavorable ruling in a pending class action lawsuit, in an effort to limit its liability.[20] Additional changes required to meet AB5 are not substantial impairments.

Finally, the Legislature can substantially impair private contracts if there is a "significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem." *Energy Reserves Group*, 459 U.S. at 411-12 (citation omitted). For all the reasons discussed in Part I.D, *supra*, AB 5 meets that standard.

### C. AB 5 is not a bill of attainder

A bill of attainder "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Serv.*, 433 U.S. 425, 468 (1977). But "[a]n otherwise valid law is not transformed into a bill of attainder merely because it regulates conduct on the part of designated individuals or classes of individuals."

---

[19] *See, e.g., Mohamed v. Uber Technologies, Inc.*, 109 F.Supp.3d 1185, 1190-92 (N.D. Cal. 2015) (describing Uber's method of modifying its contracts with driversvia app notification).

[20] Tracey Lien, *Uber Tries to Limit Size in Class-Action Lawsuits with New Driver Contract*, L.A. Times (Dec. 11, 2015), https://tinyurl.com/ycu9m57b (reporting thecontracts contained "a revised arbitration clause that would exclude anyone who signs it from participating in current or future class-action lawsuits").

*Fresno Rifle & Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723, 727 (9th Cir. 1992).

AB 5 does not specify or single out companies within the meaning of the Bill of Attainder Clause. *See SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 669 (9th Cir. 2002). AB 5 is a law of general applicability. It applies to parties far beyond Plaintiffs. Plaintiffs contend that they are being regulated based on prior conduct, a factor that can be considered in the bill-of-attainder analysis, *id.* at 669-70, because "the legislature applied the ABC test retroactively with respect to wage-order claims." AOB at 53. But all wage-order claims were already subject to the ABC test under *Dynamex* when AB 5 was enacted. More fundamentally, the discussion of past conduct in *SeaRiver* was not about retroactivity, but rather whether the law identifies an individual by describing "conduct which, because it is past conduct, operates only as a designation of particular persons." *SeaRiver*, 309 F.3d at 670 (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 847 (1948)). Here, whether AB 5 applies the ABC test to a company has nothing to do with the company's prior actions. AB 5 instead defines its applicability based on occupations and industries. For all these reasons, AB 5 is not a bill of attainder.

## CONCLUSION

For the forgoing reasons, the decision below should be affirmed.

Dated:  February 24, 2022

Respectfully submitted,

s/ *Scott A. Kronland*
Scott A. Kronland
Stacey M. Leyton
ALTSHULER BERZON LLP

*Attorneys for Amici Curiae International Brotherhood of Teamsters, Service Employees International Union California State Council, and United Food and Commercial Workers Union Western States Council*

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** <u>20-55267, 21-55757</u>_____

I am the attorney or self-represented party.

**This brief contains 6,994 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ *Scott A. Kronland*_____ **Date** _February 24, 2022_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/18*

## CERTIFICATE OF SERVICE

Case Name: ***Lydia Olson et al v. State of***   Case No.  **20-55267, 21-55757**
              ***California et al.***

I am employed in the City and County of San Francisco, California.  I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108.  On February 24, 2022, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**AMICUS CURIAE BRIEF OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, SERVICE EMPLOYEES INTERNATIONAL UNION CALIFORNIA STATE COUNCIL, AND UNITED FOOD AND COMMERCIAL WORKERS UNION WESTERN STATES COUNCIL IN SUPPORT OF APPELLEES AND AFFIRMANCE**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed February 24, 2022, at San Francisco, California.

Janelle Ibañez