No. 21-55757

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

LYDIA OLSON; MIGUEL PEREZ; POSTMATES, INC., (Successor
Postmates LLC); UBER TECHNOLOGIES, INC.,
Plaintiffs – Appellants,

v.

STATE OF CALIFORNIA; ROB BONTA, in his capacity as
Attorney General of the State of California,
Defendants – Appellees.

On Appeal from the United States District Court
for the Central District of California
Case No. 2:19-cv-10956-DMG-RAO
Honorable Dolly M. Gee

*AMICI CURIAE* BRIEF OF WORKER RIGHTS ORGANIZATIONS
IN SUPPORT OF APPELLEES' PETITION FOR
PANEL REHEARING OR REHEARING EN BANC

Veena Dubal
200 McAllister Street
San Francisco, CA 94102

Jonathan B. Miller
Abigail Lawlor
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
jon@publicrightsproject.org

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* disclose that none of *amici* has any parent corporation and no publicly held corporation owns 10% or more of their stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE ............................................................... i

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF INTEREST ............................................................ 1

SUMMARY OF ARGUMENT ........................................................... 2

ARGUMENT ...................................................................................... 3

I.    AB 5 DIRECTLY ADVANCES THE
      LEGISLATURE'S PURPOSE TO ADDRESS THE
      HARMFUL MISCLASSIFICATION OF LOW-
      WAGE WORKERS AND THE PANEL'S DECISION
      DIRECTLY CONFLICTS WITH PRIOR CASES ..................... 3

      A.  App-Based Transportation Is The Only Area In
          Which Independent Contracting Is Growing ......................... 4

      B.  App-Based Transportation Workers Are At
          Particular Risk Of Exploitation Through
          Misclassification ................................................................. 5

II.   STATEMENTS BY LEGISLATORS DESCRIBING
      THEIR INTENT TO REGULATE CERTAIN
      COMPANIES ARE NOT EVIDENCE OF
      "ANIMUS" AND THE PANEL'S DECISION
      CONFLICTS WITH THE WELL-ESTABLISHED
      MEANING OF THE TERM ...................................................... 10

      A.  Plaintiffs Are Not Politically Unpopular ............................ 11

      B.  Statements In The Record Are Not Animus ........................ 14

CONCLUSION ................................................................................ 16

APPENDIX A—LIST OF *AMICI CURIAE* ..................................... 18

# TABLE OF AUTHORITIES

**CASES**

*Allied Concrete & Supply Co. v. Baker*,
  904 F.3d 1053 (9th Cir. 2018) ................................................... 11, 12

*Am. Soc'y of Journalists & Authors v. Bonta*,
  15 F.4th 954 (9th Cir. 2021) ............................................ 4, 6, 12, 14

*Angelotti Chiropractic, Inc. v. Baker*,
  791 F.3d 1075 (9th Cir. 2015) ........................................................ 5

*Animal Legal Def. Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018) ..................................................... 10

*Capriole v. Uber Tech. Inc.*,
  7 F.4th 854 (9th Cir. 2021) ............................................................ 7

*Castellanos v. California*,
  305 Cal. Rptr. 3d 717 (Cal. Ct. App. 2023) .................................... 14

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ..................................................................... 10

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ................................................................ 11, 14

*Dandridge v. Williams*,
  397 U.S. 471 (1970) ...................................................................... 9

*Daniel v. Family Sec. Life Ins. Co.*,
  336 U.S. 220 (1949) ..................................................................... 16

*Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ..................................................................... 11

*Desoto CAB Co. v. Picker*,
  228 F. Supp. 3d 950 (N.D. Cal. 2017) ...................................... 12, 13

*DoorDash Inc. v. City & Cty. of San Francisco*,
  No. 21-cv-05502-EMC, 2022 WL 867254
  (N.D. Cal. Mar. 23, 2022) ......................................................... 7, 14

*FCC v. Beach Commc'n, Inc.*,
  508 U.S. 307 (1993) ............................................................ 3

*Gallinger v. Becerra*,
  898 F.3d 1012 (9th Cir. 2018) ........................................ 16

*Hughes v. Alexandria Scrap Corp.*,
  426 U.S. 794 (1976) .......................................................... 4

*Int'l Franchise Ass'n v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) .......................................... 12

*Lawrence v. Texas*,
  539 U.S. 558 (2003) .......................................................... 11

