No. 21-55757

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LYDIA OLSON, et al.,

*Plaintiffs-Appellants*,

v.

STATE OF CALIFORNIA, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:19-cv-10956-DMG-RAO | Hon. Dolly M. Gee

## PLAINTIFFS-APPELLANTS' SUPPLEMENTAL EN BANC BRIEF

Joseph E. Barakat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3301

Theane D. Evangelis
Blaine H. Evanson
Alexander N. Harris
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520
tevangelis@gibsondunn.com

*Attorneys for Plaintiffs-Appellants Lydia Olson, Miguel Perez,
Postmates Inc., and Uber Technologies, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................ 4

I.    The California Legislature Enacts Assembly Bill 5 to Target
      Network Companies ............................................................. 4

II.   Plaintiffs Move for a Preliminary Injunction .................................. 9

III.  The Legislature Amends Assembly Bill 5 to Preclude
      Network Companies from Escaping the ABC Test ........................ 11

IV.   The District Court Dismisses the Case ......................................... 13

V.    This Court Reverses and Then Grants En Banc Review ............. 14

ARGUMENT ............................................................................... 15

I.    The Complaint Plausibly Pleads That AB5's Classifications
      Do Not Rationally Advance Any Legitimate Governmental
      Purpose ............................................................................... 16

      A.    The Complaint's Allegations, Taken as True, Show
            That No Conceivable Legitimate Purpose Justifies
            Plaintiffs' Exclusion from the Exemption Granted to
            Similarly Situated Referral Agencies ................................. 17

      B.    Rational-Basis Review Is Not a License to Disregard
            Factual Allegations on a Motion to Dismiss ......................... 27

II.   Affirming the Dismissal Would Create a Circuit Split ................. 33

CONCLUSION ............................................................................ 38

CERTIFICATE OF COMPLIANCE ........................................... 39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied Concrete & Supply Co. v. Baker*,
  904 F.3d 1053 (9th Cir. 2018) ............................................................... 29

*Am. Soc'y of Journalists & Authors, Inc. v. Bonta*,
  15 F.4th 954 (9th Cir. 2021) .................................................... 30, 31, 32

*Andrews v. City of Mentor*,
  11 F.4th 462 (6th Cir. 2021) ......................................................... 25, 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................. 27

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ........................................................ 1, 15, 19, 27, 36

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002) ......................................... 1, 35, 36, 37, 38

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
  920 F.2d 1496 (9th Cir. 1990) ............................................................... 24

*Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ........................................................ 1, 15, 17, 18, 27

*Dias v. City & County of Denver*,
  567 F.3d 1169 (10th Cir. 2009) ...................................................... 37, 38

*Dynamex Operations West, Inc. v. Superior Court*,
  4 Cal. 5th 903 (2018) .............................................................................. 4

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
  880 F.3d 450 (9th Cir. 2018) ................................................................. 17

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) .......................................................................... 20, 27

*Fowler Packing Co. v. Lanier*,
  844 F.3d 809 (9th Cir. 2016) ........................ 1, 15, 17, 20, 27, 28, 29, 34

*Hu v. City of New York*,
  927 F.3d 81 (2d Cir. 2019) ................................................................ 30

*Lacey v. Maricopa County*,
  693 F.3d 896 (9th Cir. 2012) ............................................................ 29

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008) ................................. 17, 21, 26, 27, 28, 29

*Merrifield v. Lockyer*,
  547 F.3d 978 (9th Cir. 2008) ................. 1, 15, 17, 19, 20, 22, 27, 34, 35

*Olson v. California*,
  62 F.4th 1206 (9th Cir. 2023) ................................................ 14, 27, 32

*People v. Uber Techs., Inc.*,
  56 Cal. App. 5th 266 (2020) .............................................................. 12

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
  48 Cal. 3d 341 (1989) .......................................................................... 4

*Sacramento Cty. Retired Emps. Ass'n v. County of Sacramento*,
  2012 WL 1082807 (E.D. Cal. Mar. 31, 2012) ..................................... 30

*St. Joseph Abbey v. Castille*,
  712 F.3d 215 (5th Cir. 2013) ................................................ 1, 35, 36, 38

*Vill. of Willowbrook v. Olech*,
  528 U.S. 562 (2000) ......................................................... 1, 15, 28, 29

*Wynn v. N.Y.C. Hous. Auth.*,
  2015 WL 4578684 (S.D.N.Y. July 29, 2015) ...................................... 30

**Statutes**

Assembly Bill 5, ch. 296, 2019 Cal. Stats. 2888 .................................... 4, 5

Cal. Bus. & Prof. Code § 7463 .................................................................. 9

Cal. Lab. Code § 2750.3 ....................................................................... 7, 12

Cal. Lab. Code § 2775 ................................................................................. 5

Cal. Lab. Code § 2777 ......................................................... 11, 22, 23, 24, 32

Cal. Lab. Code § 2779 ....................................................................... 11, 23, 32

Cal. Lab. Code § 2781 ............................................................................... 22

Cal. Lab. Code § 2785 ............................................................................... 12

Cal. Unemp. Ins. Code § 976 ...................................................................... 5

Cal. Unemp. Ins. Code § 977 ...................................................................... 5

Cal. Unemp. Ins. Code § 13020 .................................................................. 5

Cal. Unemp. Ins. Code § 13021 .................................................................. 5

## Rules

Fed. R. Civ. P. 1 ..................................................................................... 27

Fed. R. Civ. P. 12 ................................................................................... 27

## Other Authorities

Cal. Sen. Comm. on Lab., Public Emp., & Ret.,
Assembly Bill 5, 2019–20 Reg. Sess. (July 10, 2019) ...................... 5, 6

Assembly Bill 5, 2019–20 Reg. Sess. (as amended in Senate,
July 11, 2019) ................................................................................... 6

Lorena Gonzalez, *The Gig Economy Has Costs. We Can No
Longer Ignore Them*, Wash. Post (Sept. 11, 2019) ............................. 8

Oral Argument, *Olson v. California*, No. 21-55757 (9th Cir.
July 13, 2022) .................................................................................. 25

Xavier Becerra, Press Release (May 5, 2020) ........................................... 9

iv

## INTRODUCTION

The Equal Protection Clause prohibits arbitrary legislative classifications that undercut a law's very purposes and impose unequal treatment for no conceivable reason other than animus. The Supreme Court has held this repeatedly, even with respect to economic regulation. *See*, *e.g.*, *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). This Court has followed suit, consistently upholding equal-protection challenges to irrational economic legislation even under rational-basis review. *See*, *e.g.*, *Fowler Packing Co. v. Lanier*, 844 F.3d 809 (9th Cir. 2016); *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008). Those decisions are in line with the law in essentially every other circuit. *See*, *e.g.*, *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002).