*Merrifield v. Lockyer*,
  547 F.3d 978 (9th Cir. 2008) .......................................... 12

*Mountain Water Co. v. Mont. Dep't of Pub. Serv. Reg.*,
  919 F.2d 593 (9th Cir. 1990) .................................... 10, 11

*Olson v. California*,
  No. CV1910956DMGRAOX, 2020 WL 905572
  (C.D. Cal. Feb. 10, 2020) .............................................. 10

*Romer v. Evans*,
  517 U.S. 620 (1996) .......................................................... 11

*RUI One Corp. v. City of Berkeley*,
  371 F.3d 1137 (9th Cir. 2004) ........................................ 11

*S.F. Taxi Coal. v. City & Cty. of San Francisco*,
  979 F.3d 1220 (9th Cir. 2020) ............................ 11, 12, 14

*Tigner v. Texas*,
  310 U.S. 141 (1940) ............................................................ 9

*U.S. R.R. Ret. Bd. v. Fritz*,
  449 U.S. 166 (1980) .......................................................... 16

*United States v. Wilde*,
  74 F. Supp. 3d 1092 (N.D. Cal. 2014) ............................ 11

*Vance v. Bradley*,
  440 U.S. 93 (1979) ............................................................ 13

iv

*Williamson v. Lee Optical Co.,*
 348 U.S. 483 (1955) ........................................................ 13

*Windsor v. United States*,
 699 F.3d 169 (2d Cir. 2012) ........................................... 11

**STATUTES**

Cal. Lab. Code § 2777(a)(10) ............................................. 9

**OTHER AUTHORITIES**

Alex Rosenblat, *When Your Boss is an Algorithm*, N.Y.
 Times Opinion (Oct. 12, 2018), https://perma.cc/A8DF-
 M63L ............................................................................... 8

Andrew Garin et al., *Is Gig Work Changing the Labor
 Market? Key Lessons from Tax Data*, 75 Nat'l Tax J.
 791 (2022)........................................................................ 5

Annette Bernhardt & Sarah Thomason, *What Do We
 Know About Gig Work in California? An Analysis of
 Independent Contracting* 2, UC Berkeley Ctr. for Lab.
 Res. & Educ. (2017), https://perma.cc/6VLG-N3UL........ 6

Annette Bernhardt et al., *Independent Contracting in
 California: An Analysis of Trends and Characteristics
 Using Tax Data* 4, UC Berkeley Lab. Ctr. (2022),
 https://perma.cc/83H8-WT2N ........................................... 4

Ben Zipperer et al., *National Survey of Gig Workers
 Paints a Picture of Poor Working Conditions, Low Pay*
 5, Econ. Pol'y Inst. (2022), https://perma.cc/QXF8-
 NV3J ................................................................................ 6

Brief for the United States and the Federal Trade
 Commission as Amici Curiae In Support of Appellant
 and in Favor of Reversal, *Chamber of Com. v. City of
 Seattle*, 890 F.3d 769 (9th Cir. 2018) (No. 17-35640),
 2017 WL 5166667 ........................................................... 7

Catherine Thorbecke, *How Uber Left Lyft in the Dust*,
 CNN (Mar. 29, 2023), https://perma.cc/2SR3-CEGK........ 7

Complaint, *Valdez v. Uber Tech.*, CGC-20-587266 (Cal. Super. Ct. Oct. 22, 2020) ................................................................ 14

Fed. Trade Comm'n, *FTC Policy Statement on Enforcement Related to Gig Work*, https://perma.cc/EFZ4-SCNC ........................................................ 7

Feng Zhu & Marco Iansiti, *Why Some Platforms Thrive and Others Don't*, Harvard Bus. Rev. (Jan.-Feb. 2019), https://perma.cc/VTR3-YM7D ........................................................ 8

Jennifer Sherer & Margaret Poydock, *Flexible Work Without Exploitation* 6, Econ. Pol'y Inst. (2023), https://perma.cc/DUJ2-A529 ........................................................ 12

Keith Cunningham-Parmeter, *Gig-Dependence: Finding the Real Independent Contractors of Platform Work*, 39 N. Ill. U.L. Rev. 379 (2019) ............................................................ 9

Lawrence Mishel, *Uber and the Labor Market: Uber Drivers' Compensation, Wages, and the Scale of Uber and the Gig Economy* 2, Econ. Pol'y Inst. (2018), https://perma.cc/4LD9-7JBP ........................................................ 6