The panel opinion is a straightforward application of these established legal principles to a California statute that *egregiously* targets gig-economy network companies (like Plaintiffs Uber and Postmates) and irrationally discriminates against those who use their platforms (like Plaintiffs Ms. Olson and Mr. Perez). In AB5 and follow-

1

on legislation, the California legislature purported to adopt a stringent test for determining whether a worker is an employee or independent contractor to protect workers from misclassification, but simultaneously exempted numerous industries covering millions of workers from that test. The legislation did not simply maintain the status quo with respect to the exempted industries and workers; it affirmatively rolled back the protections for those workers, all in an effort to single out network companies.

In 285 paragraphs spanning 89 pages, the complaint pleads concrete factual allegations showing that the legislature targeted Plaintiffs for disfavored treatment in AB5 as compared to similarly situated businesses and workers. The district court denied Plaintiffs' motion for a preliminary injunction, in part because it believed they would meet AB5's referral-agency exemption for "business[es] that connect[] clients with service providers." In response, the legislature enacted new urgency legislation, AB2257, which immediately and retroactively excluded "delivery, courier, [and] transportation" apps that otherwise satisfied the exemption—while making it even easier to access

for materially identical apps for pet-sitting, home services, and everything else.

The State has never offered a rational explanation for this arbitrary line-drawing—not in the trial court or in any of its briefing or arguments before this Court. And the panel correctly reversed the dismissal of Plaintiffs' complaint because this Court's well-settled precedent precludes the legislature from acting out of a bare desire to harm a politically disfavored group. The State asks the Court to reconsider that precedent, and has said it will now—for the first time, at the en banc stage—offer a rational basis for the line-drawing in the statute. *See* Dkt. 72 at 2–3. But any forthcoming justification cannot insulate the State from having that claim tested in discovery. The allegations in Plaintiffs' detailed complaint must be taken as true at this stage, and allowing a late-breaking justification for the law to defeat Plaintiffs' well-pleaded complaint would ignore the Supreme Court's binding decisions and create a split with other circuits.

There is no basis for dismissing Plaintiffs' complaint—at the outset of the case, before Plaintiffs have even had the opportunity to establish their claims in discovery. Of course, Plaintiffs will have to prove the

allegations in the complaint in order to ultimately *prevail*. But the complaint, when the factual allegations are accepted as true, *states a claim for relief*. The en banc Court should reverse the dismissal of Plaintiffs' equal-protection claim.

## BACKGROUND

### I. The California Legislature Enacts Assembly Bill 5 to Target Network Companies

California long followed the traditional common-law rule for classifying workers as independent contractors. Under that test, courts evaluated worker classification under the totality of the circumstances with no one factor given dispositive weight. *See S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989). In *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018), however, the California Supreme Court adopted a different standard, the "ABC test," for purposes of the California Industrial Welfare Commission's wage orders. The ABC test presumes a worker is an employee and requires the hiring entity to rebut this presumption by establishing each of three disjunctive elements. *Id.* at 916–17.

In 2019, the California legislature enacted Assembly Bill 5, purportedly to codify and extend *Dynamex*. Ch. 296, § 1(d), 2019 Cal.

4

Stats. 2888, 2890. AB5's lead author and most vocal sponsor, Assemblymember Lorena Gonzalez, argued that *Borello* "was weighted heavily against … trying to prove misclassification." 2-ER-124 (SAC ¶ 220). A Senate committee report claimed that workers subject to *Borello* "remain in the messy muddle of a failed employment test that met the needs of neither employers nor workers." Cal. Sen. Comm. on Lab., Public Emp., & Ret., Assembly Bill 5, 2019–20 Reg. Sess., at 8 (July 10, 2019) ("Sen. Rep."), https://tinyurl.com/jzw3f3xw. These sentiments were ultimately reflected in AB5's statement of purpose, which asserted that "potentially several million workers" have been denied "basic workplace rights" under *Borello*. AB5 § 1(e), 2019 Cal. Stats. at 2890.

To that end, AB5 extended the ABC test from wage-order claims under *Dynamex* to the entirety of the California Labor Code *and* the California Unemployment Insurance Code. Cal. Lab. Code § 2775(b)(1). The effects were dramatic. Overnight, thousands of independent contractors were transformed into presumptive employees *for all purposes* of California law. *See*, *e.g.*, Cal. Unemp. Ins. Code §§ 976, 977, 13020, 13021. At the same time, however, AB5 exempted a whole host of occupations from the ABC test.

For the exempted industries and workers, AB5 did not simply preserve the status quo. It affirmatively *rolled back* existing law (*Dynamex*) and reinstated the very *Borello* test decried by AB5's sponsors. AB5 effectively stripped thousands of workers of the employee benefits they had presumptively received under *Dynamex*.

AB5's myriad exemptions traced their origins to a July 8, 2019 report from the Senate Committee on Labor, Public Employment, and Retirement. The report articulated four factors for determining whether an industry should be exempted: (1) market strength, (2) rate setting, (3) relationship between contractor and client, and (4) technological neutrality. Sen. Rep. at 8–12. Consistent with that approach, early drafts of AB5 exempted professional occupations, such as lawyers, physicians, surgeons, dentists, and accountants. *See* Assembly Bill 5, 2019–20 Reg. Sess. (as amended in Senate, July 11, 2019).