Margo Roosevelt, *New Labor Laws Are Coming to California. What's Changing in Your Workplace?* L.A. Times (Dec. 29, 2019), https://perma.cc/QF7H-CQJF ................... 15

Rebecca Smith et al., *Uber State Interference: How TNC's Buy, Bully, and Bamboozle Their Way to Deregulation*, Nat'l Emp. L. Project (2018), https://perma.cc/67NZ-BESY ........................................................ 12

Rick Claypool, *Disrupting Democracy: How Uber Deploys Corporate Power to Overwhelm and Undermine Local Government*, Public Citizen (2016), https://perma.cc/QBQ9-MWJ5 ...................................................... 12

Ryan Menezes et al., *Billions Have Been Spent on California's Ballot Measure Battles. But This Year Is Unlike Any Other*, L.A. Times, (Nov. 13, 2020), https://perma.cc/NBY7-4XSP ........................................................ 14

Suhauna Hussain, *Uber, Lyft Push Prop. 22 Message Where You Can't Escape It: Your Phone*, L.A. Times (Oct. 8, 2020), https://perma.cc/28CM-ZLW4 ............................... 14

Uber, *Platform Access Agreement* (last updated Jan. 1, 2022), https://perma.cc/K22K-68YU ................................................ 7

UCLA Inst. for Res. on Lab. & Emp., *More than a Gig: A Survey of Ride-hailing Drivers in Los Angeles* 9 (2018), https://perma.cc/C294-K55P ........................................................ 8, 13

Veena Dubal, *Economic Security & the Regulation of Gig Work in California: From AB 5 to Proposition 22*, 13 Eur. Lab. L.J. 51, 61–63 (2022)........................................................ 15

Veena Dubal, *On Algorithmic Wage Discrimination*, Colum. L. Rev. (forthcoming 2023) (manuscript at 31–33), https://perma.cc/3VT6-SKBV.................................................... 8

## STATEMENT OF INTEREST

*Amici curiae* are national and California-based organizations that work to advance the rights of workers, particularly app-based workers, through organizing, litigation, and policy advocacy.[1] Many *amici* advocated for the passage of Assembly Bill 5 ("AB 5"), and several have been involved in both prompting enforcement efforts as well as ongoing defense of the law through direct and ancillary cases, including challenges to Proposition 22's undermining of AB 5.

*Amici* are deeply familiar with the harmful impact of worker misclassification on wages and protections, and have fought against misclassification because the unlawful practice enables companies to pass social and other economic burdens onto workers as well as state and local governments. *Amici* have extensive experience advocating on behalf of low-wage workers, women, people of color, and immigrants, and we have seen the extensive exploitation that comes from misclassification in the workplace.

*Amici* have a strong interest in this case because we regularly advocate for legislative and policy ends that are directed at particular sectors of the economy and routinely focused on a small set of bad actors. The Panel's decision threatens the

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than *Amici* or *Amici*'s counsel made a monetary contribution to the preparation or submission of this brief. A list of all *Amici* is available at Appendix A.

ability of state and local governments to enact incremental legislation, target efforts at particular bad actors, and focus their attention and resources without fear that they will be accused of irrational animus.

## SUMMARY OF ARGUMENT

The Panel's decision conflicts with well-established law and must be overturned. As California effectively explained in its opening brief, any conclusion that equal protection principles bar legislators from regulating app-based ride-hail and delivery companies plainly conflicts with controlling precedent. *Amici* write separately to emphasize two core points. *First*, rather than reflecting irrational, animus-driven line-drawing, AB 5 focused principally on regulating sectors where misclassification was growing, and workers were especially exploited. The Legislature responded directly to specific information and direct advocacy from workers who shared their experiences and concerns. *Second*, the Panel's acceptance of plaintiffs' assertions that they are the vulnerable and exploited group is absurd. App-based companies, including Uber, have successfully used their economic power to secure favorable regulations, avoid legal liability, and make it more difficult for workers to appeal to the political process or the courts. They are not the types of interest meant to be protected from irrational animus (even if it existed here).

Allowed to stand, the Panel decision contorts equal protection law to shield powerful corporations from needed oversight, silence elected officials from publicly

sharing their legislative aims, and punish workers for their successful political advocacy. *Amici* urge this Court to grant rehearing or rehearing *en banc* and affirm dismissal of plaintiffs' equal protection claims.