But as the bill progressed through the legislature, legislators tacked on *dozens* of additional exemptions that in no way related to these factors—or any others. The lobbying became so overt that, at the urging of Assemblymember Gonzalez, the California Labor Federation circulated a one-page form that business groups could complete to

request an exemption. 2-ER-77 (SAC ¶ 83). As one journalist explained, "How do you qualify for an exemption? Answer: pressure and persistence. Better also hire a lobbyist. And, of course, it helps to be a political supporter." 2-ER-115 (SAC ¶ 189 n.98). The final version of the statute exempted millions of workers, spanning all sorts of vocations, skill levels, income, education, and sophistication, and bearing no relation to the Senate Committee's standards or any other objective indication of rationality. *See* Cal. Lab. Code § 2750.3 (repealed); Dkt. 14 at 8 n.2.

Although network companies offered multiple proposals to address the legislature's stated concern of ensuring wages, benefits, and protections for independent service providers, the legislature rejected them out of hand. 2-ER-117–18 (SAC ¶¶ 194–95). Assemblymember Gonzalez tweeted after AB5's enactment that she had "fought so hard for #AB5 with no gig carve-outs." 2-ER-82 (SAC ¶ 89). And she stated on the Assembly floor that she would consider future exemptions only if there was no way that "*Uber* will [be able to] just say" that it might fall within them. 2-ER-83 (SAC ¶ 92); *see also* 2-ER-80 (SAC ¶ 85) (AB5's sponsor "open to changes in the bill next year, including an exemption for

musicians—but not for app-based ride-hailing and delivery giants" like Plaintiffs).

The reasons for the double standard were no secret. In Assemblymember Gonzalez's own words, AB5 was designed to force "'gig' companies such as Uber, Lyft, DoorDash, Handy, and others" to abandon "a contract workforce," while its litany of "exceptions … w[ould] ensure that independent contractors" in other similarly situated industries could proceed unscathed. Lorena Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them*, Wash. Post (Sept. 11, 2019), https://tinyurl.com/whrx6j4f; *see also* 2-ER-78. Indeed, during the debates and passage of AB5, the statute's sponsors stated that Uber's Chief Legal Counsel was "full of sh*t" (2-ER-79 (SAC ¶ 85) (Assemblymember Gonzalez)) and claimed that "the gig economy [wa]s … a continuation of hundreds of years of corporations trying to screw over workers," calling the gig economy "f—g feudalism all over again" (2-ER-50, 2-ER-80 (SAC ¶¶ 13, 86) (Assembly Speaker Rendon)).

Following AB5's enactment, Assemblymember Gonzalez publicly "ask[ed] the 4 big City Attorneys offices to file for injunctive relief on 1/1/20" against network companies. 2-ER-62 (SAC ¶ 56). Defendant

Attorney General Xavier Becerra (now succeeded by Rob Bonta)—joined by the city attorneys of San Francisco, Los Angeles, and San Diego—heeded the call and "sue[d] Uber and Lyft for misclassifying their drivers as independent contractors," "[p]ursuant to authority codified by Assembly Bill 5." Xavier Becerra, Press Release (May 5, 2020), https://tinyurl.com/5x29catj.

## II. Plaintiffs Move for a Preliminary Injunction

Plaintiffs Uber and Postmates are network companies that have developed smartphone applications to connect independent providers of transportation and delivery services with those in need of them, and Plaintiffs Lydia Olson and Miguel Perez are drivers who use these apps to run their own independent businesses. 2-ER-53, 2-ER-107, 2-ER-109 (SAC ¶¶ 21–22, 155, 165); *see also* Cal. Bus. & Prof. Code § 7463(l). Plaintiffs sued to enjoin AB5 because it singled out Plaintiffs for disfavored treatment, while simultaneously exempting similarly situated groups in violation of the Equal Protection Clause. 2-ER-45 (SAC ¶ 2).

The district court denied Plaintiffs' motion for a preliminary injunction, finding that no "serious questions exist[ed] as to Plaintiffs' likelihood of success on the merits." 1-ER-29–34. While recognizing that

"AB 5 targeted Company Plaintiffs and other gig economy companies" (1-ER-28), the court held that the "State's asserted interest in protecting exploited workers" provided a blank check to engage in such apparent "targeting" (1-ER-24). And because "'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind'" (1-ER-28), the court saw nothing amiss with the legislature's adamant "refusal to consider an exemption for gig economy companies" (1-ER-27)—while liberally doling them out for politically favored groups.

The district court determined that Plaintiffs established "some measure of irreparable harm stemming from threatened municipal enforcement actions." 1-ER-36. But the court reasoned that any irreparable injury was merely "speculative" (1-ER-35) because "[f]ood delivery for Uber Eats and Postmates would likely fall under" AB5's referral-agency exemption (2-ER-197 (Prelim. Inj. Hr'g Tr. at 9:5–7)). As a result, the court reasoned, "the ABC test would not affect … drivers' employment statuses." 1-ER-35.

## III. The Legislature Amends Assembly Bill 5 to Preclude Network Companies from Escaping the ABC Test

The legislature soon realized that—even with AB5's laundry list of exemptions—it may have mistakenly "caught up" other industries in its attempt to force Plaintiffs to reclassify.  2-ER-91 (SAC ¶ 110).  So it quickly sought to "fix" AB5 to "provide relief" to those industries while tightening the screws on "companies like Uber and Lyft."  2-ER-91 (SAC ¶ 110).  The result was AB2257, which added dozens of additional exemptions rolling back the ABC test for millions more California workers and which removed any doubt that the legislature was targeting network companies.  *See* Dkt. 14 at 13 n.3.

In particular, AB2257 dramatically expanded the referral-agency exemption to include *any and all* referral agencies and service providers that meet certain requirements but then *excluded* "delivery, courier, [or] transportation" services.  Cal. Lab. Code § 2777(b)(2)(B) ("Under this paragraph, referrals for services shall include, *but are not limited to* …." (emphasis added)); §§ 2777(b)(2)(C), 2779(c) (referrals for services "do not include" "delivery, courier, [or] transportation" services, even if those occupations meet the same requirements).