## ARGUMENT

### I. AB 5 DIRECTLY ADVANCES THE LEGISLATURE'S PURPOSE TO ADDRESS THE HARMFUL MISCLASSIFICATION OF LOW-WAGE WORKERS AND THE PANEL'S DECISION DIRECTLY CONFLICTS WITH PRIOR CASES

The Panel incorrectly concluded that plaintiffs had adequately alleged a violation of equal protection because the exemptions to AB 5 were "starkly inconsistent with the bill's stated purpose." Opn. 24. We join California's arguments that the Panel's analysis is a gross departure from the Court's well-established approach to rational basis review. Pet. 12–17. Plaintiffs' burden is to negate "any conceivable basis which might support" a legislative classification, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (citation omitted), a far greater burden than calling into question the legislature's sincerity, and not one met here.

Even if inconsistency was the proper litmus for irrationality, AB 5 as amended directly advances the legislature's stated goal to "ensure [that] workers who are currently being exploited as independent contractors instead of employees have the basic rights and protections they deserve." Opn. 24 (quoting AB 5 § 1(e)). In regulating app-based transportation, including app-based ride hail and delivery, the legislature addressed *the area* where (1) independent contracting is growing; and (2)

3

workers are particularly at risk of misclassification because of low incomes, marked power imbalances, and technology-driven management.

### A. App-Based Transportation Is The Only Area In Which Independent Contracting Is Growing

The legislature plausibly included app-based ride-hail and delivery companies under AB 5, because app-based transportation is *the* sector in which there has been rapid growth in independent contractor arrangements, even as overall rates of self-employment remain relatively constant.[2] *See Am. Soc'y of Journalists & Authors v. Bonta* (*ASJA*), 15 F.4th 954, 965 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2870 (2022) (concluding that both historical patterns of classification and potential prevalence of misclassification were legitimate bases for AB 5's line-drawing). California-specific research has shown that independent contracting nearly doubled in the transportation sector from 2014 to 2016 even as the overall use of independent contractor arrangements remained the same.[3] Another study of nationwide tax data found that app-based work "is the *only* type of contract-based freelance work becoming more

---

[2] Andrew Garin, et al., *New Gig Work or Changes in Reporting? Understanding Self-Employment Trends in Tax Data* 2 (Becker Friedman Inst. Working Paper No. 2022-67) (May 2022), https://perma.cc/B5KW-MPE7. While "[t]he State is not compelled to verify logical assumptions with statistical evidence," *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812 (1976), the statistical evidence lends support that sudden growth in app-based ride-hail and delivery caused a unique shift in worker classification practices.

[3] Annette Bernhardt et al., *Independent Contracting in California: An Analysis of Trends and Characteristics Using Tax Data* 4, UC Berkeley Lab. Ctr. (2022), https://perma.cc/83H8-WT2N.

prevalent over time" and that "nearly all" of this work is on ride-hail and delivery apps.[4] Thus, the legislature's regulation of app-based transportation companies plausibly reflected legislators' desire to ensure that AB 5 applied to the sector of the economy in which independent contracting arrangements were a disruptive new trend (rather than long-established practice), sparking distinct concerns over misclassification. It is beyond constitutional question that legislatures may address problems incrementally and focus their energies where a problem is most pressing. *See Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1085–86 (9th Cir. 2015).

## B. App-Based Transportation Workers Are At Particular Risk Of Exploitation Through Misclassification

By its very language, AB 5 sought to better protect workers who were not only at risk of misclassification, but for whom misclassification likely meant economic exploitation. For low-wage workers, misclassification is a barrier to achieving the basic rights and protections of employees, such as a minimum wage, overtime, access to paid leave, and a financial safety net during periods of injury, unemployment, or economic disruption. *See* AB 5 § 1(e). While independent

---

[4] Andrew Garin et al., *Is Gig Work Changing the Labor Market? Key Lessons from Tax Data*, 75 Nat'l Tax J. 791, 801, 803 (2022) (emphasis added). Non-transportation tasks, including dog walking and errand running, constitute less than 10% of app-based work and rarely result in significant freelance earnings. *Id.* at 803 & n.16.

contracting occurs "in all parts of the economy at all income levels,"[5] risk of exploitation is most acute for occupations in the lowest income levels, where workers are unable to negotiate or finance basic work benefits on their own.[6] The Panel observed that the legislature granted exemptions to "some professions in which workers have more negotiating power or autonomy than in low-wage jobs . . . [a]mong them[] lawyers, accountants, architects, dentists, insurance brokers and engineers," which shows the legislature's attention to those most likely to be harmed, not irrational line-drawing. Opn. 25.