11

The legislature adopted this language through "urgency" legislation with retroactive effect specifically to exclude network companies like Uber and Postmates. Cal. Lab. Code § 2785(c); 2-ER-92 (SAC ¶ 113). This amendment came soon after the district court had observed that Plaintiffs "would likely fall under" the referral-agency exemption for "people who run errands," and Uber had defended against the State's ongoing enforcement action on that basis. 2-ER-197 (Prelim. Inj. Hr'g Tr. at 9:5–7); *see* Cal. Lab. Code § 2750.3(g)(2)(C) (repealed) ("'Referral agency' is a business that connects clients with service providers that provide … errands.").

AB2257 ensured that Uber could no longer raise the exemption. Indeed, the California Court of Appeal affirmed an injunction against Uber because the "conspicuous absence of an express exemption for ride-sharing companies"—coupled with "statements by Assemblymember Gonzalez and others"—left "little doubt" that the Legislature had "'targeted'" network companies. *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 297 & n.18 (2020).

## IV. The District Court Dismisses the Case

After Plaintiffs amended their complaint to add AB2257 (2-ER-44–132), the district court dismissed the case with prejudice, reasoning that AB5 and AB2257 were "rationally related to [the state's] interest in protecting workers." 1-ER-4. The court acknowledged Plaintiffs' new allegations that the statutes exempted (for example) TaskRabbit and Wag!, two network companies with "nearly identical business models as the Company Plaintiffs." 1-ER-7. But the court disagreed with Plaintiffs' factual allegations that they "are so similarly situated to exempted workers that the Legislature's failure to exempt [them] is irrational or arbitrary." 1-ER-4.

The court also acknowledged "Assemblymember Gonzalez's undeniable disdain for Uber and her specific desire that AB5 cover Uber in particular," as well as her statements that an exemption she sponsored "was 'shameful' and would cause 'continue[d] … miclassif[ication]'" but was a "condition of AB5's passage." 1-ER-5; 1-ER-9. Still, the court held that Plaintiffs "did not sufficiently allege that AB5 was motivated purely by irrational animus or favoritism to lobbying groups." 1-ER-4.

13

**V. This Court Reverses and Then Grants En Banc Review**

This Court consolidated Plaintiffs' separate appeals of the district court's order denying the preliminary injunction and dismissing the case. Dkt. 10. In a well-reasoned unanimous opinion, the three-judge panel reversed the dismissal of Plaintiffs' equal-protection claim, finding that they had plausibly alleged a violation even under the "'fairly forgiving standard'" of rational-basis review. *Olson v. California*, 62 F.4th 1206, 1219, *vacated*, 88 F.4th 781 (9th Cir. 2023). AB5's numerous exemptions not only were "starkly inconsistent with the bill's stated purpose of affording workers the 'basic rights and protections they deserve,'" but also discriminated between "nearly identical" companies in the gig economy. *Id.* Because the State "was unable to articulate a conceivable rationale for A.B. 5 that explains the exemptions," the panel concluded that Plaintiffs' deliberate "exclusion" from the exemptions was plausibly "attributed to animus rather than reason." *Id.* at 1219–20 & n.11. The panel thus remanded for the district court to reconsider the preliminary injunction. *Id.* at 1210.

14

This Court subsequently ordered en banc review and supplemental briefing limited to the question whether Plaintiffs plausibly alleged an equal-protection violation. Dkts. 67, 78.

## ARGUMENT

The central command of the Equal Protection Clause is that "all persons similarly situated should be treated alike." *Cleburne*, 473 U.S. at 439. Even when a protected characteristic is not at stake, the Constitution "secure[s] every person … against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution." *Olech*, 528 U.S. at 564. The Supreme Court and this Court have thus consistently invalidated statutes that draw irrational distinctions between similarly situated individuals for no reason other than animus or political favoritism. *See*, *e.g.*, *Moreno*, 413 U.S. at 534; *Fowler Packing*, 844 F.3d at 816; *Merrifield*, 547 F.3d at 991.

The panel's careful opinion correctly applied that long line of precedent. As the panel recognized, the complaint alleges in painstaking detail that AB5 was the product of the legislature's single-minded focus on punishing Uber (and companies like it), while bestowing indulgences on materially identical businesses who met with the legislature's political

15

favor. There was no legitimate reason—and the State has never suggested one—for granting dog-walking and home-repair apps an exemption, while forbidding delivery and transportation apps from even attempting to qualify on the same terms.

At this initial stage of the case, there is no basis for dismissing Plaintiffs' well-pleaded complaint full of detailed factual allegations. To deny Plaintiffs their day in court would require not only overturning the settled law of this Circuit, but also breaking with the Supreme Court and other federal courts of appeals. This Court should reach the same result as the panel decision and reverse the district court's judgment.

## I.    The Complaint Plausibly Pleads That AB5's Classifications Do Not Rationally Advance Any Legitimate Governmental Purpose

Longstanding precedent establishes that courts should invalidate laws in those rare cases where, as here, the government's hostility to one group or favoritism to another provides the only arguable explanation for arbitrary distinctions. And at the motion-to-dismiss stage, courts should take as true a complaint's factual allegations of such irrational discrimination as compared to similarly situated parties—even on

16

rational-basis review. *See*, *e.g.*, *Fowler Packing*, 844 F.3d at 816; *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590 (9th Cir. 2008).

Here, Plaintiffs plausibly pleaded that AB5 is riddled with arbitrary distinctions between similarly situated workers and that Plaintiffs' exclusion from the wide-ranging set of exemptions does not rationally relate to a legitimate governmental purpose. In reversing the dismissal of their equal-protection challenge, the panel properly rejected the State's attempt to turn rational-basis review into a get-out-of-court card. This Court should do likewise and reverse the judgment below.

## A. The Complaint's Allegations, Taken as True, Show That No Conceivable Legitimate Purpose Justifies Plaintiffs' Exclusion from the Exemption Granted to Similarly Situated Referral Agencies

Any legislative classification, whether or not premised on a protected characteristic, must be at least "rationally related to a legitimate governmental interest." *Moreno*, 413 U.S. at 533. Under that "two-tiered inquiry," courts ask first "whether the challenged law has a legitimate purpose" and then "whether the challenged law promotes that purpose." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018). This same test applies where, as here, "economic rights are at stake." *Merrifield*, 547 F.3d at 992.