Indeed, the legislature's actions plausibly accounted for industry-specific power dynamics which have made it particularly difficult for app-based transportation workers to improve their working conditions. *See ASJA*, 15 F.4th at 965 (finding "market strength and ability to set their own rates" was a rational basis for classification). App-based transportation is dominated by a small number of

---

[5] Annette Bernhardt & Sarah Thomason, *What Do We Know About Gig Work in California? An Analysis of Independent Contracting* 2, UC Berkeley Ctr. for Lab. Res. & Educ. (2017), https://perma.cc/6VLG-N3UL.

[6] One national worker survey revealed that 29% of app-based workers earned less than the applicable state minimum wage. Ben Zipperer et al., *National Survey of Gig Workers Paints a Picture of Poor Working Conditions, Low Pay* 5, Econ. Pol'y Inst. (2022), https://perma.cc/QXF8-NV3J. Another study found that Uber drivers took home an average of just $9.21 per hour after accounting for fees, expenses, employer-side taxes, and modest benefits. Lawrence Mishel, *Uber and the Labor Market: Uber Drivers' Compensation, Wages, and the Scale of Uber and the Gig Economy* 2, Econ. Pol'y Inst. (2018), https://perma.cc/4LD9-7JBP.

national companies.[7] *See, e.g.*, *DoorDash Inc. v. City & Cty. of San Francisco*, No. 21-cv-05502-EMC, 2022 WL 867254, at \*22 (N.D. Cal. Mar. 23, 2022) (finding power of app-based delivery platforms "to set prices in an oligopolistic market" was a rational basis for classification). Drivers for these companies agree to standardized form contracts and have no power to negotiate over the terms of their work.[8] These standard agreements typically include arbitration clauses and class action waivers that bar workers from asserting their rights as independent contractors or employees through individual or collective litigation.[9] Unlike exempt "referral agency" arrangements in which dog-walkers or errand-runners can shift relatively easily to direct-hire arrangements (especially for recurring work),[10] drivers lack easy exit

---

[7] *See* Fed. Trade Comm'n, *FTC Policy Statement on Enforcement Related to Gig Work*, https://perma.cc/EFZ4-SCNC (describing the risks of concentrated markets among app-based platforms). The market is completely dominated by two companies, with Uber controlling 74%. Catherine Thorbecke, *How Uber Left Lyft in the Dust*, CNN (Mar. 29, 2023), https://perma.cc/2SR3-CEGK.

[8] *See* Uber, *Platform Access Agreement* (last updated Jan. 1, 2022), https://perma.cc/K22K-68YU. Because they are classified as independent contractors, workers have no protected right to bargain collectively with the companies. In fact, any attempt to do so could be prosecuted under antitrust law. *See* Brief for the United States and the Federal Trade Commission as Amici Curiae In Support of Appellant and in Favor of Reversal, *Chamber of Com. v. City of Seattle*, 890 F.3d 769 (9th Cir. 2018) (No. 17-35640), 2017 WL 5166667.

[9] Uber, *Platform Access Agreement* § 13 (last updated Jan. 1, 2022), https://perma.cc/K22K-68YU; *see also Capriole v. Uber Tech. Inc.*, 7 F.4th 854, 863 (9th Cir. 2021) (holding that Uber drivers do not fall within the interstate commerce exemption from arbitration under the Federal Arbitration Act).

[10] Uber and other app-based transportation companies experience low levels of "disintermediation" while app-based referral agencies are far more likely to lose

options because of the legal regimes regulating for-hire transportation and the app-based companies' control of the market.[11]

As compared to workers in more traditional independent contracting arrangements, app-based transportation workers are also uniquely vulnerable to misclassification and other forms of exploitation because app-based ride-hail and delivery companies engage in new forms of non-transparent algorithmic control.[12] This includes the use of algorithms to determine the base fare and any additional incentives or bonuses that a driver will earn for a given job, a process that is wholly opaque and designed to push workers to do more work for less pay.[13] By contrast,

---

workers and customers who choose to directly transact. *See* Feng Zhu & Marco Iansiti, *Why Some Platforms Thrive and Others Don't*, Harvard Bus. Rev. (Jan.-Feb. 2019), https://perma.cc/VTR3-YM7D. This type of market information underscores how some of these workforces (but not all) behave more like true independent contractors.