17

Notwithstanding the deference accorded to legislative line-drawing, the Supreme Court and this Court have not hesitated to invalidate statutes that irrationally discriminate between similarly situated individuals based on animus or political favoritism.

In *Moreno*, for example, the Supreme Court enjoined enforcement of a statute conditioning receipt of food stamps based on whether the household contained an individual unrelated to the other members of the household. 413 U.S. at 533–34. The Court concluded that the classification was not rationally related to any of the government's proffered justifications, and the only objective that could explain the classification—a desire "to prevent so-called 'hippies' … from participating in the food stamp program"—could not withstand constitutional challenge. *Id.* at 534–36. As the Court explained, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534.

The Supreme Court reiterated that basic principle in *Cleburne*. There, too, the Court found that all of the city's proffered explanations

18

"fail[ed] rationally to justify singling out" a group home, while "imposing no such restrictions" on other multiple-dwelling facilities. *Cleburne*, 473 U.S. at 450. And once again, the Court invalidated the zoning ordinance because it could be explained only by "negative attitudes" or "'[p]rivate biases'" against the mentally disabled. *Id.* at 448; *see also* Amicus Brief of Pacific Legal Foundation at 4–13, *Olson v. California*, No. 20-55267 (9th Cir. May 14, 2020) (collecting Supreme Court cases finding rational-basis violations).

Circuit precedent is no different. Time and again, this Court has likewise sustained equal-protection challenges to economic regulations lacking any conceivable justification.

In *Merrifield*, for example, this Court invalidated a California licensing requirement that irrationally discriminated between two subsets of the pest-control industry. 547 F.3d at 992. The Court acknowledged the "[g]eneral[]" assumption that creating exemptions is "a rational and quintessentially legislative decision," but explained that this assumption does not apply when "the government … undercut[s] its own rational basis for the licensing scheme by excluding" "similarly situated" parties from the exemption's scope. *Id.* at 990–92. Because the

19

law "was designed to favor economically certain constituents at the expense of others similarly situated," it failed rational-basis review. *Id.* at 991.

The story was much the same in *Fowler Packing*. That case involved another California law that, like AB5 and AB2257, targeted a handful of companies for disparate treatment under the employment laws. This Court recognized there, as the panel did here, that rational-basis review is "not a 'license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Fowler Packing*, 844 F.3d at 815 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993)). Even so, "legislatures may not draw lines for the purpose of arbitrarily excluding individuals." *Id.* Nor is a distinction legitimate if it is included for no reason "other than to respond to the demands of a political constituent." *Id.* The equal-protection claim accordingly withstood a motion to dismiss because the complaint plausibly alleged that "the only reason the carve-outs [excluding the plaintiffs] were included in the final bill was to procure the support of" a union for the bill's passage, and because the State could "suggest no justification in [its] briefing" or "during oral argument." *Id.* at 815–16.

20

In *Lazy Y Ranch*, too, this Court affirmed the denial of a motion to dismiss an equal-protection claim that Idaho had discriminated against conservationists in denying their applications for grazing leases. Idaho insisted that it had denied the conservationist's bid because of administrative costs, but this Court held that nothing in rational-basis review "requires [the court] to accept [the government's] explanation" for the challenged classification. 546 F.3d at 590. To the contrary, plaintiffs may "rebut the facts underlying defendants' asserted rationale for a classification" (*id.* at 590–91), and those factual allegations must be "[r]ead in the light most favorable to [the plaintiffs]" (*id.* at 591). Because the plaintiff plausibly alleged that "administrative costs ha[d] been raised only to deny leases to conservationists," this Court concluded that the complaint survived a pleadings challenge. *Id.*

The complaint here pleads more than sufficient allegations to survive dismissal under this line of cases. Across 89 pages and 285 paragraphs, the complaint details the many irrational distinctions that pockmark AB5 and the copious evidence that animus or political favoritism are the only purposes that can (and do) explain the exemptions. *See*, *e.g.*, 2-ER-70–72, 2-ER-74–75, 2-ER-88–89 (SAC ¶¶ 70–

21

73, 77, 103–04); *see also supra*, at 4–12.  As in *Merrifield*, AB5 "undercut its own rational basis" by *rolling back* protections for the industries and occupations that were exempted, contrary to its stated purposes.  547 F.3d at 992.  Exempted workers who previously were subject to the ABC test under *Dynamex* now enjoy the more flexible *Borello* test—the very test the bills' sponsors decried as insufficient.  For example, the exemptions cover "growth industries"—such as construction truckers and subcontractors (Cal. Labor Code § 2781) and workers in the hospitality industry (§ 2777(b)(2)(B))—that, according to the legislature, had "some of the highest misclassification rates" (2-ER-63–64 (SAC ¶¶ 59, 62)).

Animus and political favoritism distorted the exemption giveaway in irrational ways.  From the start, AB5's sponsor made clear that she was "open to changes"—including ones that would lead to the "'continue[d] … misclassif[ication]' of 'historically misclassified' workers, such as 'women of color'" (2-ER-76–77, 2-ER-80 (SAC ¶¶ 81, 85))—but that she would never consider an exemption for "app-based ride-hailing and delivering giants" (2-ER-80 (SAC ¶ 85)).  The California legislature proceeded to grant exemptions "solely to obtain the necessary political support to punish Plaintiffs," including a last-minute exemption for the

22

newspaper industry "as a condition of AB5's passage."  2-ER-49–50, 2-ER-76 (SAC ¶¶ 13, 81).  Meanwhile, Assemblymember Gonzalez boasted that she had "fought so hard for #AB5 with no gig carve-outs."  2-ER-82 (SAC ¶ 89).