[11] This includes both longstanding taxi regulations that limit entry to the market and new regulatory and market dynamics around app-based transportation that make entry by small firms virtually impossible. *See* UCLA Inst. for Res. on Lab. & Emp., *More than a Gig: A Survey of Ride-hailing Drivers in Los Angeles* 9–10 (2018), https://perma.cc/C294-K55P.

[12] Alex Rosenblat, *When Your Boss is an Algorithm*, N.Y. Times Opinion (Oct. 12, 2018), https://perma.cc/A8DF-M63L.

[13] *See id.*; Veena Dubal, *On Algorithmic Wage Discrimination*, Colum. L. Rev. (forthcoming 2023) (manuscript at 31–33), https://perma.cc/3VT6-SKBV.

workers in "referral agency" arrangements set their own rates and therefore do not experience these manipulative practices.[14]

\*\*\*

The legislature's enacting and amending AB 5 reflect an incremental approach to addressing the problem of worker misclassification starting with *the area* in which independent contracting is rapidly expanding among low-wage workers via opaque new technology. In the same breath, the legislature chose not to touch longstanding practices largely impacting higher earners. As a matter of logic and well-established precedent, such a decision is eminently reasonable. After all, the "Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940). Nor does "the equal protection clause . . . require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970) (citation omitted).

---

[14] Cal. Lab. Code § 2777(a)(10); Keith Cunningham-Parmeter, *Gig-Dependence: Finding the Real Independent Contractors of Platform Work*, 39 N. Ill. U.L. Rev. 379, 419 (2019).

## II.     STATEMENTS BY LEGISLATORS DESCRIBING THEIR INTENT TO REGULATE CERTAIN COMPANIES ARE NOT EVIDENCE OF "ANIMUS" AND THE PANEL'S DECISION CONFLICTS WITH THE WELL-ESTABLISHED MEANING OF THE TERM

The Panel's decision departs from controlling precedent on the animus analysis as well. Potential animus may be considered under rational basis review only if the legislature lacks *any legitimate purpose* for the challenged classification, which undoubtedly is not the case here. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018). Even if the Panel's consideration of animus were proper, plaintiffs are not protected: app-based transportation companies cannot constitute a "politically unpopular group." *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Reg.*, 919 F.2d 593, 599 (9th Cir. 1990). Not only did the Panel decision bypass this important threshold issue,[15] but the decision stretches the term "animus" beyond recognition. The Panel held animus to encompass a legislator's statement of her desire to pass regulation of a billion-dollar company in response to potential abuses raised by constituents. Even if such a statement could possibly constitute animus, a constitutionally dubious proposition, "the remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979).

---

[15] While the district court specifically determined that plaintiffs were not politically unpopular, the Panel made no such finding. *See Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 905572, at *9 (C.D. Cal. Feb. 10, 2020).

### A.    Plaintiffs Are Not Politically Unpopular

Plaintiffs do not resemble the types of groups the Supreme Court or the Ninth Circuit have found to be politically unpopular, and have demonstrated actual political strength across the country, including in California. Examples of such groups include people with developmental disabilities, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985), LGBTQ people, *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *see also Romer v. Evans*, 517 U.S. 620, 630 (1996), and hippies, *Department of Agriculture v. Moreno,* 413 U.S. 528, 534–35 (1973). In these instances, the maligned group exhibited "historic patterns of disadvantage," *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) (internal citation omitted), and the challenged legislation "single[d] out a vulnerable group whose disadvantage was not of their own making." *United States v. Wilde*, 74 F. Supp. 3d 1092, 1097 n.4 (N.D. Cal. 2014).