The most blatant example of indefensible discrimination came in AB2257, which exempted any and all referral agencies that meet certain requirements but then carved out "delivery, courier, [or] transportation" services from the exemption—even if they meet the requirements.  Cal. Lab. Code §§ 2777(b)(2)(C), 2779(c).  The legislature added this carveout to slam the door shut on Plaintiffs after the district court below concluded that "Uber Eats and Postmates would likely fall under the" referral exemption for "errands" and after Uber had asserted the exemption as a defense to the State's enforcement action.  2-ER-197 (Prelim. Inj. Hr'g Tr. at 9:5–7); *see supra*, at 11–12.  The legislature's avowed purpose was to ensure there is no way "Uber will [be able to] just say" that it fits within an exemption.  2-ER-83–84 (SAC ¶ 92).

As a consequence of this irrational line-drawing, TaskRabbit and Wag! (often called "Uber for dogs") can claim an exemption from AB5's adoption of the *Dynamex* standard, while Uber and Postmates are

23

excluded, even though they use "nearly identical business models" to refer customers to service providers. 2-ER-48, 2-ER-74–75, 2-ER-89 (SAC ¶¶ 10, 77, 104). There was certainly no justification for refusing to allow "app-based ride-hailing and delivery giants" (2-ER-80 (SAC ¶ 85)) to even *try* to meet the exemption that applies to every other referral agency.

The referral-agency exemption's requirements—such as the worker setting her own hours, providing her own supplies, and being able to work for competitors (Cal. Lab. Code § 2777(a)(6), (8), (9))—either do or do not adequately determine whether referral-agency workers are independent. But there is no legitimate reason to use a different classification standard to answer the same question for certain referral-agency workers simply because they provide transportation or food delivery instead of dog-walking or minor home repair when the requirements are otherwise satisfied in exactly the same way. The legislature's unyielding goal of "singl[ing] out" Uber and Postmates, no matter how similarly situated they might be to other exempted companies, has no conceivable legitimate justification. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1509 (9th Cir. 1990).

Despite numerous opportunities, the State has never proffered a legitimate explanation for treating Uber and Postmates differently from Wag! and TaskRabbit. Not when opposing Plaintiffs' motion for a preliminary injunction. Not in any of its three motions to dismiss. Not in its answering briefs in the two appeals. Not at oral argument—despite being asked point blank, multiple times. Oral Argument at 19:35, 19:56, 20:26, 22:38, 24:42, 25:13, 26:00, 30:10, 30:27, 33:49, *Olson v. California*, No. 21-55757 (9th Cir. July 13, 2022), http://tinyurl.com/33ss45yk. And not even in its petition for rehearing, when the State denied any need to explain why a different classification test should apply to Uber (as compared to "Uber for dogs") because "rational-basis review does not permit that kind of flyspecking of legislative choices." Dkt. 49 at 15.

The State claimed, in its motion for leave to file a supplemental brief, that it wishes to *now*—at the en banc stage—articulate a rational basis for the classifications in the statute. Dkt. 72 at 2–3. But any such eleventh-hour justification is too little, too late. A government cannot "obtain judgment in its favor without so much as identifying a single rational explanation for its disparate treatment of similarly situated [people]." *Andrews v. City of Mentor*, 11 F.4th 462, 478 (6th Cir. 2021).

25

If the rule were otherwise, a plaintiff would have to "concoct and rebut a potentially valid rationale for the [government's] action in order to survive the pleadings stage where the [government] itself has failed to do so." *Id.*

This issue is beside the point because *no* conceivable legitimate justification, whether or not articulated to date, could justify Plaintiffs' arbitrary treatment under AB5. But at minimum, Plaintiffs should have the opportunity in discovery "to rebut the facts underlying" any new "asserted rationale for [the] classification." *Lazy Y Ranch*, 546 F.3d at 590–91. As a result, any proffered justification for the classifications in AB5 and AB2257 could not justify dismissal *on the pleadings*. Plaintiffs should be given the opportunity to test any of the State's new rationales in discovery.

In short, AB5 and AB2257 are the rare laws that fail the deferential rational-basis standard. The panel correctly recognized that the complaint's allegations, if proven, establish that the laws' drafting sequence and design—adopting the *Dynamex* classification standard generally, creating "wide-ranging exemptions" that roll back *Dynamex* for millions of workers, and then carving out Uber and Postmates from

26

the referral-agency exemption after they were poised to claim its benefits—can be explained only by "animus rather than reason." *Olson*, 62 F.4th at 1219. In doing so, the panel faithfully adhered to the long line of precedent establishing that, if a plaintiff's allegations plausibly knock down every conceivable legitimate explanation, animus is not a legitimate justification for treating similarly situated parties differently. *See*, *e.g.*, *Moreno*, 413 U.S. at 534; *Cleburne*, 473 U.S. at 448–50; *Merrifield*, 547 F.3d at 991; *Fowler Packing*, 844 F.3d at 816; *Lazy Y Ranch*, 546 F.3d at 590. This Court should reach the same sound conclusion as the panel and reverse the judgment below.

## B. Rational-Basis Review Is Not a License to Disregard Factual Allegations on a Motion to Dismiss

Invoking Plaintiffs' burden "'to negate every conceivable basis which might support'" AB5's exemptions, the district court proceeded to disregard the complaint's factual allegations and to draw factual inferences against Plaintiffs. 2-ER-139–42 (quoting *Beach Commc'ns*, 508 U.S. at 315). This analysis was inconsistent with the scope of a pleadings challenge under Federal Rule of Civil Procedure 12(b)(6), which applies in "'all civil actions.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting Fed. R. Civ. P. 1). Even on rational-basis review, courts

27

"'accept as true all factual allegations and determine whether they are sufficient to state a claim for relief'"—here, that there is no legitimate conceivable basis for the challenged legislative distinction. *Fowler Packing*, 844 F.3d at 814; *accord, e.g.*, *Lazy Y Ranch*, 546 F.3d at 588.