Moreover, this court has routinely declined to find that businesses subject to government regulation constitute politically unpopular groups. *See RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1155–56 (9th Cir. 2004) (marina employers); *Mountain Water Co.*, 919 F.2d at 599 (private utility companies); *see also S.F. Taxi Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020) (senior taxi medallion holders); *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018) (ready-mix concrete suppliers); *Int'l Franchise Ass'n v. City of*

*Seattle*, 803 F.3d 389, 407 (9th Cir. 2015) (franchisees).[16] A company is not politically unpopular for equal protection purposes merely because it is subject to public critique, particularly where such criticisms stem from that company's own choices about how to structure its operations and its relationship to its workforce. *See, e.g.*, *Desoto CAB Co. v. Picker*, 228 F. Supp. 3d 950, 958 n.6 (N.D. Cal. 2017), *aff'd*, 714 F. App'x 783 (9th Cir. 2018).

The Panel's conclusion that Uber could plausibly claim animus is particularly aberrant given the company's tremendous success in securing favorable regulation through unprecedented political spending, lobbying tactics, and direct appeals to voters, enforcers, and state legislatures.[17] Uber has secured passage of bills in 44 states shielding them from local ride-hail and other regulations,[18] and the end result of the company's political efforts is that app-based transportation companies are

---

[16] The decision in *Merrifield v. Lockyer*, 547 F.3d 978, 991–92 (9th Cir. 2008), which focused on the "irrational singling out" of certain pest controllers, did not specifically address the question of animus. In subsequent cases, this court has repeatedly held that *Merrifield* should be limited to its facts, or at least to cases in which no legitimate basis exists for the adoption of challenged legislation. *See ASJA*, 15 F.4th at 965; *S.F. Taxi Coal.*, 979 F.3d at 1225; *Allied Concrete & Supply Co.*, 904 F.3d at 1065.

[17] *See* Rebecca Smith et al., *Uber State Interference: How TNC's Buy, Bully, and Bamboozle Their Way to Deregulation*, Nat'l Emp. L. Project (2018), https://perma.cc/67NZ-BESY; Rick Claypool, *Disrupting Democracy: How Uber Deploys Corporate Power to Overwhelm and Undermine Local Government*, Public Citizen (2016), https://perma.cc/QBQ9-MWJ5.

[18] Jennifer Sherer & Margaret Poydock, *Flexible Work Without Exploitation* 6, Econ. Pol'y Inst. (2023), https://perma.cc/DUJ2-A529.

treated *more* favorably than similarly situated non-app-based companies.[19] *See DeSoto CAB Co.*, 228 F. Supp. 3d at 959 (unsuccessful claim of animus by taxi companies).

The driving concern beneath the court's scrutiny of government actions impacting politically unpopular groups is that such groups are powerless to challenge what they view as unfair or ill-conceived regulation through resort to the political process. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process." *Vance v. Bradley*, 440 U.S. 93, 97 (1979); *see also Williamson v. Lee Optical Co.,* 348 U.S. 483, 488 (1955) ("For protection against abuses by legislatures the people must resort to the polls, not to the courts."). That concern is absent here.

Uber's political success specifically on the issue of worker classification in California is enough to dispel the notion of political powerlessness. In November 2020, Uber, Postmates, and other app-based companies secured the passage of Proposition 22 after spending a record-setting $204 million (or roughly $20 per vote) to inundate voters with messaging in support of the initiative.[20] *See DoorDash*, 2022

---

[19] See UCLA Inst. for Res. on Lab. & Emp., *More than a Gig: A Survey of Ride-hailing Drivers in Los Angeles* 9 (2018), https://perma.cc/C294-K55P (finding that taxis and app-based ride hail "operate under a two-tiered system of regulations [that] . . . sharply disadvantages taxi drivers and taxi companies, who abide by long-legislated regulations that are much stricter").

[20] Ryan Menezes et al., *Billions Have Been Spent on California's Ballot Measure Battles. But this Year Is Unlike Any Other*, L.A. Times, (Nov. 13, 2020),

WL 867254, at *22 (finding that the successful passage of Prop. 22 was evidence that app-based delivery platforms are not a politically unpopular group). Uber's appeals included repeated in-app messages to both riders and drivers urging them to vote "Yes."[21] Not only did Uber's campaign tactics infringe on drivers' political rights,[22] but plaintiffs' legislative efforts have made it all the more difficult for drivers to use the political process to rein in abuses in the app-based economy, whether through Prop. 22's uniquely onerous amendment process or through aggressive preemption of local lawmaking. *See Castellanos v. California*, 305 Cal. Rptr. 3d 717, 753 (Cal. Ct. App. 2023) (finding that Prop. 22's amendment provision unconstitutionally infringed on the powers of the legislature and the judiciary).