The Supreme Court has treated the question whether a plaintiff is similarly situated to other persons as a *factual* question, not a legal one, determined by the complaint's allegations on a motion to dismiss. In *Olech*, the plaintiff alleged that the Village of Willowbrook had conditioned connecting her property to the municipal water supply on granting it a 33-foot easement, while it required only a 15-foot easement from her neighbors. 528 U.S. at 565. The Supreme Court summarily reversed the Seventh Circuit's affirmance of a dismissal. As the Court noted, the "complaint c[ould] fairly be construed as alleging" differential treatment between the plaintiff and "other similarly situated property owners" that was "'irrational and wholly arbitrary.'" *Id.* "These allegations," in the view of eight Justices, were "sufficient to state a claim for relief under traditional equal protection analysis." *Id.*\*

---

 \* Justice Breyer concurred in the result, but on grounds that likewise support Plaintiffs. Although he expressed that he might generally

This Court has likewise repeatedly accepted factual allegations showing that a plaintiff is similarly situated to other persons at the motion-to-dismiss stage. *Fowler Packing* and *Lazy Y Ranch* are two examples of this Court's refusal to credit the State's pretextual explanations over a complaint's well-pleaded allegations rebutting the rationality of the classification. *See Fowler Packing*, 844 F.3d at 815–16; *Lazy Y Ranch*, 546 F.3d at 590–92. Another is *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012), where this Court explained, in a case involving an equal-protection claim of selective prosecution, that the plaintiff had alleged that other lawbreakers "were similarly situated if [the Court] accept[s] the facts in the complaint as true." *Id.* at 921. In contrast, this Court has noted that "the burden" on plaintiffs "to come forward with evidence that negates every conceivable basis for the law is much higher" at the summary-judgment stage than when "opposing a motion to dismiss." *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018).

---

insulate individual spot zoning decisions from rational-basis review, he voted to let the claims go forward because the plaintiff "had alleged an extra factor"—"animus" or "an illegitimate desire to 'get' him." *Olech*, 528 U.S. at 565–66 (Breyer, J., concurring).

Other courts have similarly recognized that the "fact-intensive nature" of the analysis "caution[s] against deciding whether two comparators are similarly situated on a motion to dismiss." *Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019); *accord*, *e.g.*, *Wynn v. N.Y.C. Hous. Auth.*, 2015 WL 4578684, at *5 (S.D.N.Y. July 29, 2015); *Sacramento Cty. Retired Emps. Ass'n v. County of Sacramento*, 2012 WL 1082807, at *5 (E.D. Cal. Mar. 31, 2012).

Here, too, whether rideshare and delivery services are similarly situated to other industries covered by exemptions is a factual question controlled by the well-pleaded allegations at this stage. The California legislature articulated a series of factors that were supposed to govern whether a particular profession or industry should be exempted from the ABC test: "the workers' historical treatment as employees or independent contractors, the centrality of their task to the hirer's business, their market strength and ability to set their own rates, and the relationship between them and their clients." *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 965 (9th Cir. 2021). The historical baseline of independent contracting in the gig economy, the referral technology's independence from the service being referred,

and drivers' ability to set their own rates by soliciting referrals from multiple platforms at once (called "multi-apping") are all *factual* questions—not legal conclusions. 2-ER-56, 2-ER-70, 2-ER-105–111 (SAC ¶¶ 39, 70, 146–48, 153–54, 159–63, 168–74).

The contrasts between this case and *American Society of Journalists* underscore the importance of attending to the complaint's factual allegations at the motion-to-dismiss stage. In *American Society of Journalists*, freelance writers and visual journalists filed a bare-bones complaint (*see* No. 2:19-cv-10645 (C.D. Cal. Dec. 17, 2019), Dkt. 1) alleging that AB5 irrationally limited their exemption "to freelancers who submitted fewer than thirty-five pieces of work to a single entity in a given year" and who did not record video, whereas "other professionals, such as marketers and artists," had access to "broader, or at least differently contoured, exemptions." 15 F.4th at 959. But while their equal-protection claim was on appeal, AB2257 repealed the 35-pieces limit on the exemption, further narrowing the claim to the treatment of visual journalists. *Id.* at 959–60.

This Court rejected this challenge to the freelance exemption, holding that AB5's "occupational distinctions between different

industries are rationally related to a legitimate state purpose." 15 F.4th at 957. Legislative classifications typically have a rational basis, this Court reasoned, and the journalists had not plausibly alleged that their treatment reflected only "'corruption, pure spite, or naked favoritism lacking any legitimate purpose.'" *Id.* at 966. After all, the Legislature had granted an exemption for journalists, who complained only that it should have been broader. *Id.* at 959–60.

This case is worlds away from *American Society of Journalists*. As the panel explained, the complaint plausibly alleges that the Legislature enacted AB5 with the "primary impetus" of targeting network companies such as Uber and Postmates and then rolled back AB5 for thousands of workers in a manner "starkly inconsistent" with the act's stated purposes, all to protect politically favored constituents. *Olson*, 62 F.4th at 1219. Then, after the district court observed that Uber and Postmates might have satisfied the exemption for referral agencies and after Uber raised this defense in the State's ongoing enforcement action (2-ER-197), the Legislature swiftly enacted AB2257 as "urgency legislation" to prevent "delivery, courier, [or] transportation" agencies from accessing that exemption (Cal. Lab. Code §§ 2777(b)(2)(C), 2779(c)).

32

The complaint alleges that Uber and Postmates have essentially the same business models, and meet the same criteria, as other referral apps. The only distinction is that the legislature harbors a dislike for Uber and similar companies, while it is happy to insulate others who curried favor with AB5's sponsors from the ABC test. *See supra*, at 5–8. Given these allegations, the district court should have allowed Plaintiffs the opportunity to prove that there is no rational justification for applying a more forgiving standard to Wag! than to Uber. Plaintiffs easily stated a claim under the pleading standard this Court has applied time and again in its other rational-basis cases.

## II. Affirming the Dismissal Would Create a Circuit Split

The State all but concedes that this Court's decisions, as they stand, support reversal of the district court's dismissal. In its request for supplemental briefing, the State avowed its intent to argue that this Court "should narrow or clarify" *Merrifield* and *Fowler Packing*. Dkt. 72 at 3. But there is no basis to distinguish those prior cases from the facts as alleged in this case.