### B. Statements In The Record Are Not Animus

Nothing cited by the Panel remotely rises to the level of "animus" as it has been understood by the Ninth Circuit and the Supreme Court—namely, as "irrational prejudice," *S.F. Taxi Coalition*, 979 F.3d at 1224 (citing *City of Cleburne*, 473 U.S. at 432), or "corruption, pure spite, or naked favoritism." *ASJA*, 15 F.4th at 966.

---

https://perma.cc/NBY7-4XSP. Uber contributed over $58 million to the campaign while Postmates contributed over $13 million. *Id.*

[21] Suhauna Hussain, *Uber, Lyft Push Prop. 22 Message Where You Can't Escape It: Your Phone*, L.A. Times (Oct. 8, 2020), https://perma.cc/28CM-ZLW4.

[22] Complaint, *Valdez v. Uber Tech.*, CGC-20-587266 (Cal. Super. Ct. Oct. 22, 2020) (alleging that Uber's in-app political messages targeting drivers violated California law).

The Panel's legal discussion includes just a single statement from a single legislator, then-Assembly Member Lorena Gonzalez, that she was open to amending AB 5 but "not for app-based ride-hailing and delivery giants," a statement that is not even a direct quote.[23] Opn. 26. A factual statement of a legislator's intent to not exempt a prominent marketplace actor is not animus. It is not irrational prejudice. It reflects transparency, principles, and conviction—not to mention good policy. The remainder of the factual allegations reviewed by the Panel comprise various statements by three lawmakers that Uber was violating state labor laws by misclassifying its workers.[24] *See* Opn. 9–10. Perhaps that was debatable as a matter of politics, policy, or law, but it certainly does not reflect "animus" against Uber. Moreover, it is hard to conceive of how legislators talk about matters of policy without, at least at times, discussing particular applications, especially where they are at the center of public discourse. If the mention of a particular company or practice in a floor debate or in public statements about a bill can constitute animus,

---

[23] The statement attributable to the-Assembly Member Gonzalez is paraphrasing by an *L.A. Times* reporter. *See* Margo Roosevelt, *New Labor Laws Are Coming to California. What's Changing in Your Workplace?* L.A. Times (Dec. 29, 2019), https://perma.cc/QF7H-CQJF.

[24] This is a charge that workers themselves have repeatedly made, including through litigation and appeals to the legislature. *See* Veena Dubal, *Economic Security & the Regulation of Gig Work in California: From AB 5 to Proposition 22*, 13 Eur. Lab. L.J. 51, 61–63 (2022).

then the Panel has opened litigation floodgates and imperiled the possibility of robust legislative discussions across a host of issues.

Indeed, prior to the Panel's decision, this court has never found that legislators exhibit impermissible animus by regulating companies or industries or by publicly stating their legislative positions and priorities. The legislature's refusal to bend to lobbying by Uber while creating exemptions for other industries is entirely within their legislative purview. As this court recently held, "[a]ccommodating one interest group is not equivalent to intentionally harming another," and responsiveness to some lobbying and not others is not evidence of animus. *Gallinger v. Becerra*, 898 F.3d 1012, 1021 (9th Cir. 2018); *see also Daniel v. Family Sec. Life Ins. Co.*, 336 U.S. 220, 224 (1949) ("[A] court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system."). Uber may have "lost a political battle in which [it] had a strong interest, but this is neither the first nor the last time that such a result will occur in the legislative forum." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

## CONCLUSION

For all of the foregoing reasons and for the reasons provided by California in its petition, the request for rehearing should be granted, the decision by the Panel reversed, and the order of the district court affirmed.

16

Respectfully submitted,

Jonathan B. Miller
Abigail Lawlor
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
jon@publicrightsproject.org

Veena Dubal
200 McAllister Street
San Francisco, CA 94102

*Counsel for Amici Curiae*

Dated: May 8, 2023

## **APPENDIX A—LIST OF *AMICI CURIAE***

Public Rights Project

California Employment Lawyers Association

National Black Worker Center

National Employment Law Project

People's Parity Project

Rideshare Drivers United

Worksafe

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-55757

I am the attorney or self-represented party.

**This brief contains** | 3,972 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [               ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Jonathan B. Miller | **Date** | 05/08/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*