To the contrary, Plaintiffs have identified even more fatal defects than were at issue in *Merrifield* and *Fowler Packing*. The California

33

legislature adopted circuitous means—extending a new standard broadly, exempting referral agencies, and then including a laser-focused exclusion from that exemption for network companies—to target Plaintiffs, while undercutting the stated purposes of the law across dozens of industries (not just one). *Compare supra*, at 21–25, *with Merrifield*, 547 F.3d at 992. The California legislature also granted *numerous* unjustifiable exemptions (not just one) to political favorites to secure passage of the law. *Compare* 2-ER-49–50, 2-ER-76 (SAC ¶¶ 13, 81), *with Fowler Packing*, 844 F.3d at 815. Particularly as amended, AB5 paints with a broader brush, using more unfounded assumptions in service of even more irrational ends, than the laws this Court has previously considered.

As a result, affirming the dismissal here would require the Court to explicitly or effectively overrule important circuit precedent. And doing so would create a conflict with other circuits that have allowed equal-protection challenges to proceed on allegations that economic regulations irrationally treat similarly situated groups differently.

In *St. Joseph Abbey*, for example, the Fifth Circuit unanimously struck down a law limiting sales of caskets to licensed funeral directors.

34

712 F.3d at 227. An abbey of monks who sold "simple wooden caskets" at prices "significantly lower than those offered by funeral homes" argued that the law was irrational, and the district court enjoined the law's application. *Id.* at 218. On appeal, the Fifth Circuit considered each proffered justification for treating non-funeral directors worse than funeral directors—consumer protection, public health, and safety—and found them all wanting. *See id.* at 223–27. The law's only conceivable motivation was "economic protection of a particular industry," which the court concluded—following *Merrifield*, 547 F.3d at 991 n.15—was not "a legitimate governmental purpose." *St. Joseph Abbey*, 712 F.3d at 222 & n.38. Because "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation," the Fifth Circuit held the law unconstitutional. *Id.* at 226.

Likewise, in *Craigmiles*, the Sixth Circuit unanimously affirmed an injunction against a law that precluded independent retailers from selling caskets while allowing similarly situated funeral directors to do the same. 312 F.3d at 229. The court considered various justifications

for the law—*e.g.*, that licensed funeral directors would be more likely to point families to higher-quality caskets—and found that none could explain why the State would limit who can sell caskets, rather than the quality of the caskets or the conduct of casket retailers. *Id.* at 225–27. Although legislation need not be perfectly tailored to be rational, "[t]he Supreme Court, employing rational basis review, has been suspicious of a legislature's circuitous path to legitimate ends when a direct path is available." *Id.* at 227 (citing *Cleburne*, 473 U.S. at 449–50).

Because there was "no rational relationship to any of the articulated purposes of the state," the Sixth Circuit was "left with the more obvious illegitimate purpose" of "protecting licensed funeral directors from competition." *Craigmiles*, 312 F.3d at 228. Courts cannot simply throw their hands in the air and declare that legislation may permissibly be over- or under-inclusive, where "[t]he history of the legislation … reveals a different story than one of mere oversight in drafting." *Id.* at 227. Given the law's background, "[n]o sophisticated economic analysis [wa]s required to see the pretextual nature of the state's proffered explanations for the" law. *Id.* at 229. The Sixth Circuit thus ruled that "[t]his measure to privilege certain businessmen over

others at the expense of consumers [wa]s not animated by a legitimate governmental purpose and [could] not survive even rational basis review." *Id.*

And in *Dias v. City & County of Denver*, 567 F.3d 1169 (10th Cir. 2009), the Tenth Circuit reversed dismissal of the plaintiffs' claim that Denver's ban on pit bulls failed the rational-basis test for purposes of their due process challenge. *Id.* at 1174. While recognizing that the plaintiffs might not be able to "marshal enough evidence to prevail on the merits of their claim that the Ordinance is irrational"—for instance, by failing to show that pit bulls are no more dangerous than other dog breeds—the court explained that predicting whether plaintiffs would prevail was "not [its] role at this juncture" (on a motion to dismiss). *Id.* at 1184.

The State's arguments fly in the face of these holdings. The State ignores that the legislature's rationale for applying the ABC test to Plaintiffs—protecting workers from themselves—is an obvious pretext, given that the legislation *rolled back* those protections for similarly situated workers who use apps such as Wag!, TaskRabbit, and Handy. *Craigmiles*, 312 F.3d at 229. The State discounts the legislature's

37

"circuitous path" of adopting exemptions that suggest arbitrary classifications in service of animus. *Id.* at 227. The State disregards the factual allegations that others courts would credit "at this juncture." *Dias*, 567 F.3d at 1184. And the State incants only the truism that legislation can tackle reform one step at a time, which has never alone been enough to short-circuit the equal-protection analysis. *E.g.*, *St. Joseph Abbey*, 712 F.3d at 226–27.

The Court should reject the State's invitation to create a circuit split on the application of rational-basis review to economic legislation.

## CONCLUSION

The Court should reverse the district court's dismissal of the complaint with respect to the equal-protection claim.

Dated: January 22, 2024        Respectfully submitted,

*/s/ Theane D. Evangelis*
Theane D. Evangelis
Blaine H. Evanson
Alexander N. Harris
Patrick J. Fuster
Joseph E. Barakat

*Attorneys for Plaintiffs-Appellants*
*Lydia Olson, Miguel Perez,*
*Postmates Inc., and Uber*
*Technologies, Inc.*

38

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. P. 32(a) and Ninth Circuit Rule 32-1(e), the attached response is proportionately spaced, has a typeface of 14 points, and complies with the word limitations established by the Court's January 11, 2024 order granting the State's motion for supplemental briefing (Dkt. 72) because it contains 7,166 words.

Dated: January 22, 2024

/s/ *Theane D. Evangelis*
Theane D. Evangelis

*Attorney for Plaintiffs-Appellants*
*Lydia Olson, Miguel Perez,*
*Postmates Inc., and Uber*
*Technologies, Inc.